ANTHONY S. PETRU, Esq., CA State Bar No. 91399
petru@hmnlaw.com
GAVIN S. BARNEY Esq., CA State Bar No. 321880
barney@hmnlaw.com
HILDEBRAND, McLEOD & NELSON, LLP
Westlake Building
350 Frank H. Ogawa Plaza, Fourth Floor
Oakland, CA 94612-2006
petru@hmnlaw.com
TEL: (510) 451-6732
FAX: (510) 465-7023

NICHOLS KASTER, PLLP
JAMES H. KASTER, Esq., CA State Bar No. 248949
kaster@nka.com
LUCAS J. KASTER, Esq., CA State Bar No. 291102
lkaster@nka.com
80 South Eighth Street
4600 IDS Center
Minneapolis, Minnesota 55402-2242
TEL: (612) 256-3200
FAX: (612) 338-4878

Attorneys for Plaintiffs
JUSTIN DONAHUE; JASON CAMPBELL; and JACOB GOSS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

| | |
|---|---|
| JUSTIN DONAHUE; JASON CAMPBELL; and JACOB GOSS,<br><br>Plaintiff,<br><br>v.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>Defendant. | Case No.<br><br>COMPLAINT FOR DAMAGES<br><br>JURY TRIAL DEMANDED |

Plaintiffs Justin Donahue, Jason Campbell, and Jacob Goss (collectively, "Plaintiffs") file this Complaint against Defendant Union Pacific Railroad Co. ("Union Pacific" or "Defendant") for damages resulting from its violation of the Americans with Disabilities Act, 42 U.S.C § 12101 *et seq.*, as amended ("ADA").

## PRELIMINARY STATEMENT

1. Union Pacific enforces a company-wide fitness-for-duty program ("Fitness-for-Duty"), through which the company imposes a blanket policy automatically removing from service employees who disclose or who Union Pacific suspects have certain health conditions. Union Pacific then subjects employees whom it removes from service to a Fitness-for-Duty evaluation. Union Pacific applies this policy regardless of whether the employee has been safely performing the essential functions of their job. Union Pacific evaluations do not assess whether an employee is capable of safely or effectively performing their work.

2. Employees responsible for train movement must be certified by the Federal Railroad Administration ("FRA"). The FRA allows railroads to certify employees through one of twelve color-vision examinations, including the *Ishihara* test, which consists of a number of colored plates, each containing a circle of dots appearing randomized in color and size, that form a number or shape clearly visible to those without color-vision deficiency, and invisible, or difficult to see, to those who are color-blind or who have color-vision deficiency.[1] Because employees who have color-vision deficiency may nevertheless be able to distinguish between

---

[1] Color-vision deficiency is the inability to distinguish certain color shades under normal lighting condition: whereas, color blindness is the inability to see colors. Color-vision deficiency is relatively common, *e.g.*, one in twelve men suffer from red-green color vision deficiency. And unlike color blindness, color-vision deficiency does not prevent its sufferers from performing tasks that require them to distinguish between colors.

COMPLAINT
Page 2 of 18

colors, the FRA permits them to be certified through a color-vision field test ("CVFT"). Even employees who the employer deems have not met the employer's requirements to pass a CVFT may be certified and the employee allowed to work when there is reason to believe that they can perform their job's essential functions.

3. Because employees responsible for train movement must be certified, Union Pacific's Fitness-for-Duty program includes color-vision testing. In or around April of 2016, Union Pacific replaced its CVFT with a new test – the "Light Cannon" test. The old CVFT used existing train signal masts with actual wayside lights and lenses in the field or railyards; whereas the Light Cannon test uses a mobile light device that Union Pacific developed in-house. The Light Cannon test does not replicate what employees see in the field, and yet the majority of those who have been subjected to it fail, despite having successfully passed the old CVFT and performed their jobs without missing a signal for years or even decades.

4. In February 2016, several Union Pacific employees commenced a class action disability discrimination lawsuit against Union Pacific, alleging that Union Pacific's Fitness-for-Duty policies and practices constituted a pattern and practice of discrimination under the ADA. *See Quinton Harris et. al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.). The *Harris*-plaintiff's allegations "clearly encompass vision testing as it is included in the FFD program." *Harris,* 2019 U.S. Dist. LEXIS 16113, at *10-11 (D. Neb. Feb 1, 2019).

5. Plaintiffs are victims of the same discriminatory Fitness-for-Duty policies and practices alleged in *Harris*. Despite each being qualified and safely performing his job without incident, Plaintiffs were removed from service for a Fitness-for-Duty evaluation and excluded from work at Union Pacific on the basis of their real or perceived disabilities, which regards their

ability to see color. Plaintiffs were putative class members in *Harris*, and now timely bring this action.

