# EXHIBIT 1

1              IN THE UNITED STATES DISTRICT COURT

2                    DISTRICT OF ARIZONA

3                     TUCSON DIVISION

4                       ---o0o---

5   JAMES BLANKINSHIP,          )
                                )
6            Plaintiff,         )
                                )
7            v.                 ) CASE NO. 4:21-cv-00072-RM
                                )
8   UNION PACIFIC RAILROAD      )
    COMPANY, A DELAWARE         )
9   CORPORATION,                )
                                )
10           Defendant.         )
    _____   )

11

12                 Volume 1 (Pages 1-150)

13              VIDEOTAPED DEPOSITION OF

14             JEFF RABIN, O.D., M.S. PhD

15            THURSDAY, APRIL 14, 2022

16

17

18

19

20

21

22

23

24

25  Stenographically Reported by:
    KATHRYN S. SWANK, RPR, CSR #13061

Jeff Rabin, O.D., M.S., Ph.D.

1    ANTHONY S. PETRU and GAVIN BARNEY, Attorneys at

2  Law, of HILDEBRAND MCLEOD & NELSON, 350 Frank H. Ogawa

3  Plaza, 4th Floor, Oakland, California 94612, appeared

4  as counsel on behalf of the Plaintiff.

5  Tel:     (510) 451-6732

6  E-mail:  petru@hmnlaw.com; barney@hmnlaw.com

7

8    JASMINE ANDERSON, Attorney at Law, of

9  CONSTANGY, BROOKS, SMITH, & PROPHETE LLP, 601

10  Montgomery Street, Suite 350, San Francisco,

11  California, 94111, appeared as counsel on behalf of

12  the Defendant Union Pacific Railroad Company.

13  Tel:     (415) 918-3018

14  E-mail:  janderson@constangy.com

15

16    SCOTT MOORE, Attorney at Law, of

17  BAIRD HOLM LLP, 1700 Farnam Street, Suite 1500, Omaha,

18  Nebraska 68102, appeared as counsel on behalf of the

19  Defendant Union Pacific Railroad Company.

20  Tel:     (402) 344-0500

21  E-mail:  spmoore@bairdholm.com

22

23

24

25

Jeff Rabin, O.D., M.S., Ph.D.

```
 1       WILLIAM WALSH, Attorney at Law, of COZEN O'CONNOR,
 2   999 Third Avenue, Suite 1900, Seattle, Washington,
 3   98104, appeared as counsel on behalf of the Union
 4   Pacific Railroad Company.
 5   Tel:     (206) 224-1296
 6   E-mail:  wwalsh@cozen.com
 7
 8       SOUFOU LEE, of FOCUS LITIGATION SOLUTIONS,
 9   appeared as the videographer.
10   Tel:     (916) 288-4593
11   E-mail:  production@focuslitigationsolutions.com
12
13   ALSO PRESENT:
14       JACQUELYN CLARK, Union Pacific Railroad Company
15
16                   ---o0o---
17
18
19
20
21
22
23
24
25
```

Jeff Rabin, O.D., M.S., Ph.D.

```
 1   "However, it is strongly recommended that before any
 2   internal decision is made about relying on such
 3   testing devices in the field, and in particular the
 4   prototype LC, that they undergo proper scientific
 5   and operational validational studies to ensure that
 6   they will be fair, reliable, effective and be
 7   defendable for purpose of -- for that purpose should
 8   technical, administrative, or legal challenges arise
 9   from a candidate, current employee, union, or
10   regulatory agency in charge of the public safety,"
11   that is a recommendation, isn't it?
12      A    Yes, sir.  And I --
13      Q    And you made -- you made that
14   recommendation, didn't you?
15      A    Yes, sir.  I signed it; so I did.
16      Q    And Union Pacific did not follow it, to
17   your knowledge, correct?
18           MS. ANDERSON:  Objection --
19           THE WITNESS:  I -- that --
20           MS. ANDERSON:  -- to form.
21           You can answer.
22           THE WITNESS:  I -- that, I don't -- I can't
23   answer.  I have no knowledge.
24           MR. PETRU:  Okay.  All right.  Well --
25   yeah.  That's why I asked the question that way,
```

1    operational validation studies prior to it being

2    rolled out?

