# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                      DISTRICT OF ARIZONA

 3                       TUCSON DIVISION

 4                          ---o0o---

 5    JAMES BLANKINSHIP,        )
                                )
 6          Plaintiff,          )
                                )
 7            v.                ) CASE NO. 4:21-cv-00072-RM
                                )
 8    UNION PACIFIC RAILROAD    )
      COMPANY, A DELAWARE       )
 9    CORPORATION,              )
                                )
10          Defendant.          )
      _____ )

11

12              Volume 2 (Pages 17 - 150)

13              VIDEOTAPED DEPOSITION OF

14              DOUGLAS IVAN, M.D.

15              FRIDAY, JUNE 17, 2022

16

17

18

19

20

21

22

23

24

25    Stenographically Reported by:
      KATHRYN S. SWANK, RPR, CSR #13061
```

1      GAVIN BARNEY, Attorney at Law, of

2   HILDEBRAND MCLEOD & NELSON, 350 Frank H. Ogawa Plaza,

3   4th Floor, Oakland, California 94612, appeared as

4   counsel on behalf of the Plaintiff.

5   Tel:      (510) 451-6732

6   E-mail:  barney@hmnlaw.com

7

8      JASMINE ANDERSON, Attorney at Law, of

9   CONSTANGY, BROOKS, SMITH, & PROPHETE LLP, 601

10  Montgomery Street, Suite 350, San Francisco,

11  California, 94111, appeared as counsel on behalf of

12  the Defendant Union Pacific Railroad Company.

13  Tel:      (415) 918-3018

14  E-mail:  janderson@constangy.com

15

16     SCOTT MOORE, Attorney at Law, of

17  BAIRD HOLM LLP, 1700 Farnam Street, Suite 1500, Omaha,

18  Nebraska 68102, appeared as counsel on behalf of the

19  Defendant Union Pacific Railroad Company.

20  Tel:      (402) 344-0500

21  E-mail:  spmoore@bairdholm.com

22

23

24

25

1    CONNOR ROWINSKI, Attorney at Law, of COZEN

2  O'CONNOR, 999 Third Avenue, Suite 1900, Seattle,

3  Washington, 98104, appeared as counsel on behalf of

4  the Union Pacific Railroad Company.

5  Tel:     (206) 224-1296

6  E-mail:  crowinski@cozen.com

7

8    JENNIFER SAELEE of FOCUS LITIGATION SOLUTIONS,

9  appeared as the videographer.

10  Tel:     (916) 288-4593

11  E-mail:  production@focuslitigationsolutions.com

12

13  ALSO PRESENT:

14    JACQUELYN CLARK, Union Pacific Railroad Company

15

16                    ---o0o---

17

18

19

20

21

22

23

24

25

1    the '90s, people began to learn how to cheat on

2    them.  And it became easy-to-get information on how

3    to get around those tests.  So those tests became

4    compromised; so a whole development sector began in

5    looking for ways to develop a new color vision test

6    that could be administered that were difficult to

7    cheat on.

8           The gold standard color vision test that

9    has always been around since the late 1800s, the

10   anomaloscope, the Air Force used that as a final

11   determinant, but not everyone out there

12   occupationally, clinically, has access to an

13   anomaloscope; so the thrust of the industry has been

14   to try to come up with a foolproof color vision test

15   that gets away from some of the things or games that

16   can be played with traditional color vision tests

17   like the Ishihara and Dvorine and others like it.

18        Q     Okay.  Thank you.

19              The anomaloscope -- is the issue there

20   that -- is it cost or simple availability that is a

21   limiting factor?

22        A     There -- it -- it's primarily cost.  There

23   are not a lot of them, but there's -- it also

24   requires a certain amount of expertise to administer

25   them and to keep them standardized.  So you really

Douglas Ivan, M.D.

1    need dedicated staff to administer them.  It's not

2    something that's practical, for example, the general

3    aeromedical examiner who, you know, there's

4    thousands of them around the country who are

5    screening pilot applicants on behalf of the FAA.

6    They don't -- they want a simple test to use, that's

7    cheap to purchase, and that gets them where they

8    need to be.

9         So the anomaloscope is more complicated; so

10   you will find those at research centers and --

11   however, they are the gold standard for determining

12   the type and degree of a color vision defect,

13   whereas those other tests I mentioned before are

14   screening tests and have limitations.

15        Q    Okay.

16        A    If you want to know what somebody's color

17   vision defect is or isn't, you do an anomaloscope

18   testing, testing both red/green or blue/yellow.

19             Now, beyond anomaloscopes today, there

20   are -- there are new electronic systems that are

21   coming into play.  The CAD test would be one, the

22   CCT test, the Waggoner test.  These are all

23   computer-based ones that are being validated to see

24   if they can replace anomaloscopes because they can

25   then be more readily available to anyone to purchase

