**EXHIBIT 9**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF OREGON

 3                         PORTLAND DIVISION

 4                            ---o0o---

 5   NICHOLAS DEFRIES,            )
                                  )
 6              Plaintiff,        )
                                  )
 7         vs.                    ) Case No. 3:21-cv-00205-SB
                                  )
 8   UNION PACIFIC RAILROAD       )
     COMPANY, a Delaware          )
 9   Corporation,                 )
                                  )
10              Defendant.        )
     _____)
11

12

13

14                          DEPOSITION OF

15                           DEB GENGLER

16                    VOLUME 1, PAGES 1-109

17                  VIA REMOTE VIDEOCONFERENCE

18                    FRIDAY,  JULY 8, 2022

19                    9:08 A.M. - 12:01 P.M.

20

21

22

23

24   Reported By: Stephani French, CSR No. 14240

25             Certified Shorthand Reporter
```

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF OREGON

 3                         PORTLAND DIVISION

 4                             ---o0o---

 5   NICHOLAS DEFRIES,          )
                                )
 6              Plaintiff,      )
                                )
 7         vs.                  ) Case No. 3:21-cv-00205-SB
                                )
 8   UNION PACIFIC RAILROAD     )
     COMPANY, a Delaware        )
 9   Corporation,               )
                                )
10              Defendant.      )
     _____)
11

12

13

14

15

16

17                  DEPOSITION OF DEB GENGLER,

18   taken by the attorney for the Plaintiff, commencing at

19   the hour of 9:08 a.m., and concluding at 12:01 p.m., on

20   Friday, July 8, 2022, via remote videoconference, before

21   Stephani French, Certified Shorthand Reporter No. 14240,

22   in and for the State of California.

23                             ---o0o---

24

25
```

```
 1                 A P P E A R A N C E S

 2    For the Plaintiff:

 3    Hildebrand McLeod & Nelson
      350 Frank H. Ogawa Plaza, 4th Floor
 4    Oakland, California 94612
      By:  ANTHONY PETRU
 5         GAVIN BARNEY
           DYLAN WILLIAMS
 6    Attorneys at Law

 7

      For the Defendant:
 8
      Cozen O'Connor
 9    999 Third Avenue, Suite 1900
      Seattle, Washington 98104
10    By:  WILLIAM WALSH
      Attorney at Law
11
      Constangy, Brooks, Smith & Prophete, LLP
12    601 Montgomery St Suite 350
      San Francisco, CA 94111
13    By:  ROBERT ORTBALS
      Attorney at Law
14

15    For the Deponent:

16    Union Pacific Railroad Company
      1400 Douglas Street,
17    Omaha, Nebraska, 68179
      By:  JACQUELYN CLARK
18    Attorney at Law

19
      Also Present:
20
      Katie Rhoten, Defendant representative
21
      Audra Fields, Defendant representative
22


23


24


25
```

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF OREGON

 3                          PORTLAND DIVISION

 4

 5   NICHOLAS DEFRIES,              )
                                    )
 6           Plaintiff,             )
                                    )
 7      VS.                         )  NO. 3:21-cv-00205-SB
                                    )
 8   UNION PACIFIC RAILROAD         )
     COMPANY, a Delaware            )
 9   Corporation,                   )
                                    )
10           Defendant.             )
     _____)
11

12

13

14

15

16                           VOLUME II
                 VIDEO CONFERENCE DEPOSITION OF
17                        DEB A. GENGLER
                       FRIDAY, JULY 8, 2022
18

19

20

21

22

23

24   STENOGRAPHIC REPORTER:  CHRISTA YAN, CSR NO. 14316

25
```

```
 1   APPEARANCES VIA VIDEO CONFERENCE:

 2   FOR PLAINTIFF:
         HIDEBRAND MCLEOD & NELSON
 3       BY:   ANTHONY PETRU, ATTORNEY-AT-LAW
               GAVIN BARNEY, ATTORNEY-AT-LAW
 4             DYLAN WILLIAMS, ATTORNEY-AT-LAW
         350 Frank H. Ogawa Plaza, 4th Floor
 5       Oakland, California 94612
         (510) 451-6732
 6       petru@hmnlaw.com
         barney@hmnlaw.com
 7

 8   FOR DEFENDANT:
         CONSTANGY BROOKS, SMITH & PROPHETE LLP
 9       BY:   ROBERT ORTBALS, ATTORNEY-AT-LAW
               KATIE RHOTEN, ATTORNEY-AT-LAW
10       680 Craig Road, Suite 400
         St. Louis, Missouri 63141
11       (314) 338-3740
         rortbals@constangy.com
12
     FOR DEFENDANT:
13       COZEN O'CONNOR
         BY:   WILLIAM WALSH, ATTORNEY-AT-LAW
14       999 Third Avenue, Suite 1900
         Seattle, Washington 98104
15       (206) 340-1000
         crowinski@cozen.com
16

