1

2

3

4

5

6

7                          IN THE UNITED STATES DISTRICT COURT

8                       FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10    JUSTIN DONAHUE, et al.,                    Case No.  21-cv-00448-MMC

11                    Plaintiffs,

12            v.                                 **GRANTING DEFENDANT'S MOTION
                                                 FOR SUMMARY JUDGMENT**
13    UNION PACIFIC RAILROAD                      Re: Dkt. No. 60
      COMPANY,
14
                      Defendant.
15

16        Before the Court is defendant Union Pacific Railroad Company's ("Union Pacific")

17   "Motion for Summary Judgment" (Doc. No. 60), filed August 5, 2022.  Plaintiffs Justin

18   Donahue ("Donahue"), Jason Campbell ("Campbell"), and Jacob Goss ("Goss") have

19   filed opposition, to which Union Pacific has replied.  Having read and considered the

20   papers filed in support of and in opposition to the motion and having considered the

21   arguments made at hearing, the Court rules as follows.

22

23                                    **BACKGROUND**

24        Plaintiffs are three former conductors[1] for Union Pacific (see Rhoten Decl. Ex. B

25   (Goss), Ex. C (Campbell), Ex. D (Donahue)) whose positions "entailed reading and

26   interpreting multicolored railroad traffic signal lights on signal masts" (see Compl. ¶¶ 30,

27   _____

28        [1] Goss also worked as a "locomotive engineer."  (See Compl. ¶ 56).

44, 57; see also Rhoten Decl. Exs. E, F).  Plaintiffs were each "responsible for train movement" and, consequently, each was required to be "certified by the Federal Railroad Administration."  (See Compl. ¶ 2).

As part of the certification process, the Federal Railroad Administration "prescribes minimum Federal safety standards" that conductors and locomotive engineers must meet to hold such positions, see 49 C.F.R. §§ 240.1, 242.1, including "[t]he ability to recognize and distinguish between the colors of railroad signals," see 49 C.F.R. §§ 240.121(c)(3), 242.117(h)(3).  Union Pacific recertifies conductors and locomotive engineers every three years, in accordance with FRA regulations.  (See McClelland Decl. ¶ 4).

In 2016, 2017, and 2018, respectively, Goss, Donahue, and Campbell took and failed the two tests administered by Union Pacific in those years, namely "the 14-Plate Ishihara test" ("Ishihara") and a color vision field test known as the "Light Cannon" (see Compl. ¶¶ 3, 26, 33-34, 47, 49, 61-62).  As a result, Union Pacific issued plaintiffs "permanent work restrictions" prohibiting them from working as conductors or locomotive engineers.  (See Compl. ¶¶ 37, 50, 63).  Plaintiffs challenge their work restrictions on the alleged ground that the Light Cannon test "does not assess the employee's ability to recognize and distinguish between colors of railroad signals."  (See Compl. ¶ 27).

Based on the above, plaintiffs assert two claims under the Americans with Disabilities Act ("ADA"), specifically, Count I, titled "Disability Discrimination - Disparate Treatment," and Count II, titled "Disability Discrimination – Disparate Impact."[2]

By the instant motion, Union Pacific seeks summary judgment, on the asserted grounds that (1) plaintiffs' disparate impact claim is time-barred, (2) both claims are precluded by the Federal Railroad Safety Act, 49 U.S.C. § 20100 et seq., and (3) both claims fail on their merits.

---

[2] By order filed June 16, 2022, the third claim asserted in the Complaint, titled "Failure to Accommodate," was dismissed.

United States District Court
Northern District of California

**LEGAL STANDARD**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).

The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), and Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact.  Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  See Celotex, 477 U.S. at 324 (internal quotation and citation omitted).  "When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (citations omitted).  "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion."  See Matsushita, 475 U.S. at 587 (internal quotation and citation omitted).

**DISCUSSION**

**A.  Disparate Impact Claims**

By order issued September 16, 2022, the Court granted summary judgment in favor of defendant as to both the disparate treatment and disparate impact claims, on the basis that both were time-barred, finding plaintiffs' ability to rely on "the equitable tolling doctrine set forth in American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974) . . .,

under which the filing of a class action tolls the statute of limitations as to all asserted members of the class" (see Order Granting Summary Judgment at 4:15-19) (internal quotation and citation omitted), ended when the named plaintiffs in Harris v. Union Pacific Railroad Co., Case No. 16-cv-381-JFB-SMB, the putative class action on which plaintiffs relied, voluntarily abandoned their disparate impact claims and narrowed the class definition as to their disparate treatment claims.

