**Pages 1 - 98**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

JUSTIN DONAHUE; JASON           )
CAMPBELL; and JACOB GOSS,       )
                                )
          Plaintiffs,           )
                                )
  VS.                           )   **NO. 3:21-CV-00448 MMC**
                                )
UNION PACIFIC RAILROAD          )
COMPANY,                        )
                                )
          Defendant.            )
_____)

San Francisco, California
Friday, March 14, 2025


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    HILDEBRAND McLEOD & NELSON LLP
                    5335 College Avenue, Suite 5A
                    Oakland, California 94618-2804
             **BY:  GAVIN S. BARNEY, ATTORNEY AT LAW**

For Defendant:
                    CONSTANGY, BROOKS, SMITH & PROPHETE LLP
                    601 Montgomery Street, Suite 350
                    San Francisco, California 94111
             **BY:  MICHAEL N. WESTHEIMER, ATTORNEY AT LAW**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**Friday - March 14, 2025**                                          **9:07 a.m.**

**P R O C E E D I N G S**

---o0o---

THE COURTROOM DEPUTY:  All rise.  This Court is now in session.  The Honorable Maxine M. Chesney presiding.

Calling Civil Case Number 21-448, Justin Donahue, et al. versus Union Pacific Railroad Company.

Will counsel please step forward and state your appearances for the record.

THE COURT:  Start with plaintiffs' counsel.

MR. BARNEY:  This is Gavin Barney for plaintiffs.

THE COURT:  Thank you.

MR. WESTHEIMER:  Michael Westheimer for defendants.

THE COURT:  All right.  Mr. Westheimer, did you receive -- or take a look at a filing that was made just yesterday afternoon in this case, a supplemental notice regarding recent decisions?

MR. WESTHEIMER:  I did see that, yes, Your Honor.

THE COURT:  All right.  Do you have any response to it?

MR. WESTHEIMER:  Yes.  Well, the decision was favorable to Union Pacific.  It was a grant of --

THE COURT:  That's not what I meant.

All right.  Per our local rules, a statement of recent decision is supposed to advise the Court there's been a recent

decision.  It specifically says there's not supposed to be argument.

Not only is there argument in this particular statement of recent decision -- which is not a supplement, really; it's just a statement of recent decision, except that it goes on to argue the import of the case and, not only that, purports to submit new evidence in the record on this summary judgment.  That doesn't seem appropriate.  Apparently, it went by Mr. Westheimer, however.

All right.  So what's your opinion about whether I should be adding to the record that you both agreed would remain as it was at the time that there was an appeal?

**MR. WESTHEIMER:**  Well, I think that in terms of the *Blankinship* Statement of Decision, it's a legal authority that could be cited by either side just for the legal propositions in it.

**THE COURT:**  I'm not talking about the *Blankinship* decision at this point.

Did you read, there was a declaration with a whole report from some purported expert?

**MR. WESTHEIMER:**  I only saw the *Blankinship* decision. I didn't really --

**THE COURT:**  You didn't read the rest of it?

All right.  Well, let me just tell you what there is. There's a plaintiffs' supplemental notice regarding recent

decisions.  There's one, and it's *Blankinship*, which I had before this was filed because *Blankinship* was decided three months ago.

All right.  Now, as far as what else, we have Mr. Barney's declaration to which he has attached, as an exhibit, an expert witness disclosure.  And then that was filed in connection with it, though it is dated back in April.

So my first question, since you didn't actually look at this -- are you able to pull this up on anything that you've got here with you today?

**MR. WESTHEIMER:**  I can look to see if I have a printed copy.

**MR. BARNEY:**  Your Honor, if I may, I have a printed copy for both the Court and Mr. Westheimer.

**MR. WESTHEIMER:**  That document was filed yesterday.  I saw it.  I saw the reference to *Blankinship*.

**THE COURT:**  Okay.  Apparently, no, you don't know what's in it.

All right.  There's an expert witness disclosure with a witness named -- last name is N-i-e-t-z, I think, a purported expert.

Did you ever receive that disclosure during the discovery in the case?  That's number one.  And even if you did, is it appropriate to try to advance it into the record at this time?

**MR. WESTHEIMER:**  Your Honor, I'm new to this case, and

so a lot of the discovery and expert disclosure happened in 2022 and prior.  So I am not --

THE COURT:  Okay.  Well, I'll ask counsel.

MR. WESTHEIMER:  -- as familiar with that. And I --

THE COURT:  Okay.

MR. WESTHEIMER:  -- will say that I was under the impression we did not make a submission prior to this hearing.

THE COURT:  I'm sorry.  You had not what?

MR. WESTHEIMER:  We did not file anything shortly before the hearing because of the understanding that we weren't going to be filing more.  So I think we would object to a belated evidentiary filing at this time.

THE COURT:  Would or would not?  What are you saying?

MR. WESTHEIMER:  We object to a belated evidentiary objection -- evidentiary submission at this time.

THE COURT:  All right.  I took a look at this.  Let me ask Mr. Barney first.

Was this expert disclosed during discovery?

MR. BARNEY:  Yes.

THE COURT:  All right.  On the day before the close of rebuttal expert deadline; right?

MR. BARNEY:  The --

THE COURT:  The rebuttal expert deadline was April 22. This is dated April 21.  And is this a rebuttal expert?  I

don't even know if it qualifies as one.

**MR. BARNEY:** Your Honor, this is plaintiffs' primary -- primary expert. This was -- this expert disclosure -- pardon me.

**THE COURT:** Well, you got her report. Her report was due either in March or April of '22, I guess.

**MR. BARNEY:** The report here was -- this was attached to the expert disclosures, which were disclosed on January 19th -- sorry.

**THE COURT:** No, that's not possible.

**MR. BARNEY:** I'm sorry. On --

**THE COURT:** That's not possible.

**MR. BARNEY:** On April 21st, 2022.

**THE COURT:** Yes, the day before the deadline for rebuttal experts.

All right. Now, I don't even know if she would qualify as a rebuttal expert. She looks like she is a primary expert on the subject of whether your clients are qualified. All right?

But leaving that aside, everybody agreed, at the time of the pretrial conference in this case, that you would not supplement the record. You were given an opportunity to file new briefing. You could have submitted this then if you wanted to.

But it's not my understanding that it's in the record, at this time, on the motion. I'm not inclined to admit it now

under all the circumstances.

**MR. BARNEY:** Your Honor, it's referenced -- it's -- you are correct that the report itself is not in the record.

There are multiple references to the report throughout the briefing and to functionally equivalent -- functionally identical reports that were filed in the *Walker*, *Mills*, and *Harris* cases.

**THE COURT:** Of course, you can't rely on something in some other case and say, "Oh, we'll just rely on this. Go look at the record." You either put it in or you don't.

Now, as to this one, which apparently relates to these three plaintiffs, I don't recall where in the record it would have been and what kind of references were made to it. But you can't just talk about something. You have to put it in.

So if you want to find where that was -- I'm not inclined to consider this report. And so if it's not in the record now, it's not going to be in the record because of what you submitted at the 11th hour yesterday. I mean, you're putting it in the day before the hearing at about 2:30 or 3:00 in the afternoon.

So I don't think it's any excuse that counsel on the other side is, quote, new to the case as far as what he might know or not know about what's going on here.

But the point is that everybody decided the record was fixed. All right? At whatever point, you all decided, and

that was whatever briefing I got.  So you left in a lot of the stuff that was already handled in the *DeFries* case that takes up a lot of your briefing.  Then there are a number of other issues.

I'm prepared to discuss all of them, but I was prepared to discuss them on a record I had, not a record you're trying to make now.

So if you do believe that this report is somehow encompassed in the briefing that we had before, I really would have to see that.

**MR. BARNEY:**  Your Honor, I -- to be very frank, I don't believe that this is -- that the report itself is encompassed in the --

**THE COURT:**  Well, you think --

**MR. BARNEY:**  It is referenced, though.

**THE COURT:**  -- that you did reference it in some way even, at least what you're telling me.

I have your opposition to the motion.  So where would I look there?

**MR. BARNEY:**  There's a footnote.  I'm not sure what page it's on, but I can find that for you quickly.  But there's a footnote referencing Dr. Jay Neitz as the plaintiffs' retained expert.

**THE COURT:**  That may be, but not enough to say what her opinion is.  Her opinion is pretty much based -- and I,

frankly, haven't read it in great depth; but it struck me -- I didn't have time to -- but it struck me that she was essentially relying on the testing that the plaintiffs had had before in some fashion to say that if you've passed them at some point in the past, then that means you're okay now; not so much that she had actually examined them and done an in-depth analysis of their particular impairment, if they have one, whatever.

But I'm just looking now.  I'm trying to catch a footnote in here, just flipping.  If your recollection is --

**MR. BARNEY:**  May I find it for you?

**THE COURT:**  -- as you mentioned -- here's a footnote, but I don't see her name.

That's Footnote 1.  Okay.  That was on page 3.

I'll just flip through for a second, now that you think it's in a footnote.

I'll tell you, this case has so many issues.

Oh, I see it.  It's Footnote 2.  You're correct that it says Dr. Neitz has been retained in this case as well, but let me see where -- oh, okay.  That's up at the very top line.

Let me go back to the page before.  She's mentioned on page 12, also, in the text.  So let's see here.

This is actually on the *Harris* issue, the tolling question under *American Pipe*.  So give me a second here.

There's nothing about -- even anything here about her

report in any way even discussed, really.  If that's the only reference, it really is not in the record.

MR. BARNEY:  If I may, the only purpose that plaintiffs intended to submit this for was -- was for the expert opinion of Dr. Neitz that color vision deficiency is -- of the types that we're discussing here is generally a congenital issue, not something that gets worse and worse over time.

THE COURT:  That's an important opinion that's not coming in.

MR. BARNEY:  Understood.

THE COURT:  It's not in the record.

Her whole view is, they don't have glaucoma, so it's not degenerative.  Okay.  That's apparently what her view is.  If you just have plain old red-green color blindness, she's got an idea that it doesn't change over time and that, if it is in conjunction with some other condition that does degenerate and get worse over time, that would be one thing, but they just have plain old regular red-green color problems.

Okay.  I can read it in depth, but it just doesn't seem fair to open it up now.  It would change all the briefing.  It would change the arguments, whether or not she has said enough to mean that they're qualified.

I looked at all of this on the record that we have, and I can just tell you, at the outset, that I thought that Campbell

and Goss had problems with qualification and Donahue probably made enough to raise a triable issue.  You can be thinking of that while we're talking.

Okay.  But there are just so many issues.  And that's why I say, if I sound a little put out, it's because I spent an awful lot of time going over the record the way we had it, not the way somebody, in the 11th hour, decides that they're going to add to it.

So just to go into kind of the overview, and then we can talk about it because I have some questions.  All right.  Otherwise, I wouldn't bring you in here.  It's not worth it.

We have a couple of affirmative defenses essentially, defenses that are independent of the merits.  Okay.  In other words, whatever the merits are, there's still an argument being made that there is a statute of limitations defense that can be raised as to the impact claim.

All right.  Now, that's kind of an interesting issue, and you should gear up somewhat to talk about that, because *Blankinship*, who you want to say is distinguishable on one issue, you may well want to say is similar on another because they did address two different issues.

One, the question of whether or not *DeFries*, and then the separate orders in each of our cases, *Blankinship* and ours, essentially are telling the Court that it can't rely on a dismissal for the impact claim.  Okay?

And *Blankinship* said:  Well, I know there are certain facts here that would suggest that the impact claim wasn't part of the *DeFries* case, but there was such a blanket ruling by the Ninth Circuit that that judge felt that everything essentially got tossed, every dismissal got tossed, and then they went on to say, "But there's no qualification."

So, okay.  I went back and looked at the original briefing on this, and the defendant did make a clear distinction as to the record on the impact and treatment claims in arguing that *Harris* never was about the impact claim, *DeFries* wasn't about the impact claim.  So essentially, there's no reversal on the impact claim.

So we'll talk about that a little more, and I want to give you both a chance to discuss it.  But that's an important factor because, of the two claims, frankly, the impact looked like there may be a better claim than the treatment claim.  So if it is barred, that's a significant point, whereas in *Blankinship*, essentially the judge took a conservative approach and then tossed the case on the merits.  So that would not necessarily be what would happen here.  So I just want to say I think it's pretty important.

The other affirmative defense goes to preclusion and whether or not a plaintiff with a claim such as this is limited.  There's no exhaustion rule anywhere where you have to exhaust administrative remedies and then come to court; but as

an alternative, and the only one, the only option, essentially, the defendant is arguing you have to go through the administrative procedure.  They're experts.  They know what they're talking about.  Whether somebody ought to run a train, the butcher, baker, and candlestick maker on your jury don't know really what a train conductor, engineer, signalman needs to be able to do.  And it has a certain appeal, but I think there may be problems with it.  So we'll talk about that too.

Then we get down to the merits.  Okay.  And I'm just throwing out this sort of outline for you so you can be thinking about it and focusing on what I'm particularly looking at:  two claims, treatment and impact. Right?  Okay.