## JURISDICTION AND VENUE

6. This action arises under the Federal Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* As such, this Court has jurisdiction under 28 U.S.C. § 1331.

7. Venue is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events that give rise to this lawsuit occurred in the Northern District of California.

8. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the alleged unlawful practices was committed by Union Pacific in the Northern District of California and because, but for the unlawful practices of Union Pacific, at least one of the Plaintiffs would have worked in the Northern District of California.

## THE PARTIES

9. Plaintiffs are individuals with disabilities, as that term is defined under the ADA, who, at all times material to this lawsuit, were employed by Union Pacific in the State of California.

10. Plaintiff Justin Donahue ("Donahue") resides in Milpitas, CA.

11. Plaintiff Jason Campbell ("Campbell") resides in Shasta Lake, CA.

12. Plaintiff Jacob Goss ("Goss") resides in Riverside, CA.

13. Union Pacific is a railroad carrier engaged in interstate commerce.

## PROCEDURAL PREREQUISITES AND TIMELY FILING

14. On February 19, 2016, counsel for Plaintiffs, on behalf of six named plaintiffs and those similarly situated, filed a First Amended Complaint against Union Pacific in the Western

District of Washington, alleging disability discrimination in violation of the ADA, along with state law. The case was thereafter transferred to the District of Nebraska. *See Quinton Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.).

15.  Plaintiffs were each putative class members in the *Harris* case and Plaintiffs' claims under the ADA were subject to tolling during the pendency of litigating the class-wide claims, pursuant to the Supreme Court's ruling in *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

16.  The *Harris* court certified the class action in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision on March 24, 2020.

17.  As a result of *Crown Cork* tolling, Plaintiffs had three hundred (300) days from the date of the Eighth Circuit's order to file a Charge of Discrimination with the Equal Employment Opportunity Commission, "EEOC." Shortly after the Eighth Circuit issued its order reversing class certification, the parties entered into a tolling agreement, extending the time for Plaintiffs and other putative class members to file EEOC charges by an additional sixty (60) days.

18.  Donahue timely filed a Charge of Discrimination with the EEOC on April 24, 2020. The EEOC issued a determination on November 17, 2020, requiring that Donahue file a complaint in court by February 15, 2021.

19.  Campbell timely filed a Charge of Discrimination with the EEOC on April 10, 2020. The EEOC issued a determination on November 18, 2020, requiring that Campbell file a complaint in court by February 16, 2021.

20.  Goss timely filed a Charge of Discrimination with the EEOC on December 10, 2020. The EEOC issued a determination on December 18, 2020, requiring that Goss file a

complaint in court by March 18, 2020.

21. Plaintiffs timely bring the present action.

## FACTUAL ALLEGATIONS

### *UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

22. Union Pacific's Medical Rules outline its Fitness-for-Duty program. The rules require that certain employees, including all employees in Operating Department field positions (such as Transportation, Engineering Services and Mechanical positions), undergo a Fitness-for-Duty evaluation where they report or Union Pacific suspects that they have one of an enumerated list of medical and/or physical conditions.

23. When a Fitness-for-Duty evaluation is triggered, the employee is removed from work without pay while Union Pacific Health and Medical Services completes the evaluation and until Union Pacific informs the employee's supervisor that the employee has been cleared to return to work.

24. Union Pacific Fitness-for-Duty includes color-vision testing. Suspected color-vision deficiency triggers a Fitness-for-Duty evaluation.

25. FRA regulation requires that all locomotive engineers and conductors undergo periodic certification. Under the fitness requirement, an engineer or conductor must have the ability to recognize and distinguish between the colors of railroad signals, as demonstrated through one of twelve forms of color-vision examination. Where an employee fails one of the listed examinations, FRA regulations state that an engineer or conductor may nonetheless be certified through a CVFT or where there is otherwise reason to believe that they can recognize and distinguish between colors of railroad signals.

COMPLAINT
Page 6 of 18

26. Union Pacific utilizes the 14-Plate Ishihara test to test for color-vision deficiency for FRA certification. When an employee fails the Ishihara test, Union Pacific subjects the employee, as part of the Fitness-for-Duty process, to a CVFT implemented in or around April 2016, called the Light Cannon test.

27. The Light Cannon Test does not simulate real world conditions and does not assess the employee's ability to recognize and distinguish between colors of railroad signals.

28. As a result of the conduct described above, Union Pacific employees who have never had a problem performing the essential functions of their jobs have been removed from work without pay either for an extended period or indefinitely.