3            MS. ANDERSON:  Objection.  Asked and

4    answered.

5    BY MR. PETRU:

6        Q    I'm narrowing it down to eliminate some of

7    the stuff that you had in the prior answer, sir.

8            I'll -- let me ask the question again and

9    tell you what I'm --

10       A    I have three words.  Not to --

11       Q    Sure.

12       A    -- well, not --

13       Q    Let -- let me -- let me -- let me -- let me

14   ask the question again.  Just for the record.

15           Is it correct that you are unaware of

16   anything that Union Pacific did specifically to

17   cause the light cannon to undergo proper scientific

18   and operational validation studies before it was

19   rolled out for fitness-for-duty purposes?

20           MS. ANDERSON:  Objection.  Asked and

21   answered.

22           THE WITNESS:  I am -- yes.  I am unaware of

23   anything UPRR did.

24           MR. PETRU:  Okay.

25       Q    Let's go back to our list here.

1   BY MR. PETRU:

2       Q    On page 20, (as read), "In our opinion,

3   while certainly worthy of a -- of continued

4   development, the device in its current form remains

5   technologically immature in the short term; lacks

6   the necessary scientific and occupational

7   validation, e.g. as reported by the NTSB following

8   Goodwell; and addresses only a specific LED-based

9   signal light recognition task within a wayside

10  signal system that currently does not yet

11  exclusively use LED signal lights.  Most of these

12  disconnects can be addressed with simple engineering

13  improvements and a suitable validation program, but

14  until the process is completed and signal light

15  recognition tasks only involved LED wayside signal

16  lights, exclusive reliance on the LC in its current

17  form without proper validation as the only test to

18  verify safe performance in critical color vision

19  railroad tasks is problematic and challengeable."

20          Did I read that correctly?

21      A    Yes.

22      Q    And you meant that -- when it was written,

23  you meant it -- correct? -- what you said here?

24          MS. ANDERSON:   Objection.   Object as to

25  form.   Lacks foundation.

1          You can answer.

2          THE WITNESS:  Yes.  But --

3   BY MR. PETRU:

4       Q    Good.

5       A    -- I want to stress -- I -- I'm sorry if my

6   memory escapes me on this -- I don't know if this

7   was the modified light cannon test or if this was

8   the first one that we saw where we recommended

9   several improvements.

10          And if you will scroll down, sir, you can

11  see my main contribution to this, if it -- if

12  it's -- if you have time.

13      Q    Sure.  I got time.

14      A    About three quarters of the way down, I

15  think my light measurements and --

16      Q    You are talking about the pretty graphs?

17  This stuff here?

18      A    Yeah.  So this is --

19      Q    That -- that's your thing?

20      A    This -- yeah.  Umm, yeah.  That's my thing.

21  So that -- I mean, I --

22      Q    All right.

23      A    -- won't explain it or anything.

24          But what I was trying to do there was, if

25  you look on the right, measure the color -- that's

1   know, on behalf of our clients, what you will

2   testify to at trial, when I haven't been produced a

3   document that you are relying on now -- do you know

4   how difficult that is?

5          MS. ANDERSON:  Objection.  Argumentative.

6   BY MR. PETRU:

7     Q    So my question is has anybody at the Union

8   Pacific, any individual at Union Pacific, ever seen

9   the proposed submittal for peer review that the

10  graduate student and you worked on?

11         MS. ANDERSON:  Objection as to form.

12         THE WITNESS:  Not that document.  But

13  everything in that document is covered in the

14  PowerPoint document, which summarizes all of the

15  results.

16  BY MR. PETRU:

17    Q    "The PowerPoint document, which summarizes

18  all of the results."

19         Have I been -- has --

20         MR. PETRU:  Counsel, have I been produced

21  "the PowerPoint document that summarizes all of the

22  results"?