1    understand how they all related.

2        Q    Okay.   Was that an important process,

3    that -- testing individuals -- is that an important

4    part of the validation process for the cone contrast

5    test?

6        A    Yeah.   That's when we -- you -- or any

7    test.   You basically want to make sure that the test

8    is sensitive enough to identify somebody who has got

9    the problem.   And then you also have to have a test,

10   that if they -- they are specific enough, that if

11   you pass it, you truly are normal.

12              So all of that stuff is part and parcel of

13   what is done with all color vision tests.   And all

14   color vision tests have numbers of specificity and

15   sensitivity that are used to determine how good a

16   test is for that purpose.

17              And all those other tests are then

18   ultimately compared to the anomaloscope gold

19   standard to see how well it compares to that gold

20   standard test.

21              And that's all part of -- or one part of

22   one type of validation that goes on with color

23   vision testing -- or any testing, really, any

24   medical testing.

25       Q    Okay.   Does it also help determine whether

1    there's a risk of false positive tests results?

2        A    Oh, absolutely.  Yeah, absolutely.  Because

3    even the Ishihara test, normals can fail that, and

4    then you have to -- you have to decide whether you

5    can just live with the possibility of rejecting

6    somebody who is normal and they just made a mistake,

7    or they didn't understand or miscalled something, or

8    basically just move on and discard them, or you go

9    back and you try to salvage them.

10        So within anybody who would fail the

11   Ishihara, or any PIP test, you are looking to see if

12   they truly are normal on another test -- or abnormal

13   on another test.

14        Q    Okay.  How long did you work with

15   Dr. Rabin?

16        A    Oh, I have known Dr. Rabin, Army Air

17   Force -- the relationship since probably the '90s.

18   And I don't remember when we brought him to Brooks

19   after -- after his predecessor passed away.  But he

20   was at Brooks, ballpark, 10 years, at least, right?

21   I may be off on that, but it seems like it was at

22   least 10 years.  But I could tell you 10 years and

23   you could tell it was me 20, and I would say, "Yeah,

24   time is flying for me too."

25        But, yeah, I would say 10 years we worked

Douglas Ivan, M.D.

1   sense?

2       A    Yes.  I have no problem with that.  I

3   understand.

4       Q    Okay.  Thank you.

5            When did you first become aware that Union

6   Pacific was developing a new color vision field

7   test?

8       A    I can't be really specific about when I was

9   aware of that.  I can tell you that I -- I believe

10  in -- well, certainly, our first look at the light

11  cannon, the first model of the light cannon -- and

12  when I talk about light cannon, then we should also

13  agree that we mean the LED one, right?

14           So we call it the new light cannon, but

15  it's really the first new light cannon, right?

16           So that's the one I'm addressing here.

17           We became aware of that somewhere before

18  October of 2015, because in October of 2015 is when

19  we actually conducted the on-site evaluation of it

20  here in San Antonio.  In terms of specifically, I

21  don't know how many months prior to that.  I don't

22  think it's in the report, but I can certainly look

23  and see if it is, if you need a more specific answer

24  to that or see if it's in the report.

25           But it was obviously a matter of a couple

Douglas Ivan, M.D.

1      A    You should have that.  I -- I'm pretty sure

2    you have that, correct?

3            MR. BARNEY:  Yes.  I will go ahead and mark

4    this as Exhibit 4.

5            (Exhibit No. 4 was marked for

6            identification.)

7    BY MR. BARNEY:

8      Q    This is the "Draft Final Report" dated 25

9    January 2016.

10           Is this the report that you are -- you are

11   looking at?

12     A    Yes, it is.

13     Q    And is there a -- it's -- obviously, it

14   says "Draft" at the top.

15           Is there a version of this that does not --

16   is not considered a draft report?

17     A    Negative.

18     Q    Okay.  Is there --

19     A    Not that I ever -- not that I ever saw.

20   Not submitted from Dr. Rabin or myself.  Whether

21   somebody internally took that word "Draft" off, I

22   don't know.  But I have never seen.  It's always

23   been in this format.

24     Q    Is there a reason this is a considered a

25   draft as opposed to a final version of this?

1    A    I think -- yeah.  Just a procedural one, in

2   terms of letting other folks read through it.