17   ALSO PRESENT:
     JACQUELYN CLARK, IN-HOUSE COUNSEL, UNION PACIFIC
18

19

20                          --oOo--

21

22

23

24

25
```

```
 1      Q.   Did you review any of the exhibits that were
 2   attached to your prior depositions?
 3      A.   No.
 4      Q.   Did you talk to anybody outside of the folks
 5   you identified a week or so ago and just before the
 6   start of the deposition today?
 7      A.   About the deposition?
 8      Q.   Yes -- no, about the best options on the menu
 9   for lunch.  No --
10      A.   Yeah.  No.  So I mean my manager, my director
11   -- my general director, I let him know my schedule would
12   be blocked, that I was coming for this deposition, of
13   course.
14      Q.   Sure.  Sure.  Other than logistical stuff.  I'm
15   talking substantive.
16      A.   Oh.  No.
17      Q.   All right.  Your current -- well, your title
18   all along has been director of clinical services.
19           What does that mean?
20      A.   I would -- do want to just -- for the record,
21   there was a time where my title was general director of
22   clinical services.  They had some changing within the
23   organization, as far as leveling of our job titles.  So
24   to answer your question, director of clinical services,
25   I'm responsible for the nurses that support the --
```

```
 1                    (Reporter clarification.)
 2                    THE WITNESS:  That support the fitness for duty
 3     process, and also for the vocational case managers.
 4     BY MR. PETRU:
 5          Q.   Other than the supporting the nurses who were
 6     responsible for execution of the fitness for duty
 7     process and the individuals who are part of Union
 8     Pacific's vocational case managers or management group,
 9     are there any other areas of which you have
10     responsibilities?
11          A.   Not currently, no.
12          Q.   In the past, have there been additional areas
13     of responsibility whilst you've been employed by Union
14     Pacific?
15          A.   Yes.
16          Q.   And what are those?
17          A.   I had one period there.  Occupational health
18     nurses, the field nurses, I was responsible for them.
19     And there may have been -- when I joined the company in
20     2006, there might have been some other responsibilities
21     for a brief period.  All within health and medical
22     services.
23          Q.   When's your best estimate of the time that you
24     had additional responsibility.
25          A.   Of the occupational health nurses?
```

```
 1   vision field test utilizing the light cannon protocol was
 2   accurately evaluating whether employees could perform the
 3   essential function of their jobs in reading wayside
 4   signals?
 5        MR. WALSH:  Object to form.
 6        THE WITNESS:  My response to that is I operated that
 7   as the evaluations had been done with Steve Flemming and
 8   Dr. Rabin and Dr. Ivan and Dr. Holland.  So they had
 9   looked at this.
10   BY MR. PETRU:
11        Q    Do you know whether or not Ivan, Rabin, or
12   Holland ever did a study comparing then same individuals
13   reading wayside signals with or without color vision
14   deficiencies and comparing their ability to read or to
15   pass the light cannon test?
16        A    So before 2016, before we rolled them out, no.
17        Q    No.  Ever, ever?  Do you know whether or not
18   Union Pacific or any of its vendors, contractees,
19   employees, directors, managers, vice presidents, anybody
20   at Union Pacific has ever conducted a scientifically-valid
21   study evaluating groups of employees who both had color
22   vision -- who are color vision normal and color vision
23   deficient to see whether or not the light cannon device
24   accurately evaluated whether or not an employee could see
25   a wayside signal?
```

```
 1      A    No employees were tested --
 2      MR. WALSH:  Object to form.
 3           Sorry.  Go ahead.
 4      MR. PETRU:  Can you let her answer, please?  I'm
 5   kidding.
 6   BY MR. PETRU:
 7      Q    What was your answer?
 8      A    No employees were tested, no.
 9      Q    Anybody specifically tested using both wayside
10   signals and the light cannon device as a comparator to
11   determine whether or not it accurately caught people who
12   could not see a wayside signal as opposed to just validate
13   the fact that they had some colorblindness or color
14   deficiencies?
15      A    What I'm aware is that Dr. Rabin did a study
16   using students, I believe, in the school of optometry and
17   he tested them, clinical testing, and then used the light
18   cannon and tested them for light cannon.
19      Q    That's --
20      A    I do know that was done.
21      Q    I get that as well.  We're familiar with that.
22   I'm asking something different.  I'm asking comparing the
23   employees' or a test subject's ability to see wayside
24   signals properly and compare those results to seeing your
25   light cannon device properly.  Was that comparison ever
```

1   done?
2       A    No.  We did not take them to the field.
3       Q    As a nurse with an occupational background, do
4   you agree with me that it would be an appropriate study to
5   see, and you'd like to see it, whether or not a light
6   cannon test accurately weeded out people who could not see
7   wayside signals properly?
8       MR. WALSH:  Object to form.
9       THE WITNESS:  I'm not really prepared to -- that's not
10  my background to make that opinion.  I can tell you
11  what -- as a nurse, that when Dr. Rabin tested the
12  students, clinical testing, he did, as said that you know,
13  there was a variety of tests.  Including the -- (remote
14  technical) -- scope and other testing --
15      THE REPORTER:  Including the what scope?
16      THE WITNESS:  Anomaloscope [phonetic].
17           So in other clinical tests on students and then
18  compare them with the color vision, the light cannon.  I
19  am aware of that.  And I thought from doing the clinical
20  testing, therefore, they would know if they had eye
21  disease or if they could have actually normal color
22  vision.
23           So I thought that was appropriate information and
24  they tested them according to our protocol, the light
25  cannon protocol.

 1   identical and are identical to this day, correct?

 2   A    Yes.

 3   Q    All right.  In addition to the doctors, Rabin and

 4   Ivan, have you shown or shared this device with any other

 5   non-Union Pacific folks?

 6   A    So the FRA came for a visit.  I definitely talked

 7   through what we do with them.

 8   Q    Okay.

 9   A    And then the (verbal utterance) board --

10   Q    I'm sorry.  The what board?

11   A    It's called the LERB, L-E-R-B, Board.  Maybe,

12   yeah.  Members of the locomotive engineers and the

13   conductor board came.  So they're non-UP employees.  So I

14   was asked to demonstrate the light cannon, talk through

15   the light cannon.  So they joined me at the (verbal

16   utterance) yard.

17        THE REPORTER:  The what yard?

18        MR. PETRU:  Council Bluffs.

19        THE WITNESS:  So those are two groups that are non-UP

20   employees.

21   BY MR. PETRU:

22   Q    Okay.

23   A    And then did you mention, Dr. Rabin had students?

24   Q    Yeah.

25   A    Yeah.