Plaintiffs appealed, and, on June 14, 2024, the Ninth Circuit reversed and remanded the action. See Donahue v. Union Pac. R.R. Co., No. 22-16847, 2024 WL 2988223 (9th Cir. June 14, 2024). On appeal, however, plaintiffs chose to "pursue only their disparate treatment theory." See Donahue, Campbell, & Goss v. Union Pac. R.R. Co., No. 22-16847, Dkt. 25 at 15 n.1 (9th Cir. May 5, 2023). In light of such election by plaintiffs, their disparate impact claims were not addressed by the Ninth Circuit. In particular, the Memorandum decision issued in the instant case incorporated the reasoning of DeFries v. Union Pac. R.R. Co., 104 F.4th 1091 (9th Cir. 2024), one of three cases argued to the panel on the same date and in which the plaintiffs therein were "situated identically." See Donahue, 2024 WL 1988223, at *3.

In DeFries, the plaintiff, like the plaintiffs here, did not pursue his disparate impact claim on appeal, electing to proceed solely on his disparate treatment claim. See DeFries v. Union Pac. R.R. Co., No. 23035119, Dkt. 14 at 14 n.3 (9th Cir. May 24, 2023). Consequently, the sole issue addressed was whether American Pipe tolling ended when the class definition as to the Harris plaintiffs' disparate treatment claim was "voluntarily narrowed by [the Harris] plaintiffs' counsel." See DeFries, 104 F.4th at 1096-97 (explaining, "[w]hether the narrowed class definition included or excluded color-vision plaintiffs like DeFries is the central question of this appeal"; further explaining, "[t]his appeal concerns a distinct question" from that presented by "voluntary abandonment of a claim by class counsel"). After considering the question at length, the Ninth Circuit concluded that "to end American Pipe tolling for a particular . . . plaintiff based on a revised class definition," the new definition must "unambiguously" exclude that plaintiff,

4

1    see DeFries, 104 F.4th at 1100, and, in this instance, found the revised definition did "not

2    unambiguously remove[ ]" DeFries from the Harris class, see DeFries, 104 F.4th at 1109.

3    Although, as noted, the Ninth Circuit reversed and remanded in all three cases, said

4    reversal and remand did not encompass plaintiffs' disparate impact claims, which, in light

5    of plaintiffs' election to pursue only their disparate treatment claims on appeal, had been

6    abandoned.  See Collins v. City of San Diego, 841 F.2d 337, 339 (9th Cir. 1988) (noting

7    "well established" principle "that claims which are not addressed in [an] appellant's brief

8    are deemed abandoned").

9         Accordingly, the Court finds the remaining claims at this juncture are plaintiffs'

10   disparate treatment claims, and, in light thereof, the Court next turns to those claims.

11        **B.  Disparate Treatment Claim**

12             **1.   Preclusion by the Federal Railroad Safety Act**

13        Union Pacific contends plaintiffs' ADA claims challenging the denial of their

14   recertifications are precluded because the Federal Railroad Administration ("FRA") has

15   established, through the authority granted it by the Federal Railroad Safety Act ("FRSA"),

16   dispute resolution procedures that, according to Union Pacific, constitute the exclusive

17   means by which plaintiffs are entitled to challenge such decisions.  In support thereof,

18   Union Pacific cites to 49 C.F.R. § 242.501, which provides: "Any person who has been

19   denied certification, denied recertification, or has had his or her certification revoked and

20   believes that a railroad incorrectly determined that he or she failed to meet the

21   certification requirements of this regulation when making the decision to deny or revoke

22   certification, may petition the Federal Railroad Administrator to review the railroad's

23   decision."  See 49 C.F.R. § 242.501(a); see also 49 C.F.R. § 240.401(a) (same).  As set

24   forth below, the Court is not persuaded by Union Pacific's argument.[3]