The question that is being raised at the outset is whether or not the plaintiffs' showing, in response to a summary judgment motion -- and the defendant has most of the burden because everything's kind of flipped, their being the moving party.  But if the plaintiff is put in a position where they have to say something, can they rely on saying that there is direct evidence of discriminatory animus, or do they essentially have to rely on a *McDonnell Douglas* showing?

And the defendant argues *McDonnell Douglas* is applicable. Plaintiff, as I understand it, is arguing that they have direct evidence.  And then the defendant's position is, if you go through all the steps of *McDonnell Douglas*, you're going to get to preclusion -- I'm sorry -- pretext, and their position is

plaintiff hasn't shown that there's a pretext here.

So that's one point, and that's an interesting discussion that I spent a lot of time looking at this thing.

Okay.  And that is primarily relevant to the treatment claim because for impact, the idea is, nobody really has a bad state of mind, but something that looks like it's essentially just objective and equally evenhanded, if you will, turns out not to be.  Okay.  So I think that the *McDonnell Douglas* argument and all goes primarily to the treatment claim.

Here's where I had trouble.  Okay?  I'm going to explain this a little bit.  The *McDonnell Douglas* test comes out of Title VII cases, not ADA cases, and the most typical is racial or ethnicity, gender, age.  That's what comes under Title VII.

And what the court did, and primarily looking at race and primarily, I think, looking at African Americans, said these folks are getting discriminated against all the time, and you can't really prove what's going on in the employer's mind, so we're going to pick out a set of facts that essentially, if the plaintiff proves it, that's enough to win, unless the defendant can explain away why they didn't get the job.  And it's mostly thinking about hiring, so -- because if -- once you've hired someone, there's less chance that you're discriminating against them by firing them, let's say, or not promoting, though it's certainly there.

So let's take hiring.  An African American applies for a

job; doesn't get it.  All right.  What do they have to show under *McDonnell Douglas*?  They were qualified for the position, they didn't get the position, and a white person or somebody who wasn't black got it -- all right? -- three facts that are essentially not the ultimate determination but facts that the Court said if you can do, that's good enough.

Now, let's have the employer, now switch the burden to them, and they've got to explain:  Well, we had a lot of other people.  We had an interview.  We liked this guy better.  Whatever they want to say.

And then the plaintiff, if they come up with an explanation, has to come up with some pretext.  If, for example, the defendant said, "Well, this person had a master's and we prefer Ph.D.s and that's why they didn't get it," and then maybe the plaintiff says, "Hey, the white guy you hired didn't have a Ph.D.  He didn't even have an M.A.  All he had was a B.S.," or you show that they've got a million people on staff who don't have the degree they said the black person should get, something to show pretext.

Now, nobody, to my knowledge -- and I'm asking you if you have seen it anywhere in a case -- has articulated a similar package of facts for ADA cases.  When they articulate the *McDonnell Douglas* test, they simply repeat the elements of the offense, which -- or the violation, which are the same elements essentially that would need to be proved under Title VII:

You're qualified; there was an adverse employment decision; didn't get the job; didn't get promoted; got fired; and the defendant discriminated against you in doing that.

That's it.  That's what they say.  That doesn't help at all.  That's not a set of facts like they gave in *McDonnell Douglas*.  It's just the elements of the offense.  So I don't know what they're thinking.  But the cases I saw just reiterated that.

So my first question -- and then we'll go back to all the other issues, but I'm just curious -- did anyone see any case where a court said, similar to *McDonnell Douglas*:  All you have to show for ADA is you're qualified, you didn't get the job or you got fired, some adverse decision, and somebody who -- for example, somebody who doesn't have your particular physical or mental condition got the job?  Nobody's ever said that or found a third fact that they think would be enough that I saw.

I'm wondering -- I'll just start here -- well, let me start with the party who wants *McDonnell Douglas* to apply and just ask defendant's counsel, Mr. Westheimer, whether you saw any cases that spelled out what could be sort of a set of facts that would work to prove the ultimate case.

            **MR. WESTHEIMER:**  Well, I mean --

            **THE COURT:**  Yes or no?  Have you got one?

            **MR. WESTHEIMER:**  I don't have one off the top of my head.

**THE COURT:**  Okay.  Fine.

Okay.  Then we go to plaintiffs' counsel.

**MR. BARNEY:**  Nor do I, Your Honor.

**THE COURT:**  Okay.  So we're stuck with what they've said.  All right?

Now, the plaintiffs' position goes like this.  Everybody knows why they were reassigned.

What should we call what happened to them?  Fired?  Do we have a short word for what happened?

**MR. BARNEY:**  I -- we've always said removed from service but --

**THE COURT:**  Okay.  That's fine.

**MR. BARNEY:**  -- also decertified is also --

**MR. WESTHEIMER:**  Decertified.

**THE COURT:**  Decertified.  Let's use that.  Okay.  I want something --

**MR. BARNEY:**  "Decertified" has some connotations that go toward the *Albertson's* defense, and so there's a --

**THE COURT:**  Oh, I see.

**MR. BARNEY:**  -- misnomer there; but as long as we understand that we're talking -- what we're talking about --

**THE COURT:**  Okay.

**MR. BARNEY:**  -- plaintiff is comfortable with that.

**THE COURT:**  All right.  I'll say decertified, but I won't take it to mean anything more than if they were fired.

Okay.  I just want to just keep it shorter.  Okay.

**MR. BARNEY:**  I think it's an important distinction as opposed to "fired" because all these individuals remained employees on medical leaves of absence afterwards.

**THE COURT:**  Right.  Well, that's just kind of better for the defendant, if anything, that they didn't just can them.

But I think that whatever term -- what did you say you used?  I'll do what you use.

**MR. BARNEY:**  Removed from service.

**THE COURT:**  Fine.  Okay.  We'll use removed from service.

Okay.  So, all right.  The plaintiffs' position, if I understand it, is we all know why they were removed from service.  It was because they have a disability.  That's direct discrimination.  Okay.  That's your position.

It sounds like you're arguing that if someone is -- suffers an adverse employment decision and the employer was wrong about the reason for, let's say, not hiring the person -- I'll get it out of our category just to make it more hypothetical.  All right.  So someone doesn't get the job.  The employer says, "I didn't think that you were qualified."  Okay.  "And it's because we have some kind of entrance exam and you didn't pass it."  Okay.

Now, and let's go back to our African American applicant.  So they apply, and the employer says, "We didn't hire the

person because they didn't pass the entrance exam."  And it turns out that the plaintiff shows they, in fact, passed it and that the -- and let's just assume the employer is not making it up.  We're just at Step 2.  And they in good faith are of the understanding that the person didn't pass.  Maybe there's a mix-up in names, whatever it is.  Nobody thinks they're lying.

All right.  Does that African American have a case?  They're qualified.  Somebody didn't hire them because they were mistaken about their qualifications.  All right?  Is that a case?  Do they have to hire him now?  Do they have to pay damages?

**MR. BARNEY:**  Is this directed to me?

**THE COURT:**  Either one of you.  You're both looking at me.

**MR. BARNEY:**  I mean, I -- I would -- I mean, I would take the -- I would take the weaselly answer and say I need more facts; but based on --

**THE COURT:**  Those are the only facts.  Those are the facts, period.

**MR. BARNEY:**  Based purely on that, I don't think so --

**THE COURT:**  Okay.

**MR. BARNEY:**  -- because in that situation, there's not a -- it's not just that there is a disability -- well, in this case, there is disability.

**THE COURT:**  Leave us out.  Just talking about this

person who they made a mistake.  He would have been qualified.
He would have at least been in the pool of people they could
have considered.

MR. BARNEY:  Right.  In that situation, there isn't a
direct -- there isn't direct evidence of a -- of a
discriminatory intent.

THE COURT:  Okay.  "Discriminatory intent" meaning
what, in your mind?

MR. BARNEY:  A nexus between the protected category
and the adverse action.

THE COURT:  We say he didn't get the job because he
was black.

MR. BARNEY:  Right.

THE COURT:  Okay.  Now, let's take our case --
all right? -- just for discussion.

I'm way ahead of myself because I wanted to go back to the
statute of limitations and the other thing; but this really
interested me quite a bit because of the difference that I
noted between the Title VII that developed *McDonnell Douglas*,
which resulted in let's make it easier for people in protected
categories to prove their case because it's so hard.

Okay.  Now, in our case, what the defendant says is that
we didn't not hire you because -- let's assume they think that
the plaintiffs have a disability or they have one.  Either way,
under the law, whether it's actual or perceived, they're

considered disabled.  So we'll just call them disabled.

All right.  So they say:  It isn't that we removed you -- removal from service; right? -- removed you from service because you're disabled, we have a lot of people who have disabilities of one sort or another, but because we thought you weren't qualified.

Okay.  Now, let's say the plaintiff actually shows they are qualified.  They can see good enough.  Okay?  But that there's no showing that the defendant is lying when they say:  We thought you weren't qualified.  All right?  That's just like the African American.  Okay?

In other words, you would have to say, in effect, "You have some insidious animus or prejudice against my client as a disabled person" before you can win the case.  In other words, discrimination doesn't actually mean wrong about something but that -- I don't want to make it so simplistic as you don't like the person because whatever their protected group is, but that that's why you kept them out, not because you had some other reason.

So in reading the cases, it did seem to me that the cases are holding that a mistake is not enough to show discriminatory intent.  One would have to show, when someone articulates a mistake, that it's not a mistake made in good faith, that they're coming up with an excuse -- all right? -- of some sort.

So I don't think -- and I'll just tell you, and then you

can be thinking about this because I'm throwing all this out at you for the first time. Earlier, all we did was say too late; we're sorry. Okay. That was the other ruling. You may have a case, but irrespective, you're too late coming to court.

All right. So now we're getting into the heart of the case. And I'll give you a chance to think about this. We can even take a little break, or whatever, when we get to that point.

But it sounded to me like there is not direct evidence of discriminatory intent here. What you have is direct evidence that the disqualification was tied -- tied to, in some way, the visual condition, if we want to call it that and not label it specifically as actually disabling in some way, if the plaintiffs are taking the position it really doesn't interfere with any kind of major life activity. But we want to call it a visual condition.

Yes, I did check the record; and each time the doctor that was acting on behalf of the defendant mentioned either the vision or what -- clearly they were talking about the vision, but that doesn't mean that they necessarily simply said: Look, I don't care whether you're qualified or not. You have red-green color blindness. We have enough people running into other trains without -- we're not letting you in. Okay?

So I think that you would have to go to *McDonnell Douglas*. So I'll give you a chance to think about it, but that's where

I'm coming from on the treatment.

Impact, your state of mind is irrelevant. Impact is you have a neutral policy on its face that acts in some discriminatory way against a protected group. I don't know if we really have a neutral policy here. It's a little bit of an odd impact case.

If you had -- if it was the Ishihara, which everybody has to take, and if there was something wrong with it -- but there isn't -- I could see how that would be a little bit more like a typical impact case; but this one is already -- the light cannon, the second test that was given, is already focusing on the very group that you say your clients are part of. So...

But anyway, let's go back to the tolling. I have the two positions. I'm not really sure what the right answer is at the moment, but it does look like impact wasn't part of the history that we have here. But we had this kind of all-encompassing order. So, yes.

MR. BARNEY: Your Honor, if I may clarify a point that may actually, to a certain degree, redound to the defendant's benefit.

The way that the (b)(6) claim was pled and the defendant -- sorry -- the plaintiffs have pursued it is not a traditional disparate impact claim in the sense of an entirely alternate theory of -- of discrimination but, rather, (b)(6) as a method to prove up direct disparate treatment discrimination.

**THE COURT:** Okay. I may be confused then. Do you have -- I thought you have a freestanding impact claim. Am I wrong about that?

And hang on. I thought I had the complaint. I had a large stack of documents that I brought out, but now I'm not seeing the flag on the complaint. So maybe it's back in chambers.

**MR. BARNEY:** There's a very real possibility that I'm confusing some things because there's a number of these similar cases, and several of them have developed significantly since --

**THE COURT:** Well, I'm going to have to either take a break and get back to chambers or see if maybe Ms. Geiger could look. There are a couple of places that she could. I should have had it out here.

So, Ms. Geiger, give me a second. I'm wondering if I'm missing more than that.

So everybody just stand by for a minute.

(Pause in proceedings.)

**THE COURT:** I know I don't have it, but I want to see if I'm missing some other things. Okay.

**MR. BARNEY:** The reason I bring this up is that if I'm incorrect and that is -- and there is a -- and we have our disparate treatment claim referencing both subsection (a) and (b)(6) as methods to demonstrate disparate treatment and we

have a freestanding disparate impact claim, plaintiff will not be pursuing a disparate impact claim separately from the (b)(6) under disparate treatment, the reason simply being that it requires a showing of statistical disparity at a level that we don't have the evidence to do so.

THE COURT:  All right.  Well, give me a second, if you will.

MR. BARNEY:  That would potentially short-circuit -- shorten some of our proceedings here.