### PLAINTIFF JUSTIN DONAHUE

29. Donahue was hired by Union Pacific in California and worked as a conductor and Remote-Control Operator ("RCO") trainman from January 28, 2006, until approximately June 7, 2017, when he was removed from service.

30. As a conductor and RCO trainman, Donahue's job entailed reading and interpreting multicolored railroad traffic signal lights on signal masts. Donahue safely worked as a conductor and RCO trainman for over eleven years without misreading a signal.

31. In 2006 Donahue underwent an Ishihara test as a part of his post-hiring physical examination. He was also then administered an alternate clinical test and, upon passage, was allowed to work as a conductor.

32. Between 2006 and 2017, Donahue took the Ishihara test approximately six times as part of FRA Conductor certification. He passed the Ishihara test during several recertifications. On each occasion that he failed the Ishihara test, Donahue took and passed an alternate test. On

one occasion he passed a previous Union Pacific CVFT in which he read and relayed a series of signals from a real railroad signal mast to assess his ability to read and interpret signals in the field.

33. On or about May 3, 2017, Donahue went to recertify as a conductor. He took and failed the Ishihara Test. On this occasion his test results triggered a Fitness-for-Duty evaluation and Union Pacific removed Donahue from work.

34. On May 22, 2017, as part of the Fitness-for-Duty process, Union Pacific administered the Light Cannon test. Donahue missed two lights out of twenty on the test, which Union Pacific considered a failure.

35. On May 24, 2018, Union Pacific determined, based on his performance on the Light Cannon test, that Donahue could not identify colored train signals reliably and accurately and issued him permanent work restrictions.

36. On May 24, 2017, Donahue took and passed an Ishihara color vision test at Milpitas Family Eyecare, administered by optometrists David Schymeinsky, O.D., and George Contos, O.D. Donahue's doctors reported that he has no color vision defect.

37. On or around June 6, 2017, Union Pacific issued Donahue permanent work restrictions prohibiting him from working in any position requiring accurate identification of colored railroad wayside signals, including as a conductor or RCO trainman. Union Pacific claimed that these restrictions could not be accommodated.

38. On June 7, 2017, Donahue underwent a 14-plate Ishihara color vision test, administered by Optometrist Virginia Ko, O.D., of the Palo Alto Medical Foundation, Fremont Center. Donahue scored a 14 out of 14 on both eyes.

39. On August 2, 2017, Donahue was examined by optometrist Wayne A. Verdon, O.D., Ph.D., Professor of Clinical Optometry at the University of California, Berkeley, School of Optometry. Dr. Verdon administered multiple color vision tests, including the Ishihara and the Farnsworth Lantern test. Dr. Verdon determined that Donahue has "clinically normal" color vision and that his condition "would not be expected to interfere with his color discrimination using real world stimuli."

40. Dr. Verdon's office mailed the results of Donahue's examination to Union Pacific Health and Medical Services and the Union Pacific Fitness-for-Duty Nurse on August 4, 2017.

41. In the time since removing him from service, Union Pacific has persisted in its refusal to allow Donahue to return to his job as a conductor/trainman. At all times, Donahue was capable of performing the essential functions of his job, and he remains able to perform them today.

42. To the extent that Donahue needed reasonable accommodation, Union Pacific failed to provide them, and failed to even engage in an interactive process regarding what accommodations were possible.

### PLAINTIFF JASON CAMPBELL

43. Campbell was hired by Union Pacific in California in 2003 and worked as a Conductor from about April 11, 2004, until approximately May 22, 2018, when he was removed from service.

44. Part of Campbell's job as a conductor entailed reading and interpreting multicolored railroad traffic signal lights on signal masts. Campbell safely worked as a conductor for over twelve years without misreading a signal.

45. In 2003, Campbell took and failed the Ishihara color vision test as part of his post-hiring physical examination. Campbell then took and passed an old Union Pacific CVFT in which Campbell read and relayed a series of signals from a real railroad signal mast to assess his ability to read and interpret signals in the field.

46. Between 2003 and 2016, Campbell took the Ishihara test approximately six times as part of his FRA Conductor certification. On each occasion he failed the Ishihara test but passed a previous CVFT.

47. On April 20, 2018, Campbell went to recertify as a conductor. As usual, he took and failed the Ishihara Test. On this occasion his test results triggered a Fitness-for-Duty evaluation and Union Pacific removed Campbell from work.

48. Campbell requested that Union Pacific allow him to retake the Ishihara Test with a color-tinted corrective lens, but Union Pacific refused.