23         MS. ANDERSON:  I believe --

24         MR. MOORE:  Yes.

25         MS. ANDERSON:  Thank you, Scott.  We both

Jeff Rabin, O.D., M.S., Ph.D.

```
 1    as Exhibit 5 in just a minute, was that, to your

 2    knowledge, nobody at the UP saw or had seen the

 3    submittal that apparently is being worked on by

 4    Ms. Lovell, Julie Lovell, and you.  But you said

 5    that the contents or the information is contained in

 6    the PowerPoint.

 7              Did I get that correct?

 8        A    Yes, sir.

 9              MR. PETRU:  Okay.  The PowerPoint, it was

10    referred to as -- well, it will be Exhibit 5.  And

11    it's 001082.  And I should indicate that this is

12    BLANKINSHIP-001082.  Some of the other documents are

13    Harris documents and not Blankinship documents.  I'm

14    going to share it.  Make sure we're talking about

15    the same Megillah.

16              (Exhibit No. 5 was previously

17              marked as Exhibit No. 4 for

18              identification.)

19    BY MR. PETRU:

20        Q    001082 says, "Color Vision Field Test" with

21    "BLANKINSHIP" across the front.

22              This is the PowerPoint, correct?

23              I'm going to go through the pages.

24        A    Okay.  Yes.  Unless a more recent one was

25    created by us.
```

1        But this, yes, seems to have everything.

2      Q    Well, has "a more recent one been created

3   by us"?

4      A    No, I don't think so, sir.

5      Q    Okay.  And it runs through 001090.

6           And it's your testimony, if I understand it

7   correctly, this contains all of the conclusions or

8   the information that will be replicated in the

9   submittal that's being worked on by you and

10  Ms. Lovell; is that right?

11     A    With the exception of the final graph, I

12  myself determined a more effective way to correlate

13  a computer-based test called the "cone contrast

14  test" with the results of the cannon -- light cannon

15  test.

16          And so that graph is essentially the same,

17  but the -- statistically, it's more powerful what we

18  did.  I'll just say that.

19     Q    So the -- (court reporter clarification.)

20          Okay.  So the final page, page 9 of the

21  nine-page PowerPoint, has a different graph

22  utilizing a more sophisticated analysis model.  Is

23  that --

24     A    Yes.

25     Q    Okay.  All right.

1   who is color deficient failed, everybody who is

2   color normal passed.

3       Q     Right.

4             So you -- you showed that your subsequent

5   work was tweaked so that anybody who had color

6   deficiency would fail the test, right?

7       A     No.  The primary thing was this, sir:  What

8   we found -- so this is what we were given to do in

9   2019, dictated.  So validate the light cannon.  But

10  there were 70 people who had already been tested and

11  they are all color vision-deficient.  So our aim

12  then, in 2019, was to do the other half.  What do

13  color vision normals show?

14            68 percent of the subjects -- or 60 percent

15  went through the study.  We found that one quarter,

16  25 percent, of color vision normals were failing the

17  test as administered.

18      Q     So the test -- the test as administered was

19  not valid because of the high failure rate of color

20  vision normal people, correct?  Yes or no?

21      A     Yes.

22      Q     Okay.  And you wanted to figure out why

23  color vision normal -- you hadn't done it before.

24  So you administered the test to color vision normal

25  people.  You saw the high failure rate that didn't

Jeff Rabin, O.D., M.S., Ph.D.

```
 1      A      Yeah.

 2      Q      The six or so people, six or seven people,

 3  who were there, Dr. Gillis, Ms. Clark, do you know

 4  the capacities of any other people who were there?

 5  Any lawyers, claims representatives, nurses, any of

 6  the counsel who are on this call today?

 7      A      Well, I wouldn't be surprised if

 8  Ms. Gengler was there.  She's a nurse.

 9      Q      I know who she is.

10      A      Okay.  I wouldn't be surprised.

11             I don't recall any other legal

12  representation --

13      Q      Okay.

14      A      -- frankly.

15      Q      Did you know at that time that there were

16  claims that employees had filed against Union

17  Pacific for violation of the ADA because of color

18  vision issues?

19      A      I did not.

20             MS. ANDERSON:  Objection as to form.  Lacks

21  foundation.

22             You can answer.

23             THE WITNESS:  I -- not according to the

24  ADA.  But I suspected there were issues.

25
```

Jeff Rabin, O.D., M.S., Ph.D.

1  BY MR. PETRU:

2       Q     Why did you suspect that there were issues?

3       A     I probably heard that -- well, to put the

4  cart before the horse, in the sense that, you know,

5  a lot of color vision-deficients were tested, but we

6  didn't do the full validation of the color normals.