3   Dr. Rabin and anyone else that needed to read

4   through it, in case there were mistakes, issues,

5   concerns.  It's just kind of the habit to label

6   something a draft until it has a chance to be by --

7   be reviewed by participants and make sure that we

8   got the observation and the comments correct.

9    Q    And was there ever an effort to finalize

10   this draft and -- or -- not -- strike that.

11        Was there ever a -- were you ever asked to

12   finalize this to get to a version that was not -- no

13   longer considered a draft?

14    A    No.  I think what happened after this was

15   we moved into the second effort, the more elaborate

16   effort, to look at the device, the redesigned device

17   that followed this.

18        So the answer to your question is "No," I

19   was not asked, to my best recollection, to finalize

20   this.  This is the only thing I ever remembered

21   submitting.

22    Q    Okay.  And this indicates that you and

23   Dr. Rabin are the primary authors of this report.

24        Were there any other authors?

25    A    No.

Douglas Ivan, M.D.

1    Q        Just you and Dr. Rabin?

2    A        That's correct.

3    Q        Was this report considered a validation

4    effort?

5    A        No.   None -- not -- not from my

6    perspective.   I mean, to me, this was a -- a first

7    look at a prototypic device to evaluate it, to see

8    what needed to be done to it, to make improvements

9    to it.   Because it was clear that the design

10   features, the major design flaws that both Dr. Rabin

11   and I saw would require a redesign before proceeding

12   further with looking at other issues.

13           So I don't -- I didn't see this as a

14   validation in a traditional sense.   I mean, it was

15   an attempt to validate the Lantern as a tool to be

16   used.   You might -- you could maybe say that.   But I

17   don't see -- didn't see this as a validation step.

18   Q        Okay.   I'm going to go to page -- page 3 of

19   the report, labeled "Executive Summary."

20   A        Um-hmm.

21   Q        Down at the -- it's the third paragraph

22   down, reads, [as read] "The objectives of the

23   observational field study of the light -- of the LC"

24   -- I'm assuming "LC" means light cannon in this

25   context?

1  is to -- obviously, it's a multifaceted thing.

2  It -- it's to make sure that once the design has --

3  features have been improved to eliminate the -- not

4  the positional cues; once the luminance values were

5  adjusted so that you could eliminate the luminance

6  cue or keep it, in addition, as a -- as a false clue

7  for trying to catch folks -- color vision

8  defectives -- once you did all of that, then you

9  would then go ahead back to the -- to doing

10 scientific and operational studies and -- as a part

11 of a complete validation program for the device.

12      Q      Okay.   The next paragraph goes on to state

13 that [as read] "While the new LED-based CVFT test

14 represents a logical and worthy technical step

15 forward as a potential relevant -- potentially

16 relevant occupational field test, it is the opinion

17 of the vision consultants involved in this -- in

18 this initial field study that the existing

19 prototypical light cannon device has a number of

20 critical shortcomings in its current design and

21 within the proposed test administrative procedures

22 that will diminish its reliability and effectiveness

23 if it were to be deployed 'as is' as a final

24 determinant for the purpose of declaring an

25 individual fit to perform effectively and safely on

Douglas Ivan, M.D.

1    color -- on critical color vision-based tasks

2    expected" -- excuse me -- "expected to be

3    encountered operationally on the railroad."

4            Was -- does that -- does that accurately

5    encapsulate your opinion at the time?

6        A    Yes.

7        Q    Has your opinion changed as to this version

8    of color vision -- of the light cannon test?

9        A    With respect to this prototype?  No.  Those

10   words go -- those concepts and words still apply.

11       Q    Has your opinion on the light cannon test,

12   as it currently stands today, changed?

13       A    You mean on the second part of that?

14       Q    Sure.

15       A    Well, I mean, obviously, engineering

16   changes were made in the device to make it better.

17   There was still dialogue in terms of that device was

18   still being looked at procedurally in terms of how

19   to best administer it, that -- the testing

20   protocols, if you will, there.  And then also the

21   issue of whether we, or Union Pacific, wanted to

22   change the luminance differences within the light

23   heads to remove that cue.

24            Those were still being discussed in that

25   second group process that was with -- and headed by