```
 1     Q    He was the general director of operating safety?
 2     A    Operating practices.
 3     Q    Operating practices?
 4     A    Yeah.
 5     Q    And you were there, DG?
 6     A    Yes.
 7     Q    And do you remember --
 8     A    I'm not sure either there was another UP person
 9   there.  I can't recall.
10     Q    Do you remember how many folks from the FRA were
11   there?
12     A    One or two, I mean, obviously, the vice president
13   of safety.  And I cannot recall his name, but I might
14   recognize if you -- but I think there was another person
15   there.  Again, that's what I recall.
16     Q    Okay.  They didn't bring out like a scientific
17   crew or anybody like that.  You were just showing --
18     A    No, they were -- correct.  I was just asked by
19   Rod to show it to them and then talk through the process.
20     Q    I understand.
21     A    Yeah.
22     Q    I get it.
23          THE REPORTER:  Ms. Gengler, if I could just ask you,
24   respectfully, to please wait for counsel to complete his
25   full question before you answer.
```

```
 1         THE WITNESS:  Yes.
 2         THE REPORTER:  Thank you.
 3         MR. PETRU:  You can also ask me to respectfully not
 4   interrupt her as much as I do, and I will try.
 5         MR. WALSH:  Sure.
 6         MR. PETRU:  All right.
 7   BY MR. PETRU:
 8     Q    So in terms of them looking at it, it was just a
 9   we want a look/see kind of thing.  Fair?
10     A    You're speaking of the FRA or the LERD Board?
11     Q    Oh, I meant both.  Let's say FRA first.
12     A    So the FRA, yeah, they wanted to see it.  And I
13   talked through the -- how the process is done, the
14   procedure.  I can't recall if he had any questions, but...
15     Q    Okay.
16     A    And then that was pretty limited.
17     Q    How about the LERD Board?
18     A    The LERD Board, I do recall, I'm pretty sure we
19   actually allowed or one of them -- and I couldn't tell you
20   who -- actually, to turn on the signal and see, you know,
21   a quarter mile away and, you know, call out the signals.
22   Of course, I talked through the procedure, and I do not
23   recall if we did all 20 signals.  I can't recall that.
24   But it was more than just talking through it.  I don't
25   know if there was a memo there or...
```

1    Q    Okay.  So just to make sure I got you because you
2    jumped from one to the other, you recall that during the
3    LERD Board, one of the individuals wanted to see what it
4    looked like.  So he went a quarter mile away and went
5    through a couple of signals, not all 20 of them, didn't do
6    a full formal testing, but saw what it looked like, right?
7    A    That's what I recall.
8    Q    But with the FRA, they didn't do that, to your
9    recollection?
10   A    That's correct.
11   Q    Okay.  And obviously, there wasn't a report that
12   came afterwards, going through an analysis of it, you
13   know, verifying that it was valid or anything like that,
14   that never happened, correct?
15   A    Correct.
16   Q    Okay.  To your knowledge, was the device ever
17   shown to any other FRA folks or any other nerve -- LERD
18   Board individuals at any other time to your knowledge?
19   A    No, not to my knowledge.
20   Q    Am I sharing now?  No, I'm not sharing.  Good.
21        In -- as I'm scrolling through a bunch of
22   documents I have here, let me just ask you some kind of
23   generalized questions.
24        In your preparations for the deposition today,
25   did you review any case specific documents at all?