25   _____

26        [3] In a relatively brief footnote, Union Pacific argues that even if the Court finds
     plaintiffs' claims are not precluded, it should "exercise its discretion and dismiss
27   [p]laintiffs' claims under the primary jurisdiction doctrine so they can be resolved by the
     FRA."  (See Mot. at 11, n.8).  "The deciding factor in determining whether the primary
28   jurisdiction doctrine should apply is efficiency."  Reid v. Johnson & Johnson, 780 F.3d
     952, 967 (9th Cir. 2015) (internal quotations and citation omitted).  Here, the authority

1    In POM Wonderful v. Coca-Cola Co, 573 U.S. 102 (2014), the Supreme Court was

2   asked to determine whether actions alleging unfair competition under the Lanham Act are

3   precluded by the Federal Food, Drug, and Cosmetic Act ("FDCA") and, in arriving at its

4   resolution of that issue, provided guidance as to how federal courts are to conduct a

5   preclusion analysis.  In particular, the Supreme Court identified several relevant factors,

6   namely the "text," "structure," "purpose," and "enforcement" mechanism of each statute,

7   see id. at 113-116, and, in considering those factors, rejected the defendant's argument

8   that the plaintiff's claims were precluded, see id. at 121.  Here, although the statutes at

9   issue are different than those at issue in POM Wonderful, consideration of the relevant

10  factors produces the same result.

11    First, there is nothing in the text of the FRSA or the regulations promulgated

12  thereunder that expressly forbids or limits claims under the ADA, an "absence . . . of

13  special significance" given that the two statutes have "coexisted," see id. at 113, since the

14  passage of the ADA in 1990, see 104 Stat. 327 (1990); see also 84 Stat. 971 (1970).

15  Further, the FRSA, like the FDCA, contains an express provision preempting certain state

16  laws, see 49 U.S.C. § 20106, but contains no provision addressing the preclusion of any

17  federal laws, a circumstance which, as the Supreme Court observed, constitutes

18  "powerful evidence" weighing against preclusion, see POM Wonderful, 573 U.S. at 114.

19    Next, the Court considers the statutory structure of the FRSA and ADA and, as in

20  POM Wonderful, finds the "two statutes complement each other," each having "its own

---

granted the FRA is part of a "limited dispute resolution scheme," see Carpenter v. Mineta, 432 F.3d 1029, 1034 (9th Cir. 2005), and there is nothing in any statute or regulation suggesting the limited authority granted the FRA encompasses the resolution of discrimination claims.  Under such circumstances, the effect of Union Pacific's proposal is, in essence, a bifurcation of the issues between two separate forums, a circumstance Union Pacific fails to show promotes efficiency.  Accordingly, the Court declines to dismiss the case pursuant to the primary jurisdiction doctrine.  See Reid, 780 F.3d at 966 (noting primary jurisdiction doctrine "is not designed to secure expert advice from agencies every time the court is presented with an issue conceivably within the agencies ambit") (internal quotation and citation omitted); see also Est. of Saunders v. Comm'r, 745 F.3d 953, 962 n.8 (9th Cir. 2014) (holding "[a]rguments raised only in footnotes . . . are generally deemed waived").

United States District Court
Northern District of California

1    scope and purpose." See id. at 115.  Although both touch on the subject of employment,

2    the FRSA was enacted "to promote safety in every area of railroad operations and reduce

3    railroad-related accidents and incidents," see 49 U.S.C. § 20101, whereas the ADA was

4    enacted to "provide a clear and comprehensive national mandate for the elimination of

5    discrimination against individuals with disabilities," see ADA Amendments Act of 2008,

6    Pub. L. No. 110-325, § 2(a)(1), 122 Stat. 3553, 3553 (2008).

7         Additionally, like the FDCA and Lanham Act, the FRSA and ADA have different

8    "enforcement" mechanisms.  See POM Wonderful, 573 U.S. at 115.  Enforcement of the

9    FRSA, coupled with the detailed prescriptions of its implementing regulations, is largely

10   committed to the Secretary of Transportation, see 49 U.S.C. § 20111; the ADA, on the

11   other hand, provides disabled employees with a private right of action against their

12   employers, see 42 U.S.C. §§ 12112(a), 2000e-5(f)(1).

13        Lastly, the Court has located only two decisions that have addressed precisely the

14   same issued presented here, namely, whether the FRSA provides the exclusive remedy

15   available to color-vision deficient railroad employees challenging denial of recertification.