THE COURT:  Well, it would, although I thought the issue was interesting because of the way that they reversed in our case, not having a separate opinion but essentially saying: Oh, well, you're like *DeFries*.

I'm not sure how it's pronounced.  Is it --

MR. BARNEY:  *DeFries*.

THE COURT:  It is *DeFries*.

It's so strange.  And I seem to be missing some other papers.  Just don't go anywhere.

What I'm looking for at the moment is not only the complaint, but the papers that reflect the decision in -- maybe this is it.  These are the appeal documents, I guess.  Here's *DeFries*, and here's our little memo decision.

All right.  Ms. Geiger?

We're off the record.

(Discussion off the record between the Courtroom Deputy

and the Court.)

**THE COURT:**  Okay.  So if I understand, then, I want to get the statute, then, just to see where this is -- sort of the impact idea fits in.  So let's see.  Which statute are we relying on right now?

**MR. BARNEY:**  It's the -- pardon me.  It's, I believe, 21011.

**THE COURT:**  Okay.  But we're in which statute?

**MR. BARNEY:**  We're in the ADA itself.  I'm spinning my wheels for time.  I apologize.

**THE COURT:**  So are we dealing with --

**MR. BARNEY:**  The ADA.

**THE COURT:**  42, 12112?

**MR. BARNEY:**  Yes.

**THE COURT:**  All right.  And you are looking at 6.  Okay.  All right.  So give me a second here.

Okay.  This is how -- let's see.  Discriminate includes, all right [as read]:

"Utilizing standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability . . . ."

I see.  Okay.  That's 3.

And 6 is [as read]:

"Using qualification standards, employment tests or other selection criteria that screen out or tend

to screen out an individual with a disability,"

et cetera, unless you can show that it's job-related.

But isn't that a typical impact case?

**MR. BARNEY:** There's case law -- and unfortunately, I wasn't prepared to discuss the case law on this, but there is case law that suggests that that wording can be used for a traditional impact case. But it's also because of the way the -- because of the statutory construction, it is referencing back to (a), which is -- which prohibits discriminating against a qualified individual on the basis of disability in regards to discharge of employees and other terms, conditions, and privileges.

**THE COURT:** It just seems strange. I mean, I've always thought that would mean impact because, if you need to say that you're discriminating against someone because you don't want that kind of person working for you, essentially, that's the discriminatory animus. "We don't want" fill in the blank. And that would be what I would call a treatment claim, where you have to show a state of mind that is absent from an impact claim.

And if you wanted to say that you're wrapping it into a case with an intent that's required, then you would, I guess, say you knowingly are giving a test that you know is not going to work. Is that the idea, to make it an intentional case as opposed to "Gee, we thought it was great, but it turns out it

isn't"?

MR. BARNEY:  Well, the --

THE COURT:  I don't know.

MR. BARNEY:  The requirement for intent, for discriminatory intent -- and I think the term that's often used is -- well, there's a series of cases, including *Murray v. UBS Sec., LLC* -- sorry -- yeah, which is 601 U.S. 23 from 2024.

(Discussion off the record between the Courtroom Deputy and the Court.)

MR. BARNEY:  Then there are several other cases, *Bostock v. Clayton* and *Babb v. Wilkie*, all Supreme Court cases that indicate that the standard for discrimination is not an animus or malice or an intent to do harm but, rather, disparate treatment, different treatment --

THE COURT:  Well --

MR. BARNEY:  -- itself is the discrimination.

THE COURT:  -- it can't just be that somebody's kept out.

If somebody's kept out and there's no good business reason for it, that's impact.

A typical case from Title VII would be the firemen had a height requirement.  There were a lot of Asian Americans who said, as a group, although there's Yao Ming in the NBA, but "There are a lot of short Asians.  We're being kept out, and

there's no good reason.  You don't need this height requirement."  That would be a typical facially neutral test that -- or requirement that discriminates, without a good reason, against a group, but not intended to be.

All right.  Now, you don't have to hate someone to keep them out, but you do have to want to keep them out because of what they are, such as:  Yeah, I like women; I just don't like them working here.

Okay.  But there still has to be an intent to not hire someone because of what they are -- all right? -- what their race is, what their ethnicity is, what their gender is, what their age is -- all right? -- but that there is an intent.  If you look at the elements, there's an intent that has to be shown to keep out somebody because of what they are, whether you like them or not at cocktail parties.

Okay.  So I don't see -- if you're going to rely on the test but not show that anybody intended it not to work, I'm just wondering where that fits in.

If you have a pure impact case somewhere and you want to argue that all you have to show is there's a bad test, that's it; we win -- okay? -- that might be an impact case, but it's not a treatment case.

And so if you are pursuing the idea that "I don't care what you think.  You had this test.  It doesn't work," then that's too easy a case, and I don't think it is one.  I don't

think it fits, at least as a treatment claim.  It might fit as an impact claim.

And under those circumstances, we have the question that nobody has looked at, the question of a modified class definition with respect to impact because there never was an impact case that went up on appeal.

And in *Harris*, they dropped their impact claim.  So they never tried to certify it.  And so the argument is, maybe you didn't know what was going on with treatment, but you sure as heck had to know that there was no impact case -- no single one, no class one, no one.

And so that's kind of where we are.  There's really a different argument.  The question is whether, in some way, the Ninth Circuit didn't care and simply went:  Off with your head.  Okay?  And I don't know if that's really what they intended to do.

Looking at the memorandum of decision that was issued in our case -- and I believe that *Blankinship* is pretty much on the same language that that court got -- it says, and it's on page 2 -- and I know you've read this, but I'll just read this part, kind of caught my attention.  Quote [as read]:

"In all aspects relevant to this appeal, these plaintiffs are situated identically to the plaintiff in *DeFries*."

And then they say, under our decision in *DeFries*, the

three plaintiffs in our case were entitled to rely on *American Pipe* tolling until the Eighth Circuit issued its mandate decertifying the *Harris* class. And then you're back to essentially no class at all. So -- and then they say: We reverse summary judgment.

All right. In my summary judgment order, I probably should have broken up the impact idea from the treatment idea a little better than maybe I did or more than I did, but there were different arguments made. And I did double-check the briefing, and there clearly were separate arguments, even with separate headings, in the briefing.

So one could read this as "We're reversing you as to whatever's relevant here," what's relevant being the treatment claim, the claim that did go forward in *Harris*, the claim that ultimately was decertified and, in between, changed to a class definition.

So just because I'm not quite sure what you may be giving up -- and we really should have that complaint, and eventually, I'm just going to go back out and try and find it.

I have two very large declarations, one from you, Mr. Barney, and then -- I don't know how this woman attorney with the defendant at the time, whether she pronounces it Rhoten or -- it's R-h-o-t-e-n. I hate to say "rotten." I'm not sure if there's any other pronunciation. But she gave a very large declaration, both just covering tons of exhibits.

So that made up a big chunk.  And just in case I needed it, I brought out the Ninth Circuit pattern instructions on ADA claims of all sorts.  I've got a big package of statutes, a big package of cases that I read, the supplemental filing that I got upset about, the original briefing, the documents from the Ninth Circuit, my original order.

Let me go back to this for a minute.

**MR. BARNEY:**  That's definitely putting into context so much of my life this has taken up so far.

**THE COURT:**  Exactly.

**MR. BARNEY:**  A remarkable amount of paper.

**THE COURT:**  Exactly.

Interesting, we were deciding *Blankinship* before it went up in my original order.

I had a very detailed order of what I was doing.  It was solely on the time bar.  But anyway, I think that somewhere there's a floating-around complaint that I need to get my hands on.

So, okay.  So I do have some questions about -- it's interesting.  The defendant, for example, didn't ask to get -- nor did plaintiff -- any clarification from the Ninth Circuit as to whether they intended to cover the impact claim or not. I didn't ask them.  But anyway, so that's one.

I want to go to preclusion -- okay? -- for a minute. There's a very, I suppose, initially appealable -- not

"appealable."  That sounds like on appeal -- appealing argument that the professionals ought to be deciding, who are running these very large items that are prone to cause damage if they're not run right.  But it is also true that we often give to jurors, who are laypeople, as they're judges, hard decisions about things that involve safety and other matters.  So I don't think one can just say if it involves safety, let's take it away from the courts and give it to the pros.

But there's something very appealing.  And certainly there is a case -- thinking, is it *Turner*? -- one of the cases that did say -- they went through a whole analysis.  And I have the case here, and that's out of Texas.  And I believe there were oral arguments in that case recently.  And I'm wondering, is anyone following that appeal?

**MR. BARNEY:**  I am.  The oral argument was recently.  I don't think there's been any developments since oral argument.

**THE COURT:**  Okay.  I think early February, maybe the 5th, something like that.

Do you have any idea how the court, the Fifth Circuit, was going in that?  It's not precedential for me, but if they had a decision and it was particularly well reasoned, it's something that the Court would give some deference to because we all look at out-of-circuit cases when we don't have what might be helpful here.

**MR. BARNEY:**  It would be pure tea leaf reading on my

part if I were to say how I think that was going.

THE COURT:  Okay.  That's fine.

Any idea at all when the Circuit ordinarily issues decisions after oral argument?  Is there any ballpark for just, sort of, cases?

MR. BARNEY:  I don't know.  That office is -- the office that's --

THE COURT:  Handling it?

MR. BARNEY:  -- handling that case is -- we're in communication, but we're not working on that case directly.

THE COURT:  Okay.  Fair enough.

MR. BARNEY:  But I can certainly find that information and provide it to the Court if that would be helpful.

THE COURT:  That's okay.  I was just wondering whether it was worth waiting to see what they said, but the oral argument -- I mean, they've gone a ways.  They have had oral argument.  That means there's been briefing, and they wanted to hear about it.

It's a fairly detailed administrative proceeding.  You don't necessarily get an ALJ.  Reading their regulations, it says on, I think it's Step 2 or maybe the last step, you could get anyone, but it could be an ALJ.  But there's all kinds of rules regarding evidence and discovery.  It isn't just a quick slapdash thing.  They've tried to make it more trial-like, if you will.  And I think it's de novo review along the way.

But I was looking at *POM Wonderful*, which discusses preclusion, and it seemed like our case matched up more to what the court had seen there. There was no express preclusion, but there's express preemption. And so people know how to say, if they don't want someone to do something, how to say it.

There's also a difference in the goal. Clearly, the administrative process is totally geared to safety, and the focus that we have here is on fair employment practice, lack of discrimination or curbing discrimination.

So if all -- if only a jury here had to say, "Are they qualified," okay, and that was the end of the discussion, you could make a very strong argument on the defendant's part that this jury shouldn't be figuring out if they're qualified when there's a whole procedure by professionals who know about trains as to whether somebody is qualified.

Okay. But there's more to it because the plaintiff can't just show they're qualified. That's Step 1. The plaintiff has to go on and show that, aside from the fact that they were adversely affected by a decision in employment, but that employment decision was based on a discriminatory state of mind, which I am reading is: Don't want you, even if you're qualified -- all right? -- because of your disability or because you're black or you're a woman or you're too old.

Okay. So with that -- and the plaintiff wants to stay kind of clear of that because they really want to argue here,

"If we're qualified and you got it wrong, we get our job back."

And I don't think that's the law.  Okay?  If I thought it was the law, I might well find there was preclusion here because that's the only issue that this whole board with all of their various levels of appeal is going to be dealing with, and why was it set up if nobody has to go through it.  It does say "may," but of course, what are you going to say?  You can't make somebody appeal.  Because if you don't like what happened, you may go through this process.  They probably, if they want to make it really clear, could have said:  If you don't like what happened and you want to challenge it, you shall do this.  Okay.  They didn't say that.

So if they're thinking about it, maybe they should go back and right their regs, since they write them.  Okay.  If there's an ambiguity, they may be stuck with it because they're the people who are writing these things.

And so -- and, of course, we have many cases coming out of the ADA involving people working for the railroad.  And nobody that I've -- there are very few cases where this is even raised or, if it is raised, nobody talks about it and they appeal.  They just go ahead as if everybody belonged in court.

So, anyway, we do have a Judge Ishii down in the Eastern District in the *Weeks* case who seemed to be saying:  If I had a different case in front of me, maybe I'd rule differently.  But he didn't say for sure that he would because

it wasn't in front of him.  He had a retaliation issue and not really a pure qualification issue.  But he was recognizing that there is this system, but he didn't have to go any further.  And now he's retired, so he doesn't have to go any further at all.

Anyway, so my inclination, just to say where I'm going with that, is to deny on preclusion because of the difference between what we're addressing and what they're addressing, although there is an overlap on the question of qualification, definitely an overlap.

And I don't think it's an absolutely slam dunk issue for the plaintiff, and that's why I'm interested in what's going on in Texas with that particular appeal.

I can't recall.  Maybe I'll ask Mr. Westheimer.

Has the agency itself ever interpreted their -- I can't remember whether they themselves have interpreted their rule as being the only option if you're challenging your decertification on qualification grounds.

MR. WESTHEIMER:  I -- I am not sure if they have made a separate interpretation.