49. On May 21, 2018, as part of the Fitness-for-Duty process, Union Pacific administered the Light Cannon test. Union Pacific concluded that Campbell failed the Light Cannon test.

50. On May 22, 2018, Union Pacific informed Campbell that, based on his performance on the Light Cannon test, it had determined that he could not identify colored train signals reliably and accurately and issued him permanent work restrictions.

51. On or around June 13, 2018, Campbell received written notification from James C. Rawlinson, Union Pacific General Superintendent, advising Campbell that his work restrictions could not be accommodated, and that he could not work in any position requiring accurate color signal recognition, including as a conductor.

52.     In the time since, Union Pacific has persisted in its refusal to allow Campbell to return to his job as a conductor. At all times, Campbell was capable of performing the essential functions of his job, and he remains able to perform them today.

53.     In order to find alternative work and to mitigate his damages, in or around August 2018, Campbell was caused to resign his position as a Union Pacific conductor, relinquishing his trainman seniority, after which he reapplied with Union Pacific in the Maintenance of Way department. On or around August 6, 2018, Union Pacific hired Campbell as a Maintenance of Way worker. His current job functions include driving Union Pacific vehicles for which he maintains a commercial driver's license.

54.     On October 15, 2019, Campbell was examined by Optometrist Nancy Ekelund, O.D., and underwent an Ishihara Test with the aid of a color-tinted corrective lens. Campbell passed the Ishihara Test with the lens.

55.     To the extent that Campbell needed reasonable accommodation, Union Pacific failed to provide them, and failed to even engage in an interactive process regarding what accommodations were possible.

### PLAINTIFF JACOB GOSS

56.     Goss was hired by Union Pacific in California on July 17, 2003 and worked as either a conductor or a locomotive engineer from September 2003 until approximately May 2016, when he was removed from service.

57.     Part of Goss' job entailed reading and interpreting multicolored railroad traffic signal lights on signal masts. Goss safely worked as a conductor and engineer for nearly thirteen years without misreading a signal.

58. In 2003, Goss took and failed the Ishihara test as part of his post-hiring physical examination. He was then administered an alternate clinical test by an optometrist and, upon passage, was allowed to work as a conductor.

59. In 2005, Goss took and failed the Ishihara test as part of his Engineering certification but was allowed to work as an Engineer after passing an alternate color vision test.

60. Between 2005 and 2016, Goss recertified approximately four times. On each occasion he failed the Ishihara test and was given a previous Union Pacific CVFT in which Goss read and relayed a series of signals from a real railroad signal mast to assess his ability to read and interpret signals in the field. Goss passed the old CVFT each time it was administered.

61. In May 2016, Goss went to recertify as an engineer. As usual, he took and failed the Ishihara Test. On this occasion his test results triggered a Fitness-for-Duty evaluation and Union Pacific removed Goss from work.

62. Soon thereafter, as part of the Fitness-for-Duty process, Union Pacific administered the Light Cannon test. Union Pacific concluded that Goss failed the Light Cannon test.

63. In May 2016, Union Pacific informed Goss that, based on his performance on the Light Cannon test, it had determined that he could not identify colored train signals reliably and accurately and issued him permanent work restrictions.

64. In the time since, Union Pacific has persisted in its refusal to allow Goss to return to his job as an engineer. At all times, Goss was capable of performing the essential functions of his job, and he remains able to perform them today.

65. To the extent that Goss needed reasonable accommodation, Union Pacific failed

to provide them, and failed to even engage in an interactive process regarding what accommodations were possible.

## CAUSES OF ACTION

### COUNT I
### *VIOLATION OF THE ADA*
### *DISABILITY DISCRIMINATION – DISPARATE TREATMENT*

66. Plaintiffs incorporate the foregoing paragraphs by reference.

67. The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1). An individual is regarded as having such an impairment if they are subjected to an action prohibited under the ADA "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(1)(C).

68. At all relevant times, Union Pacific regarded Plaintiffs as having an impairment and, therefore, Plaintiffs were individuals with disabilities under the ADA.

69. At all relevant times, Plaintiffs had the requisite skill, experience, education, and other job-related requirements of their positions, and were therefore qualified individuals under the ADA.

70. At all relevant times, Plaintiffs could perform the essential functions of their positions, with or without reasonable accommodation.