7  So it was my assumption that there were issues.  But

8  I did not -- I distanced myself from that, because I

9  don't want that to influence science.

10      Q     Okay.  And in 2019, I think that the -- let

11 me see if I can get this right here.

12            Was it in 2018 that you got permission or

13 approval from the University of the Incarnate Word

14 to do a, quote, validation of Union Pacific light

15 cannon color vision field test?

16      A     Yes.  I submitted that, I believe, in 2018.

17            Incidentally, I'm the presiding chair of

18 the IRB.

19            But, yes, in 2018, we submitted it.  We may

20 have done -- no.  We didn't do any amendments, I

21 don't believe.  But that was the first phase of the

22 study.

23            I think I was just ensuring that, you know,

24 we were on time to do it during the summer and had

25 everything -- there was preliminary planning getting

Jeff Rabin, O.D., M.S., Ph.D.

1   the light cannon over to our location and things

2   like that.

3       Q    So when did you and your team start

4   actually doing any work associated with this

5   proposed validation project?

6       A    Yes.  So the -- my team isn't available

7   until -- between May 15th and August 15th.  So at

8   the earliest, it was late May.

9       Q    Of 2019, correct?

10      A    Correct, sir.

11      Q    Okay.  And it wasn't completed in 2019.

12   You did further work in 2020, correct?

13      A    Yes, sir.

14      Q    And then it was finally reported to Union

15   Pacific on August 7th, 2020, correct?

16      A    No.  We wanted to modify the protocol in

17   order -- we realized that there was the familiar --

18   familiarity issue with the lights.

19           So we communicated that to Union Pacific,

20   and we had to do an amendment to our protocol in

21   order -- you have to do that.  You can't just change

22   what you are doing in an IRB-approved protocol.  So

23   that was all taken care of, but I had to run that by

24   Union Pacific first.

25      Q    Okay.

Jeff Rabin, O.D., M.S., Ph.D.

1    A    It's a test they have already --

2    Q    So let me ask the same question with that

3  caveat.  An IRB -- because I'm a neophyte, what does

4  an "IRB" mean?

5    A    I'm sorry.  Institutional Review Board.

6  It's not a faculty committee.  It's an FT --

7    Q    Got it.

8    A    -- and regulated committee.

9    Q    So the institution -- you are the chair of

10  the Institutional Review Board.

11    A    There are two chairs.  I'm the presiding

12  chair.

13    Q    You are the presiding chair.

14        So knowing the protocols, in 2018, you

15  submitted to yourself, as one of the two cochairs,

16  the proposal.

17    A    No.  No.  No.

18    Q    I'm kidding.  I'm being facetious.  Let

19  me -- don't bother with that.

20        You submitted the proposal.  In 2019, you

21  started doing work.  You realized that there were

22  problems with the scope, so you had to resubmit.

23  You got resubmit approval.

24        And then, in 2020, you were able to go back

25  to the project when you had your team assembled in,

Jeff Rabin, O.D., M.S., Ph.D.

1   what May through July, whatever it was, in 2020.

2   Fair?

3        A      Yes, sir.

4        Q      And then the results from all of that were

5   summarized in this PowerPoint, which is Exhibit 5,

6   correct?

7        A      Yes, sir.

8        Q      And to your knowledge, was that the first

9   time that you or anybody associated with your team

10  produced any purported validity analysis to Union

11  Pacific of the light cannon protocol?

12       A      Formerly.  Now, they had the 2019.  They

13  knew what happened in 2019.  But in terms of testing

14  color vision-deficients and color normals, that was

15  the first time --

16       Q      Okay.

17       A      -- the report was issued to them.

18       Q      All right.  So --

19       A      There may have been some conversations, you

20  know, that -- we may have had informal

21  conversations, that sort of thing.