Douglas Ivan, M.D.

1    their document, I think, down here on -- if you go

2    further on down to 23, we basically -- I speak in

3    that last paragraph -- or we speak in that last

4    paragraph -- of the CIE recommending their -- if you

5    are going to do a practical test, here's what it

6    must do.  And they are listed there.

7        Q    Okay.  Let me go back up to page 22.  In

8    the middle of the page there, under "CIE Technical

9    Report," that heading --

10       A    Um-hmm.

11       Q    -- it says, [as read] "One of the key

12   reference documents often cited in discussion" --

13   oh, sorry.  I mis- -- I'm misreading.

14            Sorry.  Going back to the top of the

15   paragraph.

16       A    Okay.

17       Q    I keyed in on the word "key."

18            But the first paragraph of the page is, [as

19   read] "The key to any practical color vision test is

20   to link all possible color vision performance tasks

21   to be occupationally encountered, to include

22   variations in operational environment that may

23   degrade the vision performance from the ideal.  The

24   process to get there should be occupationally and

25   scientifically validated by experienced operational

1    personnel and occupational medicine and vision

2    experts.   It should be standardized, reproducible,

3    and equitable."

4              Is that the -- are you describing a process

5    to validate the efficacy of the test?

6         A    In concept, in the overall concept, yes.

7    That would be a -- basically a synthesis with -- of

8    all the -- all the principles that this kind of

9    testing should employ, to include the CIE's feel

10   about -- about this kind of an endeavor.

11             So, yeah, that's -- that's conceptually

12   applicable here.

13        Q    Okay.  And is that -- is that in order to

14   maximize the detection of people who might have

15   color vision deficiencies and may be on -- and --

16   strike that.

17             Is that -- is the purpose of -- of that

18   validation process to maximize the -- the detection

19   of individuals with color vision deficiency?

20        A    I think that's one aspect of it.  But the

21   other aspect is to make sure that you are not --

22   that color normals are not being discarded because

23   they are not -- the test is not identifying them to

24   be color normal.

25             So that's the -- gets into that specificity

Douglas Ivan, M.D.

1    can before you go through the entire process.

2         Q    Okay.  I'm going to direct you to one more

3    section on this -- on this document.  This is under

4    the "Conclusions," page 26.

5              And as you've pointed out -- you've

6    testified to this already.  You -- I think you used

7    almost the exact wording.

8              "In our opinion" -- it starts, [as read]

9    "In our opinion, while certainly worthy of continued

10   development" -- sorry.  I -- you did not actually

11   testify to this.  I apologize.

12             It said -- it reads, [as read] "In our

13   opinion, while certainly worthy of continued

14   development, the light cannon device is -- in its

15   current form remains technologically immature in the

16   short term; lacks necessary scientific and

17   occupational validation, e.g. as reported by the

18   NTSB following Goodwell; and addresses only a

19   specific LED-based signal light recognition task

20   within a wayside signal system that currently does

21   not yet exclusively use LED signal lights.  Most of

22   these disconnects can be addressed with simple

23   engineering improvements and a suitable -- a

24   suitable validation program, but until the process

25   is complete and the light -- the signal light

Douglas Ivan, M.D.

1  recognition tasks only involve LED wayside signals,

2  exclusive reliance on the light cannon in its

3  current form without proper validation" -- moving on

4  to the next page -- "validation as the only test to

5  verify safe performance in critical color vision

6  railroad tasks is problematic and changeable."

7      A    "Challengeable."

8      Q    "Challengeable."  Thank you.

9  "Challengeable."  I -- my mistake.  Thank you for

10  correcting me.

11          Does that accurately express your opinions

12  of the light cannon test in its form at that time?

13      A    Yes.

14      Q    Based on that -- on that assessment, the

15  light cannon -- in the form that it was in at that

16  point, would you consider that a test that should be

17  administered?

18      A    I'm sorry.  Would you rephrase that --

19      Q    Yes.

20      A    -- one more time?

21      Q    Yes.  At that time, when you had this

22  opinion of the -- of the light cannon test, did

23  you -- would -- based on that opinion, would you

24  consider the light cannon a test that should have