16   In that regard, in Turner v. BNSF Ry. Co., No. 4:23-cv-00681-P, 2023 WL 9052248 (N.D.

17   Tex. Dec. 22, 2023), the district court found such employees' claims are precluded,

18   whereas, in DeFries v. Union Pac. R.R. Co., No. 3:21-cv-205-SI, 2025 WL 1029283 (D.

19   Or. Apr. 7, 2025), the district court found to the contrary.[4]  This Court, having considered

20   those decisions, finds the reasoning set forth in DeFries more persuasive.

21   _____

22        [4] Contrary to Union Pacific's argument, Weeks v. Union Pac. R.R. Co., No. 1:13-CV-1641 AWI JLT, 2017 WL 1740123 (E.D. Cal. May 4, 2017) did not decide the
23   question presented here.  In Weeks, the district court found no preclusion where the plaintiff was "not complaining about [Union Pacific's] decision to deny recertification."
     See id. at *7.  According to Union Pacific, "[i]mplicit in the court's analysis was that if the
24   plaintiff had argued that [Union Pacific] incorrectly determined that he … failed to meet the [FRA's] qualification requirements … for recertification," such a claim would be
25   precluded by the FRSA.  (See Mot. at 10:17-11:3) (internal quotation and citation omitted; emphasis in original).  The Court disagrees.  Given that Weeks' ADA claim was based on
26   Union Pacific's failure to notify him of certification renewal proceedings, the district court was not called upon to conduct an analysis as to the question presented here.  Moreover,
27   to the extent it did comment on any of the factors identified in POM Wonderful, it noted that the FRSA and ADA "address different subject matters entirely."  See Weeks, 2017
28   WL 1740123, at *7.

United States District Court
Northern District of California

1    In sum, the Court finds plaintiffs' disparate treatment claims under the ADA are not

2    precluded and, consequently, now turns to the merits of those claims.

3                              **2. The ADA**

4    Under the ADA, "[n]o covered entity shall discriminate against a qualified individual

5    with a disability because of the disability of such individual in regard to . . . terms,

6    conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prevail on an ADA

7    claim, a plaintiff must establish: "(1) that he is a disabled person within the meaning of the

8    ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he

9    must describe), he is able to perform the essential functions of the job; and (3) that the

10   employer [removed him from service] because of his disability." Kennedy v. Applause,

11   Inc., 90 F.3d 1477, 1481 (9th Cir. 1996); see also 42 U.S.C. § 12112(a). Here, defendant

12   contends, plaintiffs can establish neither the second nor third element of their claims.

13                            **a. Disability**

14   "The term 'disability' means," inter alia, (1) "a physical or mental impairment that

15   substantially limits one or more major life activities of such individual" or (2) "being

16   regarded as having such an impairment." See 42 U.S.C. § 12102. In the instant case,

17   the parties are in accord that the first element is met. Although plaintiffs dispute Union

18   Pacific's assertion that they are, in fact, disabled, there is no disagreement that Union

19   Pacific regarded them as disabled.

20                        **b. Qualified Individual**

21   An individual is qualified for purposes of the ADA if he "with or without reasonable

22   accommodation, can perform the essential functions of the employment position that

23   such individual holds or desires." 49 U.S.C. § 12112(8). The essential functions of a job

24   are the "the fundamental job duties of the employment position" not including "the

25   marginal functions of the position." See 29 C.F.R. § 1630.2(n)(1).

26   It is an essential function of conductors to "distinguish between the colors of

27   railroad signals," see 49 C.F.R. § 242.117(h)(3), so as to "safely perform as a conductor,"

28   see 49 C.F.R. § 242.117(j). To demonstrate an ability to perform this essential function,

1    conductors must successfully complete color vision testing in accordance with the

2    scheme set forth by FRA regulations.  See 49 C.F.R. § 242.117(h)(3).

3           Such scheme consists of an initial test and further examination.  See 49 C.F.R.

4    Part 242 App'x D.  First, as an initial test of color vision acuity, the railroad administers to

5    the conductor one of the twelve scientific tests identified as "Accepted."  See 49 C.F.R.

6    Part 242 App'x D(2).  A conductor who passes the initial test has demonstrated the

7    "ability to recognize and distinguish between the colors of railroad signals," see 49 C.F.R.