THE COURT:  Okay.

MR. WESTHEIMER:  I feel that it's implicit in the regulations itself, that that is the correct interpretation.

THE COURT:  Okay.

MR. BARNEY:  I'm also not aware of any decision by the

LERB, or any other review board, saying that or the FRA issuing that.

The board has, on multiple occasions, made clear that they do not -- they actively do not opine on issues of disparate treatment and discrimination.

**THE COURT:** I'm sorry. Say that again.

**MR. BARNEY:** The -- well, I think it was the LERB at the time. I think it's now the --

**THE COURT:** Oh, I see. You're just saying they don't get involved in discrimination.

**MR. BARNEY:** They actively -- yeah, they actively --

**THE COURT:** Fine.

**MR. BARNEY:** -- stay away from disparate treatment claims.

**THE COURT:** Sure. Okay. I can -- so that might suggest that they think they belong somewhere else.

**MR. BARNEY:** I think based on -- especially based on *POM Wonderful* and the associated cases, these are complementary as opposed to conflicting.

**THE COURT:** Okay.

**MR. WESTHEIMER:** If I could just speak briefly --

**THE COURT:** Sure. It's fine because --

**MR. WESTHEIMER:** -- to the preclusion issue.

**THE COURT:** Yes, I think it's probably better that plaintiffs' counsel, knowing that I'm thinking about finding

for him on this one, doesn't say any more, except what he's already said, which was helpful to him.  Okay.

MR. WESTHEIMER:  There's definitely some overlap and some not overlap between the ADA and this FRA process.

THE COURT:  Right.

MR. WESTHEIMER:  However, when you're looking at the place where there is overlap, the FRA process is the one to be used.  And what is the discrimin- -- I mean, you can't -- discrimination -- what is the discriminatory act?  The discriminatory act is the denial of recertification.

So this is what *Turner* was talking about specifically, and *Turner* was also citing heavily to *Harris vs. P.A.M. Transport*, which is an Eighth Circuit ruling from 2003.

But what they're saying in *Turner* is -- I could just quote from the decision [as read]:

"Railroad employees are not deprived of the ADA's rights and protections.  The question isn't whether the RLA eliminates the plaintiffs' rights under the ADA -- it doesn't -- but whether the dispute resolution provisions cover the specific facts underlying the plaintiffs' ADA claim, and they do.  When an employee is not attempting to challenge the substance of the certification program or the actual decision to deny a recertification, the employee may state a claim under the ADA."

**THE COURT:** I'm sorry. Read that part again.

**MR. WESTHEIMER:** [as read]:

"When the employee is not attempting to challenge the substance of the railroad's certification program or the actual decision to deny a recertification" --

**THE COURT:** Ah, okay.

**MR. WESTHEIMER:** [As read]:

-- "the employee may state a claim under the ADA."

**THE COURT:** Okay.

**MR. WESTHEIMER:** But when it's the --

**THE COURT:** So what would be an example of that, just for an example?

**MR. WESTHEIMER:** Okay. The employee is bringing a claim against the railroad for disability discrimination unrelated to their recertification under the statutory scheme.

**THE COURT:** What would that be? Maybe they -- what? -- got a bad assignment?

**MR. WESTHEIMER:** Well, there's lots of ADA claims out there. There's any -- there's anything. You didn't --

**THE COURT:** Well, anything --

**MR. WESTHEIMER:** -- have a wheelchair ramp. I mean, I don't know. There's a million --

**THE COURT:** I'm sorry?

**MR. WESTHEIMER:** You didn't have a wheelchair ramp or something. There's a lot of different ADA claims that an employee --

**THE COURT:** Oh.

**MR. WESTHEIMER:** -- can bring against --

**THE COURT:** All right.

**MR. WESTHEIMER:** -- their employer.

**THE COURT:** Not dealing with safety issues, essentially, of running the train. Just regular ADA claims. Failing to accommodate some kind of sleep disability or who knows.

**MR. WESTHEIMER:** Yes.

**THE COURT:** All right. Fine.

**MR. WESTHEIMER:** And it's not --

**THE COURT:** Okay. I got the point. I understand which way *Turner* came out.

**MR. WESTHEIMER:** But to be -- it's not just any safety issue. It's specifically the recertification for a locomotive engineer or conductor that's required under the statutory scheme. That's all we're talking about.

And they don't have anything else other than that.

**THE COURT:** No, I understand. And frankly, if they wanted it to be the only thing that an employee could do and make it as part of the employee's employment, then it would be a lot clearer than how they've set it. And they may intend

that that's the only way you can go; and if that's true, why don't they just rewrite their regulation?

So I'm just saying that what we have here is at least an open question. And we have had one reversal already on the question of an affirmative defense. And frankly, I just feel that it should be clearer if we're going to, again, say: I don't care whether you've got any kind of a good claim or not. You can't bring it. All right? You simply can't bring it because your ADA claim is based on certification, and under those circumstances, you're a group of people who are out.

And --

**MR. WESTHEIMER:** Your Honor --

**THE COURT:** -- I'm not prepared --

**MR. WESTHEIMER:** -- they're not out.

**THE COURT:** -- to say that.

**MR. WESTHEIMER:** But they're not out. They have a whole process where they can --

**THE COURT:** No. I'm saying --

**MR. WESTHEIMER:** -- seek remedies.

**THE COURT:** -- you're out in court.

And an awful lot of these cases are running around the courts with nobody saying you're precluded. Okay?

So sometimes the defendant is apparently getting the issue in front of a court of appeal or in front of a district court, but we only know two.

Do you know any other case besides *Turner* and *Weeks* that have actually looked at this?

MR. BARNEY:  The issues were raised in *Walker* and *Mills*.

THE COURT:  Oh, in *Mills*?  Let me double-check because *Mills* also goes somewhere that I'm not sure I agree with, which is whether or not there's direct evidence.

Okay.  What did they say in *Walker*?  I've got to go back and look at those, then.

MR. BARNEY:  In both, they were very -- they were very briefly touched upon and -- and glossed over, essentially, in the decisions.

THE COURT:  I'm sorry?

MR. BARNEY:  They were glossed over, essentially, in the decisions.  They were not central to the overall decision. They were kind of taken as granted that preclusion was not at issue here.

THE COURT:  Okay.  So the two cases that looked at it are *Weeks* and *Turner*.  And *Turner* did -- they did a scholarly approach to it.  They went all through it.  *Weeks* looked at it, but from a standpoint where they didn't have to get to the hard question because they had a case that wasn't like ours.

And so I think that it's out there to be decided.  My thought is we go forward.

And, frankly, no matter how I rule, you ought to take a

look at this and see whether you want to resolve it other than by a full-blown in-court proceeding.  There are so many issues here, and they could go up forever, and these people will be in limbo forever.  And I'm just saying that whichever way I rule on any of this, it's not going to be the end of it.  It wasn't the end of it before, and it's not going to be the end of it again.

But I'm leaning towards saying that preclusion doesn't apply.  Frankly, I would like pros deciding whether somebody should be running a train.  All right?  If I had my preference, that's what it seems to me to be the best way to rule; but as a preference, essentially, for safety purposes.  But that's not -- that's not what we have here.

And I don't mean Union Pacific themselves.  They're not really the pros.  Okay?  They're just a party.  But if there were a neutral resolution process, because, obviously, Union Pacific has its own dog in the fight.  Okay.  But I don't know that the boards do.  At least you could have somebody who's totally impartial, such as an ALJ.  So I'm not talking about Union Pacific and favoring them in some way, but I think it's hard for a layperson to decide what's the best way to have people running trains -- all right? -- or flying airplanes or anything that's big and carries a lot of people, although the crash, I think, was a freight crash, okay, in the Goodwell case.

Okay.  So on the affirmative defenses, all right, I'm -- if there is an impact claim, I'm leaning toward it remaining dismissed.  If there is a preclusion argument, I'm leaning against granting summary judgment on those grounds.  Okay.

So then we go to the merits.  And I've discussed somewhat with you what I think are the elements of a treatment claim, that you can't just show the employer was wrong in thinking somebody wasn't qualified.  You would have to show they're saying that but it's just a pretext.

So -- and the first question, then, is:  Is somebody qualified?

What we have is Donahue, who after -- I believe it's after he received the notice from the railroad decertifying him that he then got a test, through a private optometrist or otherwise. I'm not sure who administered it.  It was Ishihara, and he passed.

MR. BARNEY:  There were several tests that were done by UC Berkeley Optometry.

THE COURT:  Let's go back to when those might have been, then, for a minute.

He had one in -- let's see -- June, and I think he may have had one in May also of '17.  At first I thought it was a March date because it looked like it could be a 3, but I think it's a 5.  And that one was Dr. Schymeinsky.  That's spelled S-c-h-y-m-e-i-n-s-k-y.  Okay.  I believe that's May 24 of '17.

So he fails Ishihara, and he immediately then goes in and he gets Dr. Schymeinsky to test him, and then she or he says he passed.

Then he fails the light cannon and very quickly goes and gets another Ishihara.  Well, not as quick -- well, pretty quickly goes and gets another Ishihara, this one from Dr. Ko, and he passes that.

All right.  So every time he sort of sees the handwriting on the wall, he goes and he gets another UC Optometry, or whatever, test.

Either way, it sounds to me like there's enough, given the proximity of the timing of those tests, to raise a triable issue about -- that he's -- as to whether he's qualified.  He hasn't shown he's qualified as an absolute, but he's raised a triable issue as to it.

**MR. WESTHEIMER:**  Your Honor, I think that -- there's no -- there's nothing in the statutory scheme that allows you to go out to your own optometrist, go to Milpitas Family EyeCare, get a second test, and have a doctor sitting there doing whatever it is they're doing and saying you passed.

**THE COURT:**  Well, let's put it this way.  There's at least case law that says if a test that you're using to say someone is not qualified is challenged as not being a good test, you can't say somebody, as a matter of law, is not qualified because they flunked your test.

And you're saying that this individual, Mr. Donahue, is not qualified because he flunked the second test.  Not because he flunked the first one, Ishihara.  He flunked the light cannon.

That's being challenged.  And there is case law that says you can't just cut somebody off because you're saying, "Our test is great."  It's triable whether it's any good; but it's not, as a matter of law, unchallengeable.

**MR. WESTHEIMER:**  Well, I mean, I think that --

**THE COURT:**  Isn't that your argument?  You flunked our test, so you're not qualified?

**MR. WESTHEIMER:**  Well, yes, but the tests are specifically --

**THE COURT:**  That's the whole issue.

**MR. WESTHEIMER:**  These tests are specifically designed under a regulatory scheme and --

**THE COURT:**  No.  They're allowed to do it under a regulatory scheme.  No one told them to pick that test.

And, yes, there's a couple of appeals in the regulatory scheme where at some point the board goes -- the particular board at that time went:  It's adequate once that they follow procedure, marshal, or whatever.

Okay.  But I'm just telling you now, you are not going to convince me.  So there's no point arguing it.  You can just assume you've made the argument.  You flunked our test;

therefore, you're not qualified.

**MR. WESTHEIMER:**  Well, what I'm seeing --

**THE COURT:**  It's what your client thinks, they're not qualified for that reason.

**MR. WESTHEIMER:**  I mean, there's a couple of points on this.  One is --

**THE COURT:**  Okay.  Make them fast because you're going to lose it.

**MR. WESTHEIMER:**  Okay.  When I look at their evidence that they submit, you know, it says [as read]:

        "Ishihara 24 plate test - one error, pass; two
     errors, pass."

That's not our -- that's not a recognizable test that I can see.

But the analysis that's laid out in *Turner* is, you have a certification process.  They do not have the certification.  There is a process --

**THE COURT:**  You're back to the preclusion.

**MR. WESTHEIMER:**  *Turner* analyzes it as:  If you don't -- in order to get your certification, you have to -- I mean, if you are denied it at the first step, you have to file a -- put it another way -- you may appeal it through that process.  You don't have to, but then you're just not certified.  If you do appeal it, then you might get your certification back; but absent that qualification, you're not

qualified.  And it's the licensing board, I mean, that is the certification requirement.

THE COURT:  Okay.  I don't buy your argument because it's your preclusion argument; and frankly, we are not finding -- I'm not finding that there's preclusion, at least at this point.  If I change my mind, you'll hear about it.

MR. WESTHEIMER:  And there's also the -- yeah, the various -- the *Albertson's* defense, that we were relying on, in good faith, on a regulatory scheme that was mandated.

THE COURT:  It's not mandated.  Okay?  I'm not buying *Albertson*.  Skip it.  Okay?  It's not mandated.

You have mandated, okay, Ishihara.  You don't have mandated light cannon.  You have, give them another test if they want another test.  You picked one.  They say it's no good.  All right.  That's the case.  And if they can go forward on it, they have to start with the idea that they're qualified.  Otherwise, they don't have standing.

And I would like to hear what you're saying about the passing per one or more of the doctors who gave the Ishiharas away from Union Pacific.  You say that they find a pass with a higher failure rate than Union Pacific recognizes or what?  Do both of them do it or only one?