71. Section 12112(a) of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment."

72. Discriminating against a qualified individual on the basis of disability under Section 12112(a) includes, among other things, "using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability . . . unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

73. Union Pacific discriminated against Plaintiffs on the basis of real or perceived disabilities in one or more of the following ways:

   a. Removing each Plaintiff from service and issuing work restrictions on the basis of each Plaintiff's disability;

   b. Failing to utilize alternate clinical tests to the Ishihara Test to determine whether Plaintiffs can effectively read and interpret railroad signals;

   c. Using a field test that that does not assess whether Plaintiffs can effectively read and interpret railroad signals;

   d. Failing to otherwise assess whether Plaintiffs were capable of reading and interpreting railroad signals; and

   e. Using a Fitness-for-Duty evaluation process that screens out qualified individuals with disabilities.

74. Because Union Pacific violated 42 U.S.C. § 12112, Plaintiffs have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Plaintiffs are also entitled to attorneys' fees and costs incurred in connection with these claims.

75. Union Pacific committed the above-alleged acts with reckless disregard or deliberate disregard for Plaintiffs' rights and safety. As a result, Plaintiffs are entitled to punitive damages.

## COUNT II
### *VIOLATION OF THE ADA*
### *DISABILITY DISCRIMINATION – DISPARATE IMPACT*

76. Plaintiffs incorporate the foregoing paragraphs by reference.

77. Plaintiffs are qualified individuals with disabilities within the meaning of the ADA.

78. Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity[.]" 42 U.S.C. § 12112(b)(6).

79. Discriminating against a qualified individual on the basis of disability also includes "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability." 42 U.S.C. § 12112(b)(3).

80. Union Pacific discriminated against Plaintiffs on the basis of disability in one or more of the following ways:

    a. Union Pacific's Fitness-for-Duty policies, including its use of the Light Cannon test, disproportionately and adversely impact qualified individuals with disabilities;

    b. Union Pacific uses qualification standards that screen out or tend to screen out

qualified individuals with disabilities; and

    c. Union Pacific uses a Fitness-for-Duty evaluation process that screens out or tends to screen out qualified individuals with disabilities.

81. Union Pacific cannot show that such qualifications standards are job-related and consistent with business necessity.

82. Because Union Pacific violated 42 U.S.C. § 12112, Plaintiffs have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Plaintiffs are also entitled to attorneys' fees and costs incurred in connection with these claims.

83. Union Pacific committed the above-alleged acts with reckless disregard or deliberate disregard for Plaintiffs' rights and safety. As a result, Plaintiffs are entitled to punitive damages.

## COUNT III
### *VIOLATION OF THE ADA*
### *FAILURE TO ACCOMMODATE*

84. Plaintiffs incorporate the foregoing paragraphs by reference.

85. Plaintiffs are qualified individuals with disabilities within the meaning of the ADA.

86. Discriminating against a qualified individual with a disability includes "not making reasonable accommodations to the known physical or mental limitations of the otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" 42 U.S.C. § 12112(b)(5)(A).

87. Union Pacific discriminated against Plaintiffs by failing to provide Plaintiffs with reasonable accommodation.

88. Because Union Pacific violated 42 U.S.C. § 12112, Plaintiffs have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Plaintiffs are also entitled to attorneys' fees and costs incurred in connection with these claims.

89. Union Pacific committed the above-alleged acts with reckless disregard or deliberate disregard for Plaintiffs' rights and safety. As a result, Plaintiffs are entitled to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs pray for judgment against Union Pacific as follows:**

1. That the practices of Union Pacific complained of herein be determined and adjudged to constitute violations of the ADA;

2. An injunction against Union Pacific and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

3. For an award of damages arising from loss of past and future income, emotional distress, and other compensatory damages in excess of $75,000.00 for each of the Plaintiffs;

4. Pre-judgment interest, as provided by law;

5. For Plaintiffs' costs, disbursements and attorneys' fees pursuant to law;

6.   For an award of punitive damages;

7.   For all relief available under the ADA;

8.   For such other and further relief available by statute; and

9.   For such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Date: January 19, 2021

**HILDEBRAND, McLEOD & NELSON LLP**

s/ *Anthony S. Petru*
Anthony S. Petru (CA # 91399)
petru@hmnlaw.com
Gavin S. Barney (CA # 321880)
barney@hmnlaw.com
350 Frank H. Ogawa Plaza, 4th Floor
Oakland, California 94612
Telephone: (510) 451-6732
Fax: (510) 564-7023

**NICHOLS KASTER, PLLP**

s/ *James H. Kaster*
James H. Kaster (CA #248949)
kaster@nka.com
Lucas J. Kaster (CA # 291102)
lkaster@nka.com
80 South Eighth Street
4600 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone: (612) 256-3200
Fax: (612) 338-4878

**ATTORNEYS FOR PLAINTIFF**

*\* pro hac vice application forthcomin*