22       Q      So just to put this into three dimensions,

23  the original protocol, 2019 protocol, that's the

24  original protocol you were talking about.  Then

25  there's the modification in 2020, right?

```
1        A     Yes, sir.
2        Q     And in 2019, you said we tested 68 color
3   vision normals, and lo and behold, 26 and a half
4   percent failed.  We got a problem, right?
5        A     Yes, sir.
6        Q     So you reported to Union Pacific in 2019
7   that the existing light cannon protocols that they
8   were using was problematic, and you were -- you were
9   catching a lot of folks who shouldn't have been
10  caught.
11       A     Not -- not problematic to color
12  vision-deficients.
13       Q     All right.  So there was -- the problem is
14  explained here, that 26 and a half percent of color
15  vision normals were failed when they shouldn't have
16  been.  There's something wrong, right?
17       A     Yes.
18            MS. ANDERSON:  Objection.  Argumentative.
19            MR. PETRU:  Okay.  Did you get the answer,
20  Kathy?
21            MS. ANDERSON:  Did you get the objection?
22            MR. PETRU:  Jasmine, can you let her
23  finish?
24            MS. ANDERSON:  The objection comes before
25  the response, but I'm --
```

Jeff Rabin, O.D., M.S., Ph.D.

1   be redeposed, we're going to ask that Union Pacific

2   pay for all costs associated with that.

3           MS. ANDERSON:  (Unintelligible) denied.

4           MR. PETRU:  Let me go back to -- (reporter

5   clarification).

6           MS. ANDERSON:  Oh.  I was just saying if he

7   was asking Union Pacific to pay for costs, it's

8   denied.

9           MR. PETRU:  I'm not asking.  I'm saying

10  that that is going to be the request.

11          MS. ANDERSON:  Understood.

12          MR. PETRU:  And then we will ask the court

13  to intervene.

14          Let me go back to our litany here of the

15  documents you reviewed.

16          There's a nine -- Bates 082686.  It's an

17  e-mail from Dr. Holland dated 9/9/15 to you and

18  Dr. Ivan.  I think we might have covered this.  We

19  covered that one already.  My bad.

20          093931.  This is of an outline, excuse me,

21  with a draft date of 9/17/15, from Dr. Holland to

22  Steve Maxwell, director of Administrative Services

23  Health and Medical Services.

24      Q   Did you ever speak to a Mr. Maxwell?

25      A   Not that I recall, sir.

Jeff Rabin, O.D., M.S., Ph.D.

1      Q      Okay.  And this is the Scope of Work for

2  Consultation Assess Face Validity of CVFT Device and

3  Test Protocols.

4            Did I read it correctly?

5      A     Yes, sir.

6      Q     And the validity portion of this is

7  something that was not formally completed until

8  August 7th, 2020, correct?

9      A     In my opinion, yeah.

10           MR. PETRU:  Okay.  Next -- actually, let me

11  go back.  I'm going to mark 093931 as Exhibit -- I

12  think we're at 6, correct?

13           THE COURT REPORTER:  Yeah.  We're at 6.

14           (Exhibit No. 6 was marked for

15           identification.)

16  BY MR. PETRU:

17      Q     Next document is 22675.  September 24th

18  e-mail from Holland to you and Ivan.  Apparently you

19  had a phone call, because you and he talked.

20           Do you remember that?

21      A     I can't remember the specific nature of

22  that, but apparently we did.

23      Q     Do you remember -- look.  I got a cell

24  phone here.  Anybody want a cell phone?  I'm

25  kidding.

1   Dr. Verdon's opinion if he evaluates a railroad

2   employee to determine their fitness to be able to

3   read and interpret wayside signals?

4           MS. ANDERSON:   Objection.   Lacks

5   foundation.   Object to form.

6           THE WITNESS:   I highly respect the

7   individual.   But it would depend on what tests he

8   ran on the -- on the patient, so I cannot speak

9   specifically to that.

10  BY MR. PETRU:

11      Q     What other tests are there besides the

12  Ishihara, which you consider to be -- if you have

13  somebody, for example, who comes into a clinic and

14  fails an Ishihara, what other tests would you

15  administer to determine the nature of their color

16  deficiency relative to be able to see railroad

17  signals?

18              MS. ANDERSON:   Object to form.

19              You can answer.

20              THE WITNESS:   Okay.   We have the most

21  extensive color vision testing in Texas.   We have

22  the Raley (phonetic) Anomaloscope, which is the gold

23  standard for red-green color deficiency.

24              We have three computer-based tests that are

25  similar to the cone contrast tests, including the