25  been utilized in the field?

1    When you refer to "that effort," is that

2  the second assessment process with Dr. Garber that

3  you referred to several times?

4    A    Yeah.  Because it references up here --

5  remember, now, the second step is now going to be

6  led by Dr. Garber and his organization.  And why she

7  just mentions him and Dr. Rabin, and not everybody

8  else that they were soliciting participation in, I

9  don't know.  But I guess it's because it's the key

10 players from outside Union Pacific, because I think

11 most of the other people were already on board here

12 as contractors.

13    And, again, I'm speculating here.  These --

14 these would be notable outliers from outside the

15 U -- the Union Pacific environment.

16    So this is definitely in preparation for

17 the second step.  The second -- looking at the

18 second model.

19    Q    Okay.  Are you aware of any -- any

20 additional validation efforts that were performed

21 between January 2016, when you provided your report,

22 and October 24th, 2016, the date of this letter?

23    A    No.  You mean -- you mean, am I aware of

24 any things that may have happened to get us from

25 that Lantern to the second Lantern in -- during this

Douglas Ivan, M.D.

1   interim or any modifications thereof?

2       Q    No.   I'm asking whether you are aware of

3   any additional evaluation of the test between that

4   period.

5       A    I'm not aware.   I know that certain things

6   happened when we kicked off that second

7   organization.   There were some measurements that

8   were collected out in the field by Union Pacific.   I

9   don't know if those were done just before this or

10  afterward, but I know a lot of that continued.

11          So it's possible that there were some

12  luminance measurements taken by UP in the field that

13  was going on during this interim that I was not

14  aware of.

15      Q    Okay.   Do you know whether there was any --

16  strike that.

17          Do you recall what the scope of this --

18  this evaluation -- this second evaluation process

19  was?

20      A    That scope may have been addressed by that

21  other document that you showed.   The one that was

22  signed by -- that -- the email that basically talked

23  about face validity.   There may be some scope in

24  that.

25          But, certainly, my recollection of this was

Douglas Ivan, M.D.

1   Dr. Rabin finished the work he was doing with

2   subjects by that 2019 date?

3       A    I can't say for sure that he was finished.

4   I was not really involved with some of the

5   subsequent efforts that I understood went on.  I was

6   only involved with that initial foray of getting

7   that first procedural methodology exercise done.

8   And I don't recall if he -- if he finished all of

9   that and did -- published all of that data.

10      Q    Okay.  Did you produce a -- any sort of

11  report as a part of the second -- second assessment

12  process?

13      A    That was all.  The -- basically that

14  process generated an outline for a final report on

15  the second -- the second effort, the second light

16  cannon.  And the idea there was for -- and this --

17  that was constructed by Dr. Garber.  And the idea

18  there, he had -- he had added some background

19  material, and we were going to then plug in

20  individual pieces of the effort, including the

21  luminances, the measurements of what was online, and

22  other data as -- as it came in.  And basically then

23  use that outline to put material in it, and

24  eventually a final document would come out.

25          That is largely the piece that I -- I sent

1    to you the last time, in terms of my background

2    material that was submitted as a part of supporting

3    the background of that major report, which was still

4    ongoing.

5              So I -- I have not seen that finalized.  I

6    don't know what else has been put into it since.

7    But that material that I gave you, that extensive

8    background material, was meant to, obviously, allow

9    people to have a better understanding of the

10   terminology and the sciences that would be necessary

11   to understand this entire effort.

12             MR. BARNEY:  I'm going to mark this as

13   Exhibit 6.

14             (Exhibit No. 6 was marked for

15             identification.)

16   BY MR. BARNEY:

17        Q    Is this the -- I think you referred to it

18   as an outline, that you are referring to, that you

19   worked with Dr. Garber on?

20        A    Yeah.  That appears to be it.  If you can

21   scroll down.  I don't know how many pages you have.

22   You have 12 pages and -- yes.

23        Q    I will -- I will represent to you that

24   there are two separate documents that were produced,

25   but I think you are referring to both of them kind