8    § 242.117(h)(3), and, consequently, is certified.  Conductors who fail the initial test,

9    however, "shall, upon request, be subject to further medical evaluation by a railroad's

10   medical examiner to determine that person's ability to safely perform as a conductor."

11   See 49 C.F.R. § 242.117(j).  The particular method by which a railroad conducts such

12   further examination is, pursuant to FRA guidance and regulations, largely left to the

13   railroad's discretion (see Rhoten Decl. Ex. J at 73124) and may include "another

14   approved scientific screening test or a field test," see 49 C.F.R. Part 242 App'x D(4).

15          Union Pacific adheres to the FRA's regulations by administering an accepted initial

16   test, namely, the "Ishihara (14 plate)."  See 49 C.F.R. Part 242 App'x D(2) (listing

17   "Ishihara (14 plate)" as "Accepted").  In said test, employees are presented with a book

18   containing plates (see Rhoten Decl. Ex. W) that have "colored numbers in a circle" (see

19   Campbell Depo. at 47:25).  Employees are asked to identify the number on each plate

20   and are awarded a correct answer if their response matches the expected response.

21   (See Rhoten Decl. Ex. W).  If an employee makes "2 or more errors on plates 1-11" such

22   employee is deemed to have failed the test.  See 49 C.F.R. Part 242 App'x D(2).

23   Employees who make one or fewer errors on those plates pass and are certified.

24          Union Pacific employees who fail the Ishihara (14 plate) and request further

25   medical evaluation are administered a field test, as contemplated by 49 C.F.R. Part 242

26   App'x D(4).  In particular, Union Pacific administers a field test of its own design known

27   as the "Light Cannon."  (See Holland Decl. ¶¶ 6-8).  The Light Cannon presents

28   employees with 20 test signals, each of which is an "individual colored railroad wayside

1    signal light[ ]," one at a time and instructs the employee to identify the color of the test

2    signal.  (See Holland Decl. Ex. 1 at UPDONAHUE 001594, 001597).  If an examinee

3    correctly identifies the color of the signal during the 3-second period during which the

4    light is on or "immediately after the signal goes dark," the examinee is credited with a

5    correct response.  (See id. at UPDONAHUE 001604).  A "failure to correctly identify the

6    color of any signal light" constitutes a failure.  (See id. at UPDONAHUE 001123).

7         It is undisputed that plaintiffs took and failed both the Ishihara (14 plate) and Light

8    Cannon tests.  As noted, however, plaintiffs dispute the validity of the Light Cannon and,

9    in support of such challenge, have submitted a report and a PowerPoint presentation

10   (see Barney Decl. Exs. 6, 11) in which expert consultants retained by Union Pacific offer

11   various criticisms of the Light Cannon testing procedures.  Having reviewed the record as

12   a whole, the Court finds plaintiffs have submitted sufficient evidence to raise a genuine

13   issue as to the validity of the Light Cannon.

14        Such evidence without more, however, is not sufficient to demonstrate plaintiffs

15   are, in fact, qualified.  In that regard, to the extent plaintiffs may be arguing their history of

16   job performance "without incident" (see Opp at 19:15) suffices to show they are qualified,

17   the Court does not agree.  Nor does the Court find plaintiffs' ability to pass earlier tests

18   adds weight to such showing.  No plaintiff has offered evidence that he passed an earlier

19   conducted Ishihara (14 plate),[5] and the National Transportation Safety Board has found

20   the earlier color vision field test on which plaintiffs rely "fails to ensure that Union Pacific

21   Railroad employees have adequate color perception to perform in safety-sensitive

22   positions." (See Rhoten Decl. Ex. G at 44).  Moreover, the most recent year in which any

23   plaintiff passed such test was 2015 (see Rhoten Decl. Ex. GG) and, thus, beyond the 36-

24   month period deemed relevant under the FRA's regulations.  See 49 C.F.R. § 242.201

25

26        [5] Although plaintiffs allege that between 2006 and 2017 Donahue "took the
27   Ishihara test" and "passed [it] during several recertifications" (see Compl. ¶ 32), the
     record is devoid of factual support for such assertion, and, in any event, as noted below,
28   successful testing in those years would be to no avail.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   (providing "[n]o railroad shall . . . [c]ertify a person as a conductor for an interval of more

2   than 36 months"); see also, e.g., Blankinship v. Union Pac. R.R. Co., No. CV-21-00072-

3   TUC-RM, 2024 WL 5187689, at *5 (D. Ariz. Dec. 20, 2024) (finding railroad conductor's

4   "ability to satisfy FRA color vision acuity standards in the past is insufficient to establish a

5   genuine dispute of fact as to whether he could satisfy those standards at the time he was

6   removed from service").  In short, plaintiffs need something more than past performance

7   and past testing.