MR. WESTHEIMER:  The page that I'm reading from the record is Document 65-19, page 5 of 14.

THE COURT:  Well, okay.  What exhibit number is it?

**MR. WESTHEIMER:** Yes. It is -- it is Mr. Barney's declaration, Exhibit 18.

**THE COURT:** Okay. One second. Let's go to that.

Okay. Here's an ocular examination report. This is the one with the weird first numeral, the date. At first, I thought it was a 3. I'm pretty sure it's a 5, because the way you do a 5 is to do the down part and then do the dash. And if you were doing a 3, it would continue on from the far right of that upper number. So I believe that's a 5 and not a 3.

Okay. David Schymeinsky and George Contos, both ODs in Milpitas, it says [as read]:

"Passed Ishihara color vision . . . no color vision defect."

That's what that doctor thinks.

Okay. And then you said they did not --

**MR. WESTHEIMER:** I'm referring --

**THE COURT:** -- use proper standards.

**MR. WESTHEIMER:** This is on -- it's the third page of --

**THE COURT:** Okay. I have it.

**MR. WESTHEIMER:** Or, I'm sorry. It's on the top, page 5 of 14.

**THE COURT:** Oh, okay. So the Bates number would be 27.

**MR. WESTHEIMER:** Bates Number 27, at the bottom.

**THE COURT:**  Yes.  Okay.

**MR. WESTHEIMER:**  And I'm looking at -- on the top, there's some enumeration:  5, 6, 7, 8.  I'm looking at line 6, "Ishihara 24 plate Edition."

**THE COURT:**  Wait.  You're going too fast.  Where do you want me to look?

**MR. WESTHEIMER:**  This is on that page.  On the top there's some numbers -- listed numbers:  5, 6, 7, 8.  I'm looking at the number 6.

**THE COURT:**  Wait.  Oh, 6.  Yeah.  Okay.

**MR. WESTHEIMER:**  So it's -- what I'm seeing here is [as read]:

"Ishihara 24 plate Edition, plates 1 through 15."

I'm seeing [as read]:

"One error, pass."

And then I'm seeing [as read]:

"Two errors, pass."

**THE COURT:**  I don't know what it means, to be honest. One says [as read]:

"OD:  One error."

And then it says [as read]:

"OS:  Two errors."

Frankly, on another part -- and I don't even know what those are -- he's got six errors at one point and seven on

another.

Oh, no, I know what that means.  I think that's saying how many errors you can have.  Okay?  And then they go [as read]:

"No errors."

Okay.  So the first test, this Lanthony desaturated test, you have to have no errors on one part and only two on the other.  And it says [as read]:

"Pass.  Pass."

So you're saying that it looks like they're thinking, on this Ishihara, which is Item 6, that you could have one error at one point and two on the other.

I don't, frankly, know what that means, and I also don't know if he had those errors or not.  In other words, his burden, if he wanted to show this, would be to say whether he had no errors.  He could have had one or two or three.  But the argument is that they're allowing three -- at least it looks like three total.  And I don't know how the Ishihara that Union Pacific gives is scored.

**MR. BARNEY:**  The Ishihara, under the FRA regulations, is a 14 plate.  You're able to make -- I think it's no more than two errors overall.  And there's a range.  I believe it's -- I think it's three through ten, you can't have any errors on, or you can only have one error.  It's very specific.

And -- but this is an entirely -- this is a different test.  This is the Ishihara 24 plate.

**THE COURT:** Okay. What he has is a -- they say [as read]:

"Impressions: He has clinically normal color vision . . . ."

That's a quote.

**MR. BARNEY:** It also indicates that he had an anomaloscope, which Drs. Holland, Rabin, Ivan, and Dr. Neitz have all testified to being the gold standard in color vision testing. And it does indicate that he has an extremely mild deuteranomalous defect.

**THE COURT:** That's red-green color blind.

**MR. BARNEY:** Yes, exactly. And red-green color blind specifically of the anomalous trichromat.

**THE COURT:** Okay. It seems like it's enough. I mean, it could be challenged as an opinion, but I think it's enough to -- it's in the time frame. And so you have somebody in the field saying he's okay.

If we try -- I couldn't read all of the charts and diagrams that support this -- or are offered in support, and it may explain things more clearly. But they were pretty hard to read, and I frankly didn't -- don't know what they mean without looking at somebody's testimony to explain what they mean.

But -- well, that was one of the tests. But then there was another test that was done. That one was the -- what I believe is May of 2017.

And then the June 1 of 2017 from Dr. Ko, do you have a criticism of that one, Mr. Westheimer?

**MR. WESTHEIMER:**  I think my criticism across the board is these are not the tests that are certified to --

**THE COURT:**  Okay.  Fine.  Okay.  I accept that argument, but I'm not buying it.  I mean, I understand you're making it.

But I do want to go back for a minute because we're not talking about who has the better case here.  What we're talking about, does the plaintiff have any case, assuming that we get to the merits?  And we're currently on the merits.  We're not on the affirmative defenses.

So the question is whether there's a triable issue.  You went forward.  The defendant has the burden, to start with, on summary judgment, even though the plaintiff would have the burden at trial.

So the defendant has a couple of ways they can do it. They can either put in evidence themselves or they can say, "We've gone through discovery.  Discovery is closed.  You have admitted that you have no more evidence than this, and you don't have enough evidence."  So you could do it two ways. All right.

The defendant went forward and said:  We are going to show he's not qualified.  That's why he didn't get to keep the job because he flunked Ishihara and then he flunked our light

cannon test.  All right?  That's enough to go forward.

The plaintiff comes back and says:  Yeah, if you had us a good second test, that would be the end of the discussion, but we don't concede you have a good test.  It has problems.  We'll get to those problems later.  But he says it has problems.

So, and then they say:  And furthermore, our client went to a couple of different optometrists and that they both thought he was fine, that he didn't have an impairment.

Now, keep in mind, they're not railroad people.  They may not know all the specific ins and outs that you need when you're driving a train under field conditions.  But in their view, Donahue doesn't have a particularly bad problem.  It can be bad for flying a plane, driving a train, but we'll get to that.  The point is, in their view, he's qualified to do this, that he's passed these tests.

So if that's enough to go forward, then the plaintiff will have shown Donahue is qualified enough to go to trial on the issue.  Not to win it, to go to trial on it.

Then you've got two other people.  One of them doesn't take any other tests.  And the position for Donahue and Campbell -- I'm sorry -- Goss and Campbell is:  Hey, we've been driving these trains for years.  We haven't run into anything.  That's good enough to show we're qualified.

I'm not accepting that.  Okay?  I understand the argument can be made.  One judge did accept it or at least accepted -- I

take that back.  Didn't -- that plaintiff wasn't relying on their driving record, in effect.  They were relying on tests they had taken at some point along the way.

But -- and that was -- I've got to go back to look and see which case that was.

**MR. BARNEY:**  It may have been *Mills*.  It was likely *Mills*.

**THE COURT:**  *Mills* probably.

**MR. BARNEY:**  In this case, each one of these individuals passed previous CMCs.

**THE COURT:**  You're talking about our people.  I don't buy Mills' argument.  Okay?  My feeling is that you have to have a current test of some sort, that the railroad itself requires testing every three years.  That's an indication that conditions can change.

And so what you have here is:  Do you have something that's at least within the ballpark of being around the time that you were decertified as a plaintiff?

Donahue has it.  All right?  Goss has nothing, and Campbell has a test that is disfavored by the FRA because, if you wanted to put it in pejorative terms, he cheated.  He wore chromatic lenses.  All right.  So you can't use them for Ishihara.  The regulations say:  I'm sorry.  You can't use it at all.  And then they say the individual railroads can decide whether to use it and that, if you could decide, we don't think

it's a good idea.

All right.  So I am going to accept that they do not think that it's appropriate really to use chromatic lenses, and so I don't think Campbell gets into the ballpark.

If one just wanted to say we've managed to skate along and not run into anything for 15, 16 years, it's an argument that could be made, I guess, but I'm not going to accept it.  It's like saying there's a big drop off a cliff and there's nothing blocking people from walking off it and nobody's walked off it yet, so it's safe.  And I don't think that's true.  So I'm not going to accept it.

**MR. BARNEY:**  But, Your Honor, you may have -- maybe I misunderstood you earlier; but that's not the -- that's not -- past clean records are indicative of them being safe.  That's not the argument.

The argument is that they had previous testing over the years.  It wasn't just that they didn't crash into anything.  It's that they were tested multiple times --

**THE COURT:**  Right.  But one --

**MR. BARNEY:**  -- and passed that testing.

**THE COURT:**  One of the tests is a test somebody crashed after passing, which is why they got rid of it, because it, I guess, allowed people to figure out the -- to figure out the color of a signal by its location, for example, as opposed to really discerning a color differential.

So I think we have to go, if they passed anything very recently, when was the most recent test that either Campbell or Goss passed?

**MR. BARNEY:**  It would have been three years before.

**THE COURT:**  Pardon?

**MR. BARNEY:**  It would have been three years before for the -- other than the disfavored test.

**THE COURT:**  I think it's a problem.  But I do think Donahue is differently situated.

**MR. BARNEY:**  Your Honor, the issue of qualification under the base analysis is not quite so black and white as:  Do you have this specific -- do you have this specific proof of, in this case, a past test?  It's a question of whether you have the requisite skill, training, experience, and other various job-related requirements, and whether or not you are able to pass -- whether or not you're able to perform the job functions with or without an accommodation.

**THE COURT:**  Right.

**MR. BARNEY:**  I think under that standard -- I understand what you're saying, that's that the lack of a current test, of a test that's immediately, at the same time, that would be, from our perspective, pretty dispositive, but that would be much stronger evidence.

But past performance and past performance on tests does seem to at least give a -- enough evidence that a jury could

find, under the *Bates* standard, that there's qualification. Maybe not under a standard where they require the specific qualification -- sorry -- the specific qualification standard, which *Bates* differentiates.

THE COURT:  Well, okay.  The court reporter is going to need a break, and I'll just say this.

Obviously, the legal standard is whether you can perform the essential functions of the job with or without accommodation.  All right?  But then how do you show you can?  And that's where we are.

In other words, there's no test that's based on you're only qualified if you pass a test.  All right?  It's a general statement.  And then you look at each case to see how one shows that somebody is or is not qualified.

The defendant came forward and said:  You're not qualified because you flunked a couple of tests.  All right?  That puts the burden on the plaintiff to come back and not just challenge the test that they don't like, but to show that they could pass a valid test or something else to show.  It's not limited to testing, but there's certain -- there are only certain ways you can show in any given case.

So if your job requires climbing up buildings using grappling hooks, then you've got to show you can do it, not just say, "I don't like your test."

So, okay.  I'm going to take a 15-minute break at the

Case 3:21-cv-00448-MMC   Document 127   Filed 07/11/25   Page 60 of 99   60

court reporter's request -- reasonable request.

Let's stay off the record.

(Discussion off the record.)

**THE COURT:** We're going to take a break now, giving the court reporter and everybody, including Ms. Geiger, ten minutes.

And you're going to have to call. So we've got 10:40. So we'll come back at -- if we came back here, it would be just before 11:00, but we can take these case managements if you're up to it.

So why don't you come back, then, in a half hour. Okay? And if you're a little past a half hour, don't break your neck because I don't know that I'll guarantee we'll be back.

(Recess taken at 10:41 a.m.)

(Proceedings resumed at 11:40 a.m.)

**THE COURT:** All right. Returning to the matter of this morning's hearing, Donahue versus Union Pacific.

I'm sorry, Counsel. That was totally not an adequate assessment of how long that calendar was going to be, but the last matter is what really threw everything off, unfortunately.

Okay. So when we broke, where were we exactly in this discussion of sorts? Does anybody remember?

**MR. WESTHEIMER:** I believe we were talking about disparate treatment and plaintiffs' qualification, whether they were qualified.

**THE COURT:** Oh, I think we were just dealing with the qualifications and that the last thing that plaintiffs' counsel wanted to just make a point on was that there are lots of ways to show qualification, it doesn't necessarily have to be with a test, and that you just have to show that you're able to do the job.

And anyway --

**MR. WESTHEIMER:** May I speak to that, Your Honor?

**THE COURT:** No, because you're going to go right back to saying that you have to be certified to be qualified.

**MR. WESTHEIMER:** No, Your Honor.

**THE COURT:** Oh, okay.

**MR. WESTHEIMER:** I mean, I think what I was going to do -- I mean, the qualifications for the position are in the record, and that is the position descriptions for these two positions. They're in the record at Rhoten Declaration Exhibits E and F.

Now, in both of these, the qualifications and the essential functions of the position are not you have to have -- the way it's being described. It is stated -- it's identical -- or the requirements are identical in both of them, but in the essential functions of the position --

**THE COURT:** Interpret signals.

**MR. WESTHEIMER:** Yes, interpreting signals.

**THE COURT:** Yes, I know.

MR. WESTHEIMER:  And then you have to -- and the job requirement is you have to be able to discriminate colors in signal displays --

THE COURT:  Yes.