8        As to Goss, there is no evidence of successful testing beyond that described

9   above.  Although plaintiffs allege in the Complaint that, on October 15, 2019, Campbell

10  passed an "Ishihara Test with the aid of a color-tinted corrective lens" (see Compl. ¶ 54),

11  they have presented no evidence in support of that allegation,[6] and, even if they had

12  done so, such evidence would be unavailing, as pursuant to FRA regulations, "[n]o

13  person shall be allowed to wear chromatic lenses during an initial test of the person's

14  color vision."  See 49 C.F.R. Part 242 App'x D(3).  Accordingly, Campbell and Goss have

15  failed to raise a triable issue as to qualification.

16       Donahue, by contrast, has submitted evidence that on May 24, 2017, June 7,

17  2017, and August 2, 2017, he passed Ishihara tests administered respectively by three

18  separate optometrists in private practice.  (See Barney Decl. Ex. 18).  In light thereof, the

19  Court finds Donahue has raised a triable issue as to qualification, and now turns to the

20  issue of whether Donahue was removed from service on the basis of a perceived

21  disability.[7]

22                    **c.  Removal on Basis of Disability**

23       "The ADA prohibits employment decisions made because of a person's qualifying

24  disability, not decisions made because of factors merely related to a person's disability."

25  _____

26       [6] The Complaint is not a verified pleading.

27       [7] Although the Court has found Union Pacific is entitled to summary judgment as
    to plaintiffs Goss and Campbell, the Court's analysis set forth in the next section is
28  equally applicable to those two plaintiffs.

1   See Lopez v. Pac. Maritime Ass'n, 657 F.3d 762, 764 (9th Cir. 2011).  Consequently, "[i]n

2   a disparate treatment case, liability depends on whether the protected trait . . . actually

3   motivated the employer's decision."  Hazen Paper Co. v. Biggins, 507 U.S. 604, 610

4   (1993).

5         In a disparate treatment case, a plaintiff responding to a defendant's motion for

6   summary judgment may establish a prima facie case of discrimination either "through

7   direct evidence of discriminatory intent or a presumption arising from a showing of

8   objective factors such as those outlined in McDonnell Douglas and its progeny."  See

9   Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007) (emphasis in original); see

10  also Hernandez v. Hughes Missile Sys. Co., 362 F.3d 564, 568 (applying Title VII

11  standards in ADA case).[8]  Regardless of which approach a plaintiff chooses, once he has

12  made out a prima facie case, "the burden shifts to the employer to articulate some

13  legitimate, nondiscriminatory reason for the challenged action."  See Opara v. Yellen, 57

14  F.4th 709, 723 (internal quotation, citation, and alteration omitted).

15        Here, Donahue, in support of his argument that he lost his position because he

16  was perceived as disabled, contends he has made out a prima facie case of

17  discrimination based on direct evidence, namely, two documents, a "Statement of

18  Sickness," dated June 5, 2017 (see Barney Decl. Ex. 16), and a "Railroad Retirement

19  Proof of Disability," dated June 7, 2017 (see Barney Decl. Ex. 17), each signed by Union

20  Pacific's chief medical officer and each containing the statement, "Color vision deficit.

21  Employee is medically cleared to work with permanent restrictions" (see Barney Decl.

22  Exs. 16, 17).

23

24         [8] To establish such presumption of discrimination, a plaintiff must show he (1)
    "belongs to a protected class"; (2) "was qualified for the position"; (3) "was subjected to
25  an adverse employment action"; and (4) "was replaced by someone outside [his]
    protected class."  See Lui v. DeJoy, 129 F.4th 770, 777 (9th Cir. 2025).  Here, Donahue
26  has not relied on the presumption, apparently because, as represented by his counsel at
    the hearing, a conductor's work assignments are of such a nature that it is not possible to
27  determine who replaced him and, therefore, whether he was replaced by an individual
    without a disability.
28

United States District Court
Northern District of California

1    Direct evidence is "evidence of conduct or statements by persons involved in the

2    decision-making process that may be viewed as directly reflecting the alleged

3    discriminatory attitude."  See Opara, 57 F.4th at 723 (internal quotation and citation

4    omitted).  Here, read in context, the evidence on which Donahue relies cannot be viewed

5    as directly reflecting a discriminatory animus.  In particular, the two documents were

6    completed after Donahue had taken and failed the above-referenced color vision tests.