MR. WESTHEIMER:  -- and meet the FRA color vision standards.

So it is directly in the qualification provisions, not just that you can see fine but that you have to meet specifically FRA color vision standards.

There's no evidence in the record that there's been any testing as far as -- it's not so much whether you -- the actual evidence in the record is that Mr. Donahue has an eye condition.  Okay?  Now, you can debate whether it's normal or not normal.  Those are just, you know, words.  The question isn't that.  The question is whether he has -- can read train signals, and that's what the FRA testing requirement is meant to go to.  It's not meant to give people diagnoses.  You're not taking this test to get a diagnosis.  You're there to see if you can pass a test to read train signals.

THE COURT:  Okay.  So one --

MR. WESTHEIMER:  No evidence in the record --

THE COURT:  -- of the ways that you determine, by Union Pacific, that somebody is qualified to interpret signals is if they pass Ishihara.

All right?  This man went and passed Ishihara.  Not your

Ishihara.  Somebody else's Ishihara.  Okay.  Nobody is saying that Ishihara replicates the field or what people have to do out in the field.  And it is certified as, if you pass it, you are okay to run a train.  Right?  Nothing about have to pass out in the field, that the Ishihara isn't signals and all the distractions that go along with riding a train.  You're just sitting there, looking at something.  It's nothing like the real world.  And if you pass it, that's good enough per your client.

All right.  So --

**MR. WESTHEIMER:**  All three plaintiffs --

**THE COURT:**  I'm just going to say this.  I'm not going to hear any more on that point because your position is that they don't have a good test to show they're qualified.
All right?

Obviously, Union Pacific has a test to show you're qualified.  They don't go out and look at somebody and see if he can see signals out in the real world.  They do a test.  And the first one is Ishihara, which doesn't look anything like the real world, but it does test whether you can see green and see red as green and red.

All right.  If you pass it, they go:  That's good enough.  I guess you can see signals.  If you don't pass it, they say:  Well, maybe for some reason that's not fair, and maybe you can pass some other test.

So then they gave him a test, and he didn't pass it.  So he says:  Well, it's not really a fair test.  It's not a good test.  Whatever.

That is a challenge to your certification process.

And then he says -- now, I'm just talking about Donahue -- that he has, in the same general time period, passed the Ishihara test.  Not just that the doctor said, "Looks to me like you have normal vision," although if they did say that, that tends to suggest you don't have an impairment.  Okay?  And if you don't have an impairment, then you should be able to see the colors of the signals.  But everybody's doing it by tests.

And so you seem to be saying there's something wrong with the Ishihara that he took, at least with the one doctor because it allowed for three fails.

**MR. WESTHEIMER:**  Your Honor, the record is undisputed that all three plaintiffs failed the Ishihara tests in the first go-around when they took the official testing with us.

**THE COURT:**  Okay.  Here's what I'm going to do.  I'm going to stop that because we may not have to get to this.

All right.  I'm going to find, just for now -- all right?  And then we can get back to Donahue if we have to.  I'm going to find that there has not been a triable issue raised as to Campbell or Goss.  This is a preliminary finding, and if I change my mind, I will let you know.  Otherwise, that's what I'm finding for the reasons I've said, and that there is enough

of a triable issue raised as to Donahue.

Now, the next question is:  Was there an adverse employment action taken?  Yes.  All right?  He was removed from service.

So the next question is:  Was there a discriminatory reason for removing him from service based on his disability or perceived disability; namely, color blindness.  All right?

Now, again, I do not think there's direct evidence that the railroad -- I'm sorry -- removed him because they were -- I guess just best to say they were removing him because he was color blind.  All right?  But it did play some role -- all right? -- in the determination they made.

So if I were trying to come up with some idea of how to use *McDonnell Douglas* in a way that's reasonable without simply reiterating the elements, which doesn't do anything for anybody, I guess I could say that at least there's some showing that it may have been their reason because they mentioned it.

Okay.  If that were the case, it wouldn't be direct evidence of that's the real reason that they got rid of him; but it would be, at least for a *McDonnell Douglas* showing, a fact, kind of like when we were looking at:  You're qualified; you're African American; a white person got the job.  Okay.

So I assume they did replace him with somebody who -- I don't really know because there's no showing.

MR. BARNEY:  Very complicated answer to that --

**THE COURT:**  Okay.

**MR. BARNEY:**  -- question.

There wouldn't --

**THE COURT:**  Hard to do.

**MR. BARNEY:**  -- be a specific person who was --

**THE COURT:**  All right.  Because if you track *McDonnell Douglas* and simply airlifted into ADR -- not ADR, but ADA -- you could say, "Well, who got that job that he was removed from?"

And one might say, "Well, just an absolute normal vision person got it," or you could say, "Oh, here's a guy who passed whatever the light cannon test was so he got it," or whatever, and then there'd be a problem.

So anyway, all I'm saying is because we don't really know any of that, I'm going to plug in, they said, when the doctor wrote it, "Not certified," and the reason that he puts down is this vision problem -- okay? -- or condition.

Then the question is:  Does that then require the defendant, though, in the first instance, to go forward and show why he was not certified, why he was removed?  Okay?

And the defendant's evidence is:  You did not pass the light cannon test.  Okay?

And then the plaintiff says -- and the defendant says:  We didn't remove you because of your condition but because with that condition, you're not qualified.  Not because of the

condition you're not qualified, but with that condition in this instance, you're not qualified.  Other people who are color blind may qualify, but you're not.  Okay?  And then they say because of the test.

At which point your client says:  That's not a good test. People have criticized it.  It hasn't really been tested that much on people to see if it works.

And that raises a triable issue as to whether it's a good test and whether or not he's qualified, but not whether it's an actionable reason, even if it's wrong.  All right?

As long as they, in good faith, make a mistake that doesn't deal with him being disabled but, rather, his ability to see certain things that you need to see in order to be a qualified individual, then they've gone forward.  All right?

So if they've gone forward and said, "Look, it's not because you're color blind.  If you're color blind and you can pass our test, it's fine.  But you didn't pass it."

Some other color blind people may have.  They didn't put in any evidence that way one way or the other, I don't think. Not sure.

Now, do you have any evidence of pretext, assuming we're in *McDonnell Douglas*?  You didn't argue it really.

**MR. BARNEY:**  Well, we argued that the nature of the -- the nature of the -- because of -- it was that -- it was the failure to pass a test that is specifically designed to -- to

assess color vision just means that it's all intertwined.  And the standard --

**THE COURT:**  Okay.

**MR. BARNEY:**  The standard -- sorry.  The standard under the model -- the Ninth Circuit model rules is whether or not it is a but-for cause, whether or not disability --

**THE COURT:**  Right.

**MR. BARNEY:**  -- whether disability is a but-for cause of the termination, not whether the -- not whether a desire to remove somebody because of disability is the but-for cause.

And here, it's impossible to disentangle those two things.

**THE COURT:**  It's possible.  Maybe you're right, but I'm not sure that you're right because if in every other discrimination case, if somebody says, "I made a mistake about why we didn't hire you.  It's not because you're old or you're a woman or you're black or whatever, but your qualifications don't match up," that person doesn't have a lawsuit.  And I don't know why people who claim to be disabled or claim to be perceived as disabled should be any better off, because what you're saying is you get an absolute free ride.  If you're qualified and somebody thought you weren't, they're liable.

And that is not the case in any other one of these cases and brings you directly into the whole regulatory scheme. All right?  Because the whole regulatory scheme is just devoted to are you qualified.  And if you've got nothing more than an

"are you qualified" case and that you don't go through any of the other steps except to see if you had some adverse action and then you stop, then it's really no different than what's going on in the regulatory scheme, and you have to have another element.

They're not interested -- look, I don't think Congress was interested in arbitrating, essentially, regular disputes between disabled people and their employers or otherwise but, rather, to avoid people being discriminated against because they have a disability, discriminated against because you're an African American, because you're a woman, things that you can't change that may have nothing to do with the job.

But what if they do?  Being black doesn't have anything to do with the job.  Being old might.  All right?  But probably not.  But it could.  But it wouldn't be just because you're old.  It's because as you get older, it's harder to do certain things physically in many instances, and then other people are out there running marathons in, you know, their 80s.  But, again, it could overlap with age.  It can overlap, and probably does, with disability.

But the person still has to do more than show they're qualified.  Otherwise, every time some employer makes a mistake in good faith about someone's ability to do a job, they're going to be liable, with all of the panoply of relief that goes with this kind of a violation, as opposed to a simple "You

fired me without cause."  All right?

And if you wanted to say, "Where can they go?" I'm assuming they have a union; I'm assuming they can't be fired except for good cause; I'm assuming they can't be reassigned except for good cause if it's going to be to an assignment that's in a lesser level of whatever.  And so they would have -- either there's a CBA that they're stuck with arbitration to litigate that, or they don't have that kind of provision and they could go to court and bring a wrongful termination or wrongful whatever case.

But to turn it into a discrimination case which says somebody -- yeah, you don't have to dislike them, but you have to say, "I don't care whether you qualified or not.  You're not getting the job because you're disabled."

MR. BARNEY:  Your Honor, the statute does -- this is why the statute is written in a way that's intended to include perceived as disabled and designed to avoid stereotypes and misunderstandings and things like this --

THE COURT:  Right.

MR. BARNEY:  -- because implicit bias does exist.

And people may make a decision not consciously thinking -- we don't know what's in somebody's heart.  The decision-maker may make a decision not based on -- thinking that it's based on a reasonable misunder- -- on a good faith mistake.

THE COURT:  All right.  Let me stop you.

**MR. WESTHEIMER:**  Your Honor --

**THE COURT:**  If you're right, why is there a third element?

**MR. BARNEY:**  You mean --

**THE COURT:**  All right.  In other words, the third element of the elements to show a claim, your first one is you're qualified; second, there's an adverse decision; and then you say the adverse decision could have been read to be that somebody found you unqualified when you are.

**MR. BARNEY:**  But the nexus between -- between the qualification, the disability, and the decision is because of -- it's a but-for cause standard.  It's not a question of whether they -- there's nothing written into the statute that says:  Oops, we made a mistake.  We put our head in the sand.  We made a bad test.  We put our head in the sand.  It turned out that it had this horrible effect, but we didn't realize it.

They went step by step, deciding not to do proper validation, do proper --

**THE COURT:**  That's a different question.  All right?

**MR. WESTHEIMER:**  Your Honor --

**THE COURT:**  The real question is whether they have to have an intent of some sort that doesn't -- that is more than just their disability played a role in some way because --

**MR. BARNEY:**  But there's no intent -- there's no intent written into the statute.

**THE COURT:** No, no. Well, it is because you say you were fired -- if you use, like, Title VII, which reads the same way on the elements, it just says that the last one is -- let's do it. Let's look at it. Hold on. Okay. Let's take a look right now.

I know what your argument is. Maybe you're right, but I don't think you are. It would mean that ADA is different than Title VII, and maybe you're right for that reason.

**MR. BARNEY:** And also --

**MR. WESTHEIMER:** Your Honor, disparate treatment is intentional discrimination.

**THE COURT:** Okay. Disparate treatment, Title VII. Okay. All right. The plaintiff had some adverse decision like fired, not hired, demoted. The plaintiff was qualified.

Oh, that's -- I'm sorry. This is going to be similarly situated people were treated more favorably. Sorry. That's going to be *McDonnell Douglas*. Do they have a disparate treatment in which -- because the jurors don't do, really, *McDonnell Douglas*.

**MR. BARNEY:** Are you -- are you looking at the --

**THE COURT:** I'm looking at Title VII, but I'm going to go to ADA.

Okay. ADA. They have a separate one for "regarded as." You're relying on "regarded as"? In other words, there's nothing wrong with your people.

**MR. BARNEY:**  They don't have anything that interferes with the daily -- yes.  Essentially, yes.

**THE COURT:**  Okay.  All right.  All right.  So it says the plaintiff was regarded as having a physical or mental impairment, plaintiff was qualified, as defined later, and they were -- some adverse decision.

Okay.  Let's see.  It says he was discharged because he was regarded as having an impairment.  Now, the question is whether that means that that's the only reason you were discharged, you were regarded as having an impairment; or whether it means that they thought you were not qualified because you had an impairment, for example, because the way it reads is just if -- if they thought you have an impairment, if they think you're African American and you're not -- I have a friend who tried to get an apartment and was turned down because the people thought that he was African American.  He's not African American.  But anyway, it's kind of an interesting story but...

**MR. BARNEY:**  So, Your Honor, if I may --

**THE COURT:**  The point is, if you thought somebody was African American and you plugged that in here, what you get is that if you find that they were not hired because they're African American -- okay? -- that would require -- if somebody said, "But I thought they weren't qualified," they would be able to make that defense in that case because the way one

would have to read that is the only reason that they got fired is because they're black.  Okay?  So not because somebody made some mistake about something; that as I understand the case law, a mistake doesn't make you liable if it's in good faith.