7    Moreover, such documents are designed for the limited purpose of assuring an

8    employee's continued medical insurance coverage.  (See Barney Decl. Ex. 16 (providing

9    "[t]his form should be completed and returned to the patient immediately for prompt

10   mailing; otherwise he/she may lose benefits"); see also Barney Decl. Ex. 17 (instructing

11   employee to mail the form to Railroad Enrollment Services "[i]n order for [his] health

12   coverage to continue")).

13   Under similar circumstances, a number of district courts have found the plaintiffs

14   therein had failed to produce direct evidence of discrimination.  See Carrillo v. Union Pac.

15   R.R. Co., No. EP-21-CV-00026-FM, 2022 WL 3224000, at *5 (W.D. Tex. Aug. 9, 2022)

16   (finding imposition of work restrictions following unprovoked seizure "is not equivalent to

17   showing Defendant restricted Plaintiff's duties because of a prejudice against a class of

18   individuals with Plaintiff's alleged disability") (internal quotation, citation, and alteration

19   omitted); see also Bohner v. Union Pac. R.R. Co., No. 4:19-cv-02581-SEP, 2021 WL

20   3363063, at *4 (E.D. Mo. Aug. 3, 2021) (finding restrictions based on failure to perform

21   essential functions testing not direct evidence of discriminatory animus); Jackson v.

22   Union Pac. R.R. Co., No. 4:19-cv-00069-RGE-RAW, 2021 WL 1726895, at *11 (S.D.

23   Iowa Mar. 29, 2021) (applying McDonnell Douglas framework where defendant issued

24   work restrictions after "concluding [plaintiff] was at risk of sudden incapacitation following

25   his stroke").

26   Even if plaintiff's showing constitutes direct evidence, however, the Court's

27   analysis set forth below remains unchanged, as the issue of Union Pacific's intent is

28   being raised here at summary judgment rather than trial, thus placing on Union Pacific

1    the burden of going forward in the first instance with evidence of a legitimate, non-

2    discriminatory reason for the challenged adverse action, and, as discussed above, Union

3    Pacific has submitted such evidence, specifically, Donahue's failure to pass the Ishihara

4    (14 plate) and the Light Cannon.  See U.S. Postal Serv. Bd. of Governors v. Aikens, 460

5    U.S. 711, 715 (1983) (holding "[w]here the defendant has done everything that would be

6    required of him if the plaintiff had properly made out a *prima facie* case, whether the

7    plaintiff really did so is no longer relevant"); see also St. Mary's Honor Ctr. v. Hicks, 509

8    U.S. 502, 507-08 (1993) (holding once defendant carries its "burden of producing

9    evidence that the adverse employment actions were taken for a legitimate

10    nondiscriminatory reason, . . . the presumption [of discrimination] raised by the prima

11    facie case is rebutted . . . and drops from the case") (internal quotations and citations

12    omitted).[9]

13         The Court next turns to the question of pretext, as, regardless of the manner

14    whereby a prima facie case is established, "once an employer articulates some legitimate

15    nondiscriminatory reason for the challenged action, the employee must show that the

16    articulated reason is pretextual."  See Opara, 57 F.4th at 723, 728 (noting "we need not

17    and do not decide whether Opara can establish a prima facie case of national origin

18    discrimination because even assuming arguendo that she can, her claim fails at the

19    pretext stage").