Now, let's go back to what happens if you are looking at it from the ADA standpoint.  Do you read it the same way that you are fired because you have the disability, or is it -- in other words, you're a disabled person or you're perceived as disabled and that's why we're going to fire you -- or not hire you is a little cleaner -- not hire you because you have color blindness or you have a short leg or you have -- I don't know -- something?

**MR. BARNEY:**  Your Honor --

**THE COURT:**  Sleep apnea.

Anyway, whatever your problem is, if it is simply that's something they know about -- all right? -- and then they find -- they test you, though, and they say, "If you pass, we keep you."  All right?  "If you pass this test, we're going to keep you, even though you're color blind."

**MR. WESTHEIMER:**  Yes.  Can I speak to that for just --

**THE COURT:**  Just a minute.

"But if you don't pass, we're not going to keep you, not because you're color blind but because you didn't pass the test."

So the question is really:  If you have a disability and

the only reason that they don't hire you or they fire you is because you are disabled, the only reason, and that's how you're -- if you're not reading it that way, okay.

**MR. BARNEY:**  The Model Rules 12.1 indicates that "because of" is defined in the same way that it's defined under Title VII, "disparate treatment," under the model rules --

**THE COURT:**  Is it the only reason?

**MR. BARNEY:**  -- which is 10.3.

No, it's not the only reason.

**THE COURT:**  What is it?

**MR. BARNEY:**  It's [as read]:

"'Because of' means 'by reason of' or 'on account of.'  This is sometimes referred to as 'but-for causation.'  This form of causation is shown whenever a particular outcome would not have happened 'but for' the purported cause."

**THE COURT:**  Yes, the purported cause being, in this instance, you're not qualified.

**MR. BARNEY:**  But --

**MR. WESTHEIMER:**  Your Honor --

**MR. BARNEY:**  -- it goes on to say [as read]:

"In the context of" --

"A but-for" -- "A but-for test directs us to change one thing at a time and see if" -- "at a time and see if it changes outcomes.  If it does, we have

found a 'but-for cause.'  Often, other events have multiple but-for causes.  For example . . . ."  Then it goes on.  But then it says [as read]:

"In the context of this claim, a defendant cannot avoid liability just by citing some other factor that contributed to the challenged employment decision."

So it's explicitly saying it is not a sole cause standard.

**THE COURT:**  But it says [as read]:

"A defendant cannot avoid liability just by citing some other factor that contributed."

Okay?

**MR. BARNEY:**  But the last sentence is [as read]:

"A 'but-for' -- "A 'but-for cause' does not mean the sole cause or even a primary cause."

**THE COURT:**  Yes.  Okay.  Either way, the question is:  Is it the reason?

It's how you read it.  If you want to read it as follows: "I'm qualified.  You said I'm not, and you said I'm not because of my failure to pass some test.  But it's really because I have color blindness," well, they say, "No, it's because you didn't pass the test."  All right?

**MR. WESTHEIMER:**  Your Honor --

**THE COURT:**  "We give this test to people."

**MR. WESTHEIMER:**  And if I could speak to that, that's

why there are two tests.  Okay?  This is a two-step process.

There's no dispute that Donahue and the other two failed the first test, and that's what put them into the world of the second test.  And at this point, we're only talking about my client's intent, you know, and whether there's some type of intent or not.

They're not looking to see whether he has a vision deficiency.  They're looking to see if he can sufficiently read train signals, and that's what the tests are.

I accept if you pass the Ishihara in their testing process, then you've made it, but they didn't.  They failed it, all of them.  So that put them into -- and that's where, in the record, the rules -- the interim rules of the FRA from November 2015 -- and that's the cite to the Federal Register.  The FRA issued interpretive guidance on this.  It's in Rhoten Declaration Exhibit J.

But that's where they're saying it's not enough.  Okay?  So you failed Ishihara.  You have -- you still aren't barred from the job just because you have that disability.  You now get to do a field test, and we can see whether, despite that disability, you can still read train signals.

THE COURT:  Okay.  The point here is, there's a disagreement about what "because" means.  Okay?  Now, plaintiff is saying "because" means that if I've got a disability and I get fired and I am a disabled person and it has something to do

with my disability that I'm fired, that's it.  Okay?

I don't think that's quite what it means.  I think it means that that's the reason, because you're disabled, not because -- in other words, you have to start with you're qualified -- all right? -- because, otherwise, they shouldn't be stuck with you, but that -- and it doesn't have to be a hatred -- I understand that -- or an animosity; but it has to be that that is the reason, that characteristic, if you want to put it that way, that characteristic is what caused them to take the action they did.

Now, if it is, they can't say, "And, by the way, you were late ten times.  We don't like late people," or "You punched out a co-worker," or whatever it was.  That's not going to change it if, in fact, one of the reasons that made up the reasoning is the characteristic, if you will.  So I'm just going to call it an immutable characteristic.

Okay.  And here, they're saying it's not your characteristic; it's your inability to pass certain tests.

And you go, "Yeah, but that's because of our characteristic" and then "or at least what you see as our characteristic."

But I don't see them as totally overlapping.  Now, I could be wrong.

MR. BARNEY:  Your Honor, but one leads to --

THE COURT:  But I understand your argument.

**MR. BARNEY:**  But one leads to the next.

**THE COURT:**  Not necessarily.  There are people who can be -- you, yourself, by saying "Their test is no good" are, in effect, implicitly recognizing there are tests that red-green color blind people can pass.  All right?

So it isn't as if you're always going to fail a test if you're red-green color blind.  And, in fact, they recognize -- in the FRA, they've recognized maybe you can't pass Ishihara, but maybe that's too remote from what you folks do.  So we're going to do a field test.

But the point is, I'm not -- I understand what you're saying.  You're saying if all I show is I've got a disability and when I was discharged, they said your eyesight is making it so you can't pass the test -- okay? -- maybe it is -- maybe they can't pass it for some other reason.

**MR. WESTHEIMER:**  We don't say why.

**THE COURT:**  They didn't actually say that.

**MR. WESTHEIMER:**  We don't say why.

**THE COURT:**  But they do just point -- no, they point.  They do point to the condition.

But what the role is, I'm not sure because it's just where -- let me find one for a second.  Let me see if I can find one.

Let's see.  All right.  Dr. Holland regarding Campbell, I'd have to -- we can look at Exhibit 19.  And he cited a

reportable health condition.  But if we want to put it in context, we probably should.  Let's just look at what he said.

So the form says -- it's a form where you say "I certify that"; then you fill in the person's name.  Okay.  And it says he's been disabled from performing his regular occupation from X to Y dates due to the following condition [as read]:

"Reportable Health Condition - Vision."

Now, this is like a disability thing, and it's not even necessarily, as I understand it, what ultimately happened here, but it could be.  But it's not -- it doesn't take into consideration any of the other things because that's not the role of the form.  Okay.

MR. BARNEY:  Your Honor, if I may, the form has changed.  They've changed the way they fill this form out.  It's obviously not in the record.  But the form -- as they fill it out now, they say "Unable to pass" -- "Unable to pass certification."

THE COURT:  Maybe because of the lawsuits.

MR. BARNEY:  I would think so.

But if you look at Exhibit 17, which is Mr. Donahue's, it says --

THE COURT:  [As read]:

"Color vision deficit."

MR. BARNEY:  It says -- yes.  He was removed [as read]:

". . . due to the following conditions:  Color vision deficit."

**THE COURT:**  But the problem is these are medical things.  All right?  So this is not somebody filling out a legal document or what have you.  But they're filling it out, and they say he's medically cleared to work with restrictions.  And he says here -- all right.  He calls it -- yeah, he says "Color vision deficit."  No question.

But that's not it.  In other words, somebody didn't go like this:  Hello, Dr. Holland.  Let's test your eyes here.  I'm going to give you the Ishihara.  Okay.  It looks like you've got red-green color blindness.  You're out of a job.

Okay.  It doesn't go that way because they're not necessarily saying automatically -- or they could just ask someone, "Are you red-green color blind?"

"Yes, I am."

"We're not hiring you."

"Are you red-green color blind?"

"Yeah."

"Oh, we didn't know that before.  You're not going to be able to run a train."

So if, in fact, they're inextricably intertwined, which you are endeavoring to say, then your position is well-taken; but I don't think they're inextricably intertwined.  I think you can pull them apart.

Just a minute.

So if I'm wrong -- I'll go back and think about it.  Okay?  But I don't think you're correct.  Discrimination because of means because you have a characteristic.  Okay?  You can be a hunchback.  You can have red-green color blindness, which they have, whether they want to acknowledge it as being a disability or not for purposes of standing in a lawsuit.  They don't need it as long as somebody thinks they're disabled.  And they do.  They say right there:  You're disabled because you have red-green color blind.  So you have shown they're regarded as disabled.

Now, is that why they got taken from their position?  The defendant says, "No, it's not because you're red-green color blind.  It's because you couldn't pass a test.  If you weren't red-green color blind and you couldn't pass the test, you're still out of a job."

And so that's what they're doing.  And if you are correct that all you have to show is "I'm qualified; they thought I wasn't; and therefore, I have a lawsuit because they thought I was not qualified and I do have red-green color blindness, as opposed to I'm not qualified because I have red-green color blindness" --

            **MR. WESTHEIMER:**  Your Honor --

            **MR. BARNEY:**  Your Honor --

            **MR. WESTHEIMER:**  I'm sorry.  Go ahead.

**MR. BARNEY:**  I'm just going to address that.

The characterization of the argument we're making is a little -- I don't think that's quite accurate because the argument we're making is not that -- so they're used to -- for years, there was a -- there was a -- any part, how small, or contributing factor standard for causation under the ADA.  That was --

**THE COURT:**  I'm sorry.  A what causation?

**MR. BARNEY:**  A contributing factor standard.

**THE COURT:**  Yeah.  They made it tougher.

**MR. BARNEY:**  It made it much easier for a plaintiff to demonstrate causation.

**THE COURT:**  But for?

**MR. BARNEY:**  No, no.  Because before now, it was any -- before several years ago, the standard was a contributing factor for plaintiff.  That was -- that was overturned.  But they also didn't go as far as to say sole reason.  We're saying it's a middle ground where it's a --

**THE COURT:**  No.

**MR. BARNEY:**  -- it's one of a series of reasons.

And the example you gave about somebody with a --

**THE COURT:**  If you pull it out, you don't have a case if they have a series of reasons and you say you would have been fired anyway without it.

**MR. BARNEY:**  Right.  And what we're saying is that

without the condition and their identification of the condition, the series of events would not have happened.

But I also --

**THE COURT:**  I don't read it that way.  When they're talking about other reasons, they're talking about reasons that are separate from whatever it is.

So, say, "We didn't hire them because they're a woman, but also they've got this; they've got that; what have you."

And then you say, "Well, would you have hired them with all those other things if they weren't a woman?"

"Yeah, we would have."

**MR. BARNEY:**  But, Your Honor, that's not what the Court in *Bates* says.

**THE COURT:**  Either way.  Either way, it isn't what you're saying.  There are no other characteristics.  The only characteristic here that you are saying counts is the fact that they are -- okay.  You're saying it doesn't matter whether you pass a test or not because you are disabled.

**MR. BARNEY:**  I'll say that the question of the test, the efficacy of the test, whether or not they pass it, is a question of the defenses, the business necessity and direct threat defenses.

**THE COURT:**  Okay.

**MR. WESTHEIMER:**  Your Honor --

**THE COURT:**  I think I can articulate it this way:  If

they did not remove Mr. Donahue simply because he is red-green color blind or they -- all right? -- if they didn't remove him for that reason but they removed him for a legitimate reason that he didn't pass a test, then I don't think you have a case.

If they came up with a lot of other reasons about his qualifications other than this, if they said, "Oh, he didn't do this, and he didn't do that," and didn't have anything to do with it, then you can look at it and see whether or not the current test, "but for," is applicable or not.

All right.  But all they're saying is that "We gave you a test because you couldn't pass the first test, and so we gave you a second test, and you couldn't pass that either.  And that means that, in our view, you're not qualified."

You go, "Well, that's wrong.  Okay?  Because you just didn't give us a good second test."

Then if you could say, "And you didn't give us a good test because you wanted to get rid of us and it was all a pretext," maybe you could say that, but there's nothing to show that.

Even the criticism up to the time when your client was removed -- okay? -- the criticism is it was too easy, not that it was too hard; that people could figure out that by where the signals were and certain other things, and they really couldn't read the colors, but they could figure it out.

And the suggestions that were made is make them get farther back and don't give them as much time to try and figure

out where they are positionally and do this and that.

Later, years later, they then were told that a number of people with perfectly normal vision couldn't pass the test. And they said, "You know, if you just gave them a couple of more practice choices," because they gave them -- like, before we give you the test, here's a couple of practice runs.  And then they said, "Well, if you gave them four for all the colors instead of just two," and then they go, "Oh, all right.  All the regular vision people now passed and none of the people with red-green color blind passed."

So I just think that there's nothing to show they were acting in bad faith by giving the test.  If anything, it was to the benefit of the people taking it, not to the benefit of Union Pacific.  It was too easy.