20

21    _____

22         [9] Plaintiffs' reliance on Dark v. Curry Cnty., 451 F.3d 1078 (9th Cir. 2006) in
      support of their contention that removal from service based on required testing is the
23    equivalent of removal based on disability is misplaced, as Dark is readily distinguishable
      on its facts.  In Dark the Ninth Circuit addressed the issue of "misconduct" resulting from
24    a disability, e.g., "excessive absenteeism" based on migraine headaches, and held such
      conduct "is considered to be part of the disability, rather than a separate basis for
25    termination."  Id. at 1084.  Here, by contrast, the reason for removal from service is not
      misconduct but, rather, Donahue's failure to satisfy the FRA's prescribed standards for
26    recertification.  See, e.g., Zhang v. Honeywell Int'l, Inc., Nos. CV-06-1181-PHX-MHM,
      CV-07-1790-PHX-MHM, 2009 WL 3175063, at *5 (D. Ariz. Sept. 29, 2009) (finding
27    defendant "clearly had a legitimate non-discriminatory reason for terminating" plaintiff
      where "continuing to employ [p]laintiff would have violated applicable federal laws and
28    regulations").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    "A plaintiff may establish pretext either directly by persuading the court that a

2    discriminatory reason more likely motivated the employer or indirectly by showing that the

3    employer's proffered explanation is unworthy of credence."  See Dep't of Fair Emp. and

4    Hous. v. Lucent Techs., Inc., 642 F.3d 728, 746 (9th Cir. 2011) (internal quotation and

5    citation omitted).  "An employee in this situation cannot simply show the employer's

6    decision was wrong, mistaken, or unwise."  Id. (internal quotation and citation omitted);

7    see Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002) (holding

8    "courts only require that an employer honestly believed its reason for its actions, even if

9    its reason is foolish or trivial or even baseless") (internal quotation and citation omitted);

10   see also Milton v. Nicholson, 256 Fed. App'x 655, 658 (5th Cir. 2007) (holding, where

11   defendant "may have misinterpreted government regulations[,] . . . [a]n attempt to follow

12   government regulations is not intentional discrimination, even if a misguided one").

13       Here, plaintiffs, in reliance on their asserted submission of direct evidence of

14   discrimination, have not endeavored to demonstrate Union Pacific's reason was a pretext

15   for discrimination; rather, plaintiffs argue, Donahue "need not show that [d]efendant's

16   reason for denying [his] certification and issuing [him] workplace restrictions was

17   pretextual." (See Opp. at 16:5-20).  As noted above, however, Ninth Circuit authority is to

18   the contrary.  See Opara at 57 F.4th at 723.[10]  Further, to the extent plaintiffs argue that

19   "even if [p]laintiffs did bear the burden of demonstrating … pretext[ ], . . . a jury could

20   determine that their perceived disabilities were a motivating factor" (see Opp. at 17:16-

21   20), their reliance on Dark for such proposition (see id. at 17:20-23) (citing Dark, 451 F.3d

22   at 1083) is, as discussed above, unavailing.

23       Lastly, to the extent plaintiffs, in arguing Union Pacific "ignored the[ ]

24   recommendations" made in the 2016 report (see Opp. at 21:14-20), may be contending

25   Union Pacific used the Light Cannon as a pretextual basis for disability discrimination, the

26

27       [10] Unlike the instant case, Trans World Airlines, Inc. v. Thurston, 469 U.S. 111
     (1985), to which plaintiffs cite, concerned an undisputed reason for the adverse action

28   taken, the only issue being whether it passed legal muster.  See id. at 121-22.

Court notes that the criticisms in said report were based on a concern that the test was "too easy" (see Barney Decl. Ex. 6 at 29), i.e., if anything it worked to the advantage of color vision deficient employees.[11]

In sum, whether or not characterized as a showing of pretext, in a case such as this "the plaintiff at all times retains the ultimate burden of persuading the trier of fact that an employer's contested action was due in part or in whole to discriminatory intent," and, consequently, where, as here, "abundant and uncontroverted independent evidence suggests that no discrimination occurred, plaintiff's creation of only a weak issue of fact as to whether the employer's reason was untrue will not suffice." See Opara, 57 F.4th at 724 (internal quotations, citations, and alterations omitted). Accordingly, the Court finds Donahue has failed to raise a triable issue as to his removal on the basis of a perceived disability.

## CONCLUSION

For all of the reasons stated above, Union Pacific's motion for summary judgment is hereby GRANTED.

**IT IS SO ORDERED.**

Dated: May 13, 2025

MAXINE M. CHESNEY
United States District Judge

---

[11] As for the above-referenced PowerPoint, the modified protocol described therein was based on results obtained in a study conducted long after the removals from service here at issue (see Barney Decl. Ex. 11) and, consequently, were unknown to Union Pacific at the relevant time.