**MR. WESTHEIMER:**  Your Honor, I mean, again, the test isn't about whether you have one thing or another.  The test is whether you can read train signals.

**THE COURT:**  Yes.

**MR. WESTHEIMER:**  And so --

**MR. BARNEY:**  It's not a train signal.  Sorry.

**MR. WESTHEIMER:**  Okay.  Well --

**THE COURT:**  What kind of signals did they have to see?

**MR. WESTHEIMER:**  And so --

**THE COURT:**  What kind of signals?

**MR. BARNEY:**  The light cannon device is not an actual

railroad signal.

**THE COURT:** Oh.  Is it supposed to look like one?

**MR. BARNEY:**  It's supposed to approximate it, but it doesn't.

**THE COURT:** Oh, all right.

**MR. WESTHEIMER:** So --

**THE COURT:** Okay.

**MR. WESTHEIMER:**  -- this is the test; we stand by our test.

But the issue here is there's plenty of people that have, in putting it in the plaintiffs' words, this disability that are working; and that's because even though they failed the Ishihara test, they were able to demonstrate that they could read train signals by passing that test, and so they get to work.

**THE COURT:** Okay.  Did you put that evidence in?

**MR. WESTHEIMER:**  Well, it's implicit in what we're saying.

**THE COURT:** No, it's not implicit.  And if you want to say, "Okay.  I just came in, and whoever had it before should have done it and didn't," maybe.  But I can't guess on what's in the record.  You folks all came back on a record that you had plenty of time.  You've had years to look at it.  Okay? And if not you personally, then somebody.  And certainly, you've had months since the time that we had our pretrial.

**MR. WESTHEIMER:** Well, there's no -- there's no evidence in the record whatsoever that anybody was fired because they were disabled, notwithstanding that they passed the light cannon test.

**THE COURT:** Okay. That may be the case, but the burden is on the defendant to a certain extent. So let's see where we are with it.

We may be at the pretext. If so, then the burden would be on the plaintiff to say that "Nobody ever passed this thing, and you knew it, and you just kept letting them do it because you wanted to get rid of red-green color blind people."

**MR. WESTHEIMER:** It's also important --

**THE COURT:** Just a moment. This isn't a total discussion. All right?

And so I do think -- I understand what counsel is saying. All right? If you've got a disability and that you got fired and you're disabled and you shouldn't have been because you were qualified, then you have a case. All right? And I think there is a discriminatory intent that has to be shown because you got fired because of your characteristic.

You say, "Well, it's why we couldn't pass the test." But you don't even want to admit that because you say the test was no good.

So I just -- I would say they're not inextricably intertwined, but it's hard to articulate. And certainly,

nobody's really done much of a job of doing it in any of the cases or I'd be able to quote them.

But I think *Mills* is the only case that is out there that says that if you did fire someone because of not passing the test, then that shows that that's enough to say that you were -- that's direct evidence.  I don't think it's direct evidence of discrimination, but I think that it's evidence that you could use as a fact in a *McDonnell Douglas*.  That's what I'm thinking.

Anyway, all right.  If we do this, I may end up finding that Mr. Donahue doesn't have a case, not because he's unqualified, which could be a triable issue, but because there's no showing that their reason is actionable or pretextual.

And if that's the case, then you're left with impact, which you said you don't want to pursue.

And, Ms. Geiger, I actually did find the complaint; and then when we came back out, I don't think I brought it out with me.  And if you go back and look on my desk, I think it has a red flag on it.

**THE COURTROOM DEPUTY:**  Okay.

**THE COURT:**  Okay.  So, but I don't think it comes in under the umbrella, really, of a disparate treatment claim because I believe disparate treatment says you have to do it because of the person -- in other words, there's an intent

here, not just you're liable if the behavior has occurred.

Okay. So -- but that's interesting that the Title VII, they're using *McDonnell Douglas* as a jury instruction. My understanding is you do not give *McDonnell Douglas* to the jury, that it's a sort of a preliminary thing the Court looks at and then you just give them the elements.

Right. Okay. So Count Two is labeled "Disparate Impact," and then Count One is labeled "Disparate Treatment." And if you were not pursuing -- and failure to accommodate is not being pursued anymore. So if you also didn't pursue disparate impact, I don't see where it comes in under disparate treatment because the elements are so different.

**MR. BARNEY:** The elements under (b)(6) are -- (b)(6) is used in both realms.

**THE COURT:** Well, but it's in one section. In other words, there's not an impact claim -- in other words, the statute doesn't divide them up by headings: Here's one; here's the other. You can bring the claim based on either theory, but they are different theories. And I don't think you can say that an impact claim is part of a treatment claim.

So I don't want you to get sandbagged somewhere here. I'm just telling you that if this case went forward, if I put it under treatment and treatment's gone, treatment's gone. All right? And then you would -- and if you give up your impact claim, you won't have an impact claim.

**MR. BARNEY:** Considering all that --

**THE COURT:** See what I'm saying?

**MR. BARNEY:** -- I would prefer to not withdraw the impact claim, considering --

**THE COURT:** All right. Then that leaves the question of whether or not it, nonetheless, remains out of the case on the Court's earlier order because of the distinction between what was in front of the *DeFries* court and what's in front of our court.

And then if I were not to find that -- if I were to find that I was allowed to go forward on the impact claim, then I do think you've shown that there's a test that purports to be a neutral test, fairly given, that unfairly, according to -- I don't know if it's really that unfair.

It's not a very good case if the problems with the test were that the reviewers thought it should have been stricter. But I'm just saying that it's an awfully hard case to argue that "We would have passed the test if it had been fair, but it was too strict or too wrong in some way," and then I don't know. Anyway --

**MR. BARNEY:** That's precisely --

**THE COURT:** -- I'm just looking at the evidence.

**MR. BARNEY:** I'm sorry. But that is plaintiffs' argument, that the test itself is too strict and, as a result, catches too many people.

**THE COURT:** Right. But then the complaint -- but your argument about it is based on criticism that was made of the test by a couple of people who were retained by UP -- right? -- Raben and whoever the other person was, and that they were -- their criticism sounded like they were going to things that made it easier to pass.

**MR. BARNEY:** That was part of their criticism, but Raben also criticized the test as being unsound because it was catching too many people because it was catching 26 --

**THE COURT:** But that was long after they -- long after they were fired. So it would only go, then -- I see what you're saying. It may not go to show pretext in some way, but it does go to show there were some flaws.

**MR. BARNEY:** It undermines their --

**THE COURT:** That it caught too many people.

**MR. BARNEY:** It undermines their direct defense.

**THE COURT:** Okay. I guess it would be -- although it was a pretty easy fix, as I understand it. I guess since they hadn't fixed it at the time your clients took it, they could make the argument that if they had been given a chance to see more practice tests, as was recommended by Rabin and whoever, that they could have passed possibly.

But it's kind of interesting because when they did the test with the extra practices, I believe that what happened was that the normal-sighted people were fine, but people with color

blindness still failed, even though they were given the extra opportunity.

So it may be that there's a bit of a problem in showing that you would do better if they fix up the test. And I don't know -- I can't remember. I'm sorry. Was there any independent review of the test by a plaintiffs' expert?

**MR. BARNEY:** Not prior to -- not in the record.

**THE COURT:** Not in the record.

Okay. Well, then I think that -- and even Dr. Neitz -- I don't know -- or "Neitz," I guess it is.

**MR. BARNEY:** Neitz.

**THE COURT:** I don't know -- I'd have to go back and look, but I don't know that she actually evaluated the test per se or just talked about it being criticized.

Oh, it's a he?

**MR. BARNEY:** Dr. Neitz has -- to date, has seen the test, has evaluated the test. But by the time that all this was -- but that was only about a month and a half ago.

**THE COURT:** Oh, okay. All right. So I think -- let's recap for a moment.

I have not found that the railroad had to give the light cannon test. They had to give another test beyond Ishihara, but they got to choose what it was. And so there's at least a triable issue as to whether it's a valid test. All right?

That then allowed the plaintiffs to show that they could

pass a valid test and that they were qualified for that reason or some other reason, and they went forward and raised a triable issue as to Donahue.

But I'm finding, unless I change my mind, that Campbell and Goss really didn't have enough in the record to raise a triable issue on qualification.  That means they go out of the analysis, and what we're looking at is what's shown.  But, frankly, if Donahue isn't able to show it beyond, then they would be in the same boat.

In other words, if I found they were qualified and kept going forward, we would get to the same point that, on the merits, it appears to the Court that the defendant had a reason articulated as to why the people were removed from service that was not because the individuals had the characteristic of being color blind, but because they were unable to pass the test that showed they could adequately distinguish colors.

That test is subject to being challenged, and that presents a triable issue, but only on qualification.  Once they come back as to their good faith reason, the plaintiff then would have to show pretext, and there doesn't appear to be anything in the record to show it was pretextual.  They may have made a mistake in relying on it, but it wasn't so bizarre that one can say that nobody in good faith would have accepted those results.  So then that would mean that the treatment case would not survive, again, on the merits.

To the extent it might not have survived on some other affirmative defense, the statute of limitations is out.  I don't think *Albertson's* applies.

There's a question of whether it is precluded, and that's, I think, a tougher question.  But as we stand here today, my inclination is to find it's not precluded by reason of their having a detailed regulatory scheme, that, nonetheless, it's not precluded and that, as to impact, that I may find that the Ninth Circuit let that ruling stand.  Certainly, there was a reason to distinguish that claim, given the history in the *Harris* class action.

And there were no impact claims in any of the cases that pertained here and caused the Ninth Circuit to rule as it did.  So -- just not on appeal in *DeFries*.

So it may be that I end up again back where I was, but I want to be very careful about that because it's a significant case.  All these cases are.  These are jobs that people did have for many years.  I can understand why they're very upset about not keeping them.

And in the same light, we are dealing with a matter of public safety and a matter of somewhat difficult to apply here elements of disparate treatment.

And then the impact, as I say, if it isn't barred, could likely go forward.  So I have to see on that one.  It's important to look at that if it's not time-barred.  Then that

looked to me to be the healthier case.

And ordinarily, I wouldn't try and say to somebody don't give up a claim, but I didn't want -- frankly, I didn't want you to get in a position that you didn't envision, as counsel for plaintiff, because you didn't intend to give up arguments; you just wanted to give up a heading. And I didn't think that you could necessarily get the argument in without the heading. All right?

MR. BARNEY: All right.

THE COURT: And I didn't want you to end up reading an order and saying, "Oh, wait a minute. She never said that." So in fairness, I just wanted to give you an option to change your mind if you want to.

MR. BARNEY: That's appreciated.

THE COURT: Okay. I will issue an order. I'm not sure how detailed it will be.

We've spent -- well, we went from 9:00 to 10:30 and from -- I don't know -- another at least half hour or so now. So we've spent quite a bit of time talking about it. But I want to memorialize in at least some way, if not in full-blown discussion, where I came out on all this. I think you understand it.

And I will take a close look at what you're saying about the intertwining of the events.

MR. BARNEY: And if I could just make the request that

you take one more look at the *Bates* case, its articulation of what is and is not direct evidence, because I feel that this ports almost directly on to that.

**THE COURT:**  Okay.  And I will do that, because if you don't have to rely on *McDonnell Douglas*, you would still have to show discriminatory intent.  And even if you didn't run into the pretext problem, the question would be whether there's any evidence that would suggest that they were not acting on the basis that they say they were, which they say is their one basis.

And you say, oh, it's kind of connected.  Look at this Exhibit 19 and 17 and all.  I'll look at all that.

**MR. WESTHEIMER:**  And if we're looking at *Bates*, just a quick point that it's just a different situation in *Bates* where it was not a legally mandated testing requirement.  It was more of an option.

**THE COURT:**  I wish you'd get off that and stop arguing it because it's not a good argument.  There is no legal -- are you saying you have to give a test?  Yes, that's legally mandated.  But the light cannon wasn't.

**MR. WESTHEIMER:**  Not in *Bates*, though.  In *Bates*, it was just an optional test, which made it little bit more open.

**THE COURT:**  Okay.  They do have to pass a test. All right?  That's legally mandated.  So to that extent, that's not a bad argument.

But when you were arguing that the light cannon is mandated, it's not. A second test is mandated, and it's to help the applicant, not to help the railroad. And the applicant can say, "I'd like to take another test," or they don't have to if they don't want to. You have to make one available.

Okay. Well, very interesting. Okay. I think that we're at wherever we're at for now, and I'll try to get something out. It's been a very busy week with a lot of things going on. So when I can actually catch my breath and get back and get an order out to you, I don't promise, but I try not to take too long doing it. Okay?

**MR. WESTHEIMER:** Thank you, Your Honor.

**MR. BARNEY:** Thank you.

**THE COURT:** Thank you, both. And I'm sorry again for that long hiatus waiting to come back.

Okay. All right. We'll be in recess.

**THE COURTROOM DEPUTY:** Court is in recess.

(Proceedings adjourned at 12:39 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Friday, July 11, 2